# PUBLIC REDACTED VERSION OF DOCUMENT CONDITIONALLY FILED UNDER SEAL

**Pierce Bainbridge Beck Price & Hecht LLP**
Brian J. Dunne (SBN 275689)
*bdunne@piercebainbridge.com*
Yavar Bathaee (SBN 282388)
*yavar@piercebainbridge.com*
David L. Hecht (*pro hac vice*)
*dhecht@piercebainbridge.com*
355 South Grand Avenue, 44th Floor
Los Angeles, California 90071
(213) 262-9333

**Dhillon Law Group Inc.**
Harmeet K. Dhillon (SBN 207873)
*harmeet@dhillonlaw.com*
Nitoj Singh (SBN 265005)
*nsingh@dhillonlaw.com*
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700

**White & Case LLP**
Bryan A. Merryman (SBN 134357)
*bmerryman@whitecase.com*
Catherine S. Simonsen (SBN 307325)
*catherine.simonsen@whitecase.com*
555 S. Flower Street, Suite 2700
Los Angeles, CA 90071-2433
Telephone: (213) 620-7700
Facsimile: (213) 452-2329

Bijal V. Vakil (SBN 192878)
*bvakil@whitecase.com*
Jeremy Ostrander (SBN 233489)
*jostrander@whitecase.com*
Hallie Kiernan (SBN 313541)
*hallie.kiernan@whitecase.com*
3000 El Camino Real
Two Palo Alto Square, Suite 900
Palo Alto, CA  94306
Telephone:  (650) 213-0300
Facsimile:  (650) 213-8158

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARIDAN STILES, an individual, STILES 4 U, INC., a California corporation<br><br>Plaintiffs,<br><br>v.<br><br>WALMART INC., and AMERICAN INTERNATIONAL INDUSTRIES,<br><br>Defendants. | Case No. 2:14-cv-02234-MCE-DMC<br><br>**Joint Statement re Discovery Disagreement**<br><br>**Hon. Morrison C. England, Jr.**<br>**U.S. Magistrate Judge Dennis M. Cota**<br><br>**Hearing date: January 15, 2020**<br>**Courtroom: 304**<br>**2986 Bechelli Lane**<br>**Redding, CA 96002**<br>**Time: 10:00 A.M.** |

TABLE OF CONTENTS

I.   DETAILS OF THE CONFERENCES..............................................................2

    A.   Plaintiffs' Contentions .........................................................................2

        1.   Discovery Disputes at Issue ....................................................2

        2.   Description of Meet and Confer Process ...................................2

    B.   Walmart's Contentions ........................................................................5

II.  NATURE OF THE ACTION AND FACTUAL DISPUTES ........................11

    A.   Nature of the Action...........................................................................11

        1.   Plaintiffs' Description.............................................................11

        2.   Defendants' Description .........................................................14

    B.   Issues to be Determined at the Hearing ..............................................20

III. THE CONTENTIONS OF EACH PARTY....................................................21

    A.   First Dispute: Plaintiffs' Request to Take 18 Depositions..................21

        1.   Plaintiffs' Contentions ...........................................................21

        2.   Walmart's Contentions ..........................................................31

    B.   Second Dispute: Walmart's Refusal to Provide Substantive Responses to Plaintiffs' Interrogatories (Set 2) ....................................................45

        1.   Plaintiffs' Contentions ...........................................................46

        2.   Walmart's Contentions: .........................................................49

**Joint Statement re Discovery Disagreement**

1

2

## TABLE OF AUTHORITIES

3

**Page(s)**

4

**Cases**

5

*21X Capital Ltd. v. Werra*,
   2007 U.S. Dist. LEXIS 75487 (N.D. Cal. Oct. 2, 2007)...............................................47, 48

6

*Acosta v. Sw. Fuel Mgmt.*,
   2018 U.S. Dist. LEXIS 54680 (C.D. Cal. Mar. 28, 2018)................................................40

7

8

*Aerojet Rocketdyne, Inc. v. Glob. Aero., Inc.*,
   2018 U.S. Dist. LEXIS 190035 (E.D. Cal. Nov. 6, 2018)................................................37

9

*Aerojet Rocketydyne, Inc. v. Global Aerospace, Inc.*,
   2018 WL 5993585 (E.D. Cal. Nov. 6, 2018).......................................................28, 37, 38

10

11

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
   2006 U.S. Dist. LEXIS 59095 (D.N.J. Aug. 18, 2006)........................................37, 41, 42

12

13

*Archer Daniels Midland Co. v. Aon Risk Servs., Inc.*,
   187 F.R.D. 578 (D. Minn. 1999)..................................................................................31, 40

14

15

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)...........................................................................................................49

16

*C&C Jewelry Mfg., Inc. v. West*,
   2011 WL 767839 (N.D. Cal. Feb. 28, 2011) .................................................28, 34, 37, 38

17

18

*Cable & Computer Tech., Inc. v. Lockheed Saunders, Inc.*,
   175 F.R.D. 646 (C.D. Cal. 1997) ......................................................................................29

19

20

*Casey v. Lewis*,
   43 F.3d 1261 (9th Cir. 1994) .............................................................................................35

21

*Church & Dwight Co. v. Mayer Labs., Inc.*,
   868 F. Supp. 2d 876 (N.D. Cal. 2012) ..............................................................................18

22

23

*Cole v. Layrite Prods. Co.*,
   439 F.2d 958 (9th Cir. 1971) .............................................................................................34

24

25

*Conwood v. United States Tobacco*,
   290 F.3d 768 (6th Cir. 2002) .............................................................................................18

26

27

*Cortez v. Arizona*,
   No. CV09526TUCDCBCRP, 2010 WL 11485030 (D. Ariz. Sept. 2, 2010) ...................24

28

i

*Cyntegra, Inc. v. IDEXX Laboratories, Inc.*,
   2007 WL 9701999 (C.D. Cal. Jun 29, 2007)....................................................................25

*Del Campo v. American Corrective Counseling Servs., Inc.*,
   2007 WL 3306496 (N.D. Cal. Nov. 6, 2007) ............................................................28, 41

*EEOC v. Freeman*,
   2012 U.S. Dist. LEXIS 86198 (D. Md. June 21, 2012)....................................................32

*Garnett v. ADT LLC*,
   14-cv-02851-WBS-DAD, 2015 WL 12942061 (E.D. Cal. Dec. 2, 2015)........................27

*Gucci Am., Inc. v. Exclusive Imps. Int'l*,
   2002 U.S. Dist. LEXIS 14837 (S.D.N.Y. Aug. 12, 2002)................................................47

*Jenkins v. Union Pac. R.R.*,
   22 F.3d 206 (9th Cir. 1994) ..............................................................................................35

*Jerry Beeman & Pharmacy Servs., Inc. v. Anthem Prescription Mgmt., Inc.*,
   2017 U.S. Dist. LEXIS 191720 (C.D. Cal. Nov. 17, 2017)..............................................47

*Johnson v. Chau*,
   2019 U.S. Dist. LEXIS 15011 (E.D. Cal. Jan. 30, 2019).................................................48

*Juergens v. Watt*,
   2009 U.S. Dist. LEXIS 41194 (N.D. Miss. May 15, 2009)..............................................35

*Kellam Energy, Inc. v. Duncan*,
   616 F. Supp. 215 (D.C. Del. 1985)....................................................................................24

*Kendall v. GES Exposition Servs.*,
   174 F.R.D. 684 (D. Nev. 1997)..........................................................................................48

*Krause v. Hawaiian Airlines, Inc.*,
   2019 U.S. Dist. LEXIS 133880 (E.D. Cal. Aug. 7, 2019).........................................31, 39

*Kress v. Price Waterhouse Coopers*,
   2012 U.S. Dist. LEXIS 137681 (E.D. Cal. Sep. 25, 2012).........................................41, 42

*Lloyd v. Valley Forge Life Ins. Co.*,
   2007 U.S. Dist. LEXIS 40526 (W.D. Wash. Mar. 23, 2007) .....................................31, 40

*Mackovich v. United States Gov't*,
   2008 U.S. Dist. LEXIS 124630 (E.D. Cal. May 13, 2008)........................................34, 35

*Med. Ctr. of Cent. Ga., Inc. v. Denon Dig. Emple. Benefits Plan*,
   2005 U.S. Dist. LEXIS 46957 (M.D. Ga. May 4, 2005) ..................................................35

*In re Microcrystalline Cellulose Antitrust Litigation*,
   221 F.R.D. 428 (E.D. Pa. 2004).........................................................................................25

ii

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985).........................................................................................28

*Mount Hamilton Partners, LLC v. Google Inc.*,
    2013 U.S. Dist. LEXIS 104556 (N.D. Cal. July 25, 2013)................................48

*Nevis v. Rideout Mem'l Hosp.*,
    2019 U.S. Dist. LEXIS 188550 (E.D. Cal. Oct. 30, 2019) ...............................30

*O'Boyle v. GC Servs.*,
    2018 U.S. Dist. LEXIS 82991 (E.D. Wis. May 17, 2018)..........................38, 39

*Owino v. CoreCivic, Inc.*,
    2019 U.S. Dist. LEXIS 111808 (S.D. Cal. July 3, 2019) .................................32

*United States ex rel. Proctor v. Safeway, Inc.*,
    2018 U.S. Dist. LEXIS 194313 (C.D. Ill. Nov. 14, 2018)................................51

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...........................................................................50

*Saint Alphonsus Med. Ctr. - Nampa, Inc. v. Saint Luke's Health Sys.*,
    778 F.3d 775 (9th Cir. 2015) ...........................................................................50

*Schmidt v. Fid. Nat'l Title Ins. Co.*,
    2009 U.S. Dist. LEXIS 8065 (D. Haw. Feb. 3, 2009) .....................................39

*Smith v. Ardew Wood Prods.*,
    No. C07-5641 FDB, 2008 U.S. Dist. LEXIS 93855 (W.D. Wash. Nov. 6,
    2008) ...........................................................................................................37, 40

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    2012 U.S. Dist. LEXIS 74000 (E.D. Cal. May 29, 2012)................................34

*Trevino v. ACB Am., Inc.*,
    232 F.R.D. 612 (N.D. Cal. 2006)......................................................................44

*Vinton v. Adam Aircraft Indus.*,
    232 F.R.D. 650 (D. Colo. 2005) .......................................................................47

*In re Vitamins Antitrust Litig.*,
    198 F.R.D. 296 (D.D.C. 2000)..........................................................................34

*Waterbury v. Scribner*,
    2008 U.S. Dist. LEXIS 53142 (E.D. Cal. May 7, 2008)............................31, 32

*Whittingham v. Amherst Coll.*,
    163 F.R.D. 170 (D. Mass. 1995)........................................................................31

*Windisch v. Hometown Health Plan, Inc.*,
    2011 U.S. Dist. LEXIS 151486 (D. Nev. Jan. 13, 2011).................................39

1

*Zamora v. D'Arrigo Bros. Co. of Cal.*,
    Case No. C04-00047 JW (HRL), 2006 WL 931728 (D. Or. 2006) ................................... 44

2

**Other Authorities**

3

3 Moore's Federal Practice - Civil § 15.18 (2019) ........................................................... 34, 35

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Joint Statement re Discovery Disagreement**

1    **JOINT STATEMENT REGARDING DISCOVERY DISAGREEMENT**

2    On December 6, 2019, Plaintiffs Sharidan Stiles and Stiles 4U (collectively "Stiles" or "Plain-

3    tiffs") filed a Motion to Compel Additional Depositions and/or Motion for Leave to Take Depositions

4    in Excess of 10 ("Motion").  (ECF No. 288.)  On December 24, 2019, Stiles filed a Motion to Compel

5    Walmart, Inc. to Respond to Plaintiffs' Interrogatories (Set Two).  (ECF No. 308.)  Pursuant to Local

6    Rule 251, Stiles and Walmart submit this Joint Statement re Discovery Disagreement.

7    **I.    DETAILS OF THE CONFERENCES**

8    **A.    Plaintiffs' Contentions**

9    **1.    Discovery Disputes at Issue**

10   **a.    Plaintiffs' Request for Leave to Take Depositions in Excess of 10**

11   Stiles' counsel seeks leave to take the depositions of 18 individuals or corporations.  Defend-

12   ants Walmart, Inc. ("Walmart") and American International Industries ("AI") (collectively, "Defend-

13   ants") declined to stipulate to allow Stiles to take additional depositions on the basis that there is no

14   good cause.  Stiles maintains that good cause exists to take these additional depositions.

15   **b.    Plaintiffs' Interrogatories (Set Two)**

16   Stiles served Walmart with Plaintiffs' Second Set of Interrogatories on November 5, 2019,

17   consisting of three interrogatories.  Walmart's counsel refused to provide substantive responses on the

18   basis that Stiles has already exhausted 25 interrogatories allowed under Federal Rule of Civil Proce-

19   dure 33.  As a result, Stiles' counsel initiated the below-described conferences to address discovery

20   disputes in this matter.

21   **2.    Description of Meet and Confer Process**

22   **a.    Meet and Confer re Stiles' Request to Take Depositions in Excess of 10**

23   On November 29, 2019, Stiles' counsel sent Defendants' counsel an email with an attached

24   letter, requesting Defendants' stipulation for Stiles to take 13 depositions.[1]  (Declaration of Brian

25

---

26   [1] As explained herein, Stiles initially requested that Defendants permit Stiles to take 13 depo-
     sitions; however, after reviewing additional Walmart document productions—produced _after_
27   Walmart's Motion to Compel Additional Depositions (ECF No. 288)—Stiles has identified
     parties with relevant information.  Stiles now seeks to depose 18 individuals or corporations,
28   totaling six Walmart deponents; five AI deponents; and seven third party deponents.

2

**Joint Statement re Discovery Disagreement**

1   Dunne ("Dunne Decl." or "Ex.") ¶ 2, Ex. 77 (Stiles Nov. 29, 2019 email); Ex. 78 (Stiles Nov. 29, 2019

2   letter).)

3       On December 3, 2019, the parties held a meet and confer call to discuss Stiles' November 29,

4   2019 request for stipulation to take 13 depositions.  (Dunne Decl. ¶ 3.)  Stiles' counsel explained that

5   Walmart's recent (December 3 and 13, 2019) documents productions specifically identified horizontal

6   price-sharing in Stiles' Walmart Wet Shave and Beauty Categories by non-parties Pacific World Cor-

7   poration ("Pacific World"), Coty, Inc. ("Coty"), and Proctor & Gamble Company ("P&G").  (*Id.*, Ex.

8   79 (Stiles email dated Dec. 20, 2019).)  Stiles' counsel also noted that Defendants' interrogatory re-

9   sponses and deposition notices state the relevance of each of Stiles' proposed deponents.  (*Id.*)  Stiles'

10   counsel requested that, given the principal relevance of each proposed deponent, Walmart stipulate to

11   a number of depositions above 10.  (*Id.*)

12       In response, Walmart's counsel refused to stipulate to Stiles' request to take 13 depositions,

13   citing Rule 26(b)(1)'s proportionality requirement.  (Dunne Decl. ¶ 4.)  Notably, Stiles' counsel

14   pointed out that <u>more than half of the proposed deponents were non-Walmart individuals or compa-</u>

15   <u>nies</u>.  (*Id.*)  Walmart's counsel responded that attending additional third party and/or AI depositions

16   would still be unduly burdensome for Walmart given the claims and defenses in the case.  (*Id.*)

17       Subsequently, on January 6, 2020, Stiles' counsel sent an email to Walmart's counsel, explain-

18   ing that Stiles would be seeking to depose a total of 18 individuals or corporations, not 13, as previ-

19   ously conveyed.  (Dunne Decl. ¶ 5, Ex. 89 (Stiles email dated Jan. 6, 2020).)  Stiles' counsel identified

20   five additional deponents: two former Walmart employees and three third party corporations—Edge-

21   well Personal Care LLC ("Energizer"), Kiss Products, Inc. ("KISS"), and Onyx Brands, Inc. ("Onyx").

22   (*Id.*)  The principal justification for the additional depositions was that Walmart's recent document

23   productions revealed that these individuals and/or corporations would likely have relevant information

24   related to Stiles' claims—information that previously identified deponents could not provide.  The

25   parties could not come to an agreement on this issue.

26

27

28

**Joint Statement re Discovery Disagreement**

### b.  Meet and Confer re Plaintiffs' Interrogatories (Set Two)

On November 15, 2019, Walmart's counsel sent a letter, stating that it would not respond to Stiles' Interrogatories (Set Two) because Stiles already served the 25 written interrogatories, including discrete subparts, permitted under Rule 33.  (Dunne Decl. ¶ 6, Ex. 80 (Walmart letter dated Nov. 15, 2019).)  In support of its position, Walmart stated, "Based on Walmart's numerosity objections, plain-tiffs' prior counsel <u>agreed</u> to withdraw interrogatories 1, 2, 6, and 12 from Plaintiffs' First Set of Inter-rogatories."  (*Id.* (emphasis added).)

In response, on November 25, 2019, Stiles' counsel responded, citing three primary reasons.  First, there was no prior agreement with Stiles' prior counsel by which each Plaintiff waived their independent right to serve 25 interrogatories on Walmart.  (Dunne Decl. ¶ 7, Ex. 81 (Stiles letter dated Nov. 25, 2019).)  Second, Walmart's interpretation as to "subparts" was flawed; however, even if Stiles were to accept this position, Plaintiff's would still be within the 25 interrogatory per party limitation.  (*Id.*)  Third, there are two plaintiffs in this litigation.  Under Rule 33(a)(1), they are jointly entitled to 50 interrogatories.  (*Id.*)  Plaintiffs' served far less than 50 interrogatories; therefore, Walmart must respond to Plaintiffs' second set of interrogatories.  (*Id.*)  Walmart did not respond to this letter. (*Id.*)

On December 5, 2019, Stiles' counsel sent a follow-up email to Walmart's counsel reiterating its understanding of the parties' positions.  (Dunne Decl. ¶ 8, Ex. 82 (Stiles email dated Dec. 5, 2019).)  Stiles' counsel explained that, despite Walmart's contention that an agreement with previous counsel on this issue was reached, there was no documentation of any such agreement.  (*Id.*)  Further, Stiles' position remained that Plaintiffs are entitled to 50 interrogatories total—25 "per party" under Rule 33(a)(1).  (*Id.*)

The parties held a meet call on December 6, 2019 to discuss whether Walmart would response to Plaintiffs' Interrogatories (Set Two).  (Dunne Decl. ¶ 9.)  Walmart refused to produce any substan-tive response to Interrogatory No. 16, which requests Walmart to identify category advisors in its Wet Shave and Beauty Accessory departments from January 1, 2002 to the present.  (*Id.*)  Walmart stated, however, that it was open to compromise on Interrogatory Nos. 17 and 18.  (*Id.*)

Stiles' counsel emailed Walmart on December 16, 2019 to follow-up on Walmart's responses and received no acknowledgement or response; however, the parties met and conferred again on

1  December 19, 2019.  (Dunne Decl. ¶ 10.)  Stiles' counsel explained that the three interrogatories were

2  concretely drawn to defenses Walmart has expressly made in filings with the court—for example, the

3  identity of category managers.  (*Id.*, Ex. 83 (Stiles email dated Dec. 20, 2019).)  Walmart's counsel

4  responded that just because Walmart makes an argument in a court filing in this matter, it does not

5  constitute a "claim or defense" relevant to this case for discovery purposes.  (*Id.*)  Ultimately, Walmart

6  did not respond to Stiles' December 20, 2019 email recapping the final meet and confer on the Second

7  Set of Interrogatories, and Walmart refused to provide any substantive responses to Interrogatories

8  Nos. 16, 17, and 18.  (*Id.*)

9      **B.    Walmart's Contentions**

10      On November 29, 2019—over ***five years*** after plaintiffs filed their original complaint in this

11  case, and ***six weeks before the close of fact discovery***, at which point ***plaintiffs had still not taken a***

12  ***single deposition***—plaintiffs sent defendants a letter in which they asked defendants to stipulate to

13  plaintiffs taking 13 depositions in this case:  five AI depositions, four Walmart depositions, and four

14  depositions of individuals or entities serving as category managers for Walmart (see *infra* for back-

15  ground on Walmart's category management program).  Dunne Decl., Ex. 78.

16      The parties met and conferred regarding plaintiffs' request on December 3, 2019.  Declaration

17  of Catherine S. Simonsen ("Simonsen Decl."), ¶ 2.  Contrary to Brian Dunne's declaration, counsel

18  for plaintiffs did not, during that meet and confer call, "explain[]that Walmart's recent (December 3

19  and 13, 2019) documents productions specifically identified horizontal price-sharing in Stiles'

20  Walmart Wet Shave and Beauty Categories by non-parties Pacific World Corporation ("Pacific

21  World"), Coty, Inc. ("Coty"), and Proctor & Gamble Company ("P&G")."  Dunne Decl., ¶ 3.  As an

22  initial matter, plaintiffs could not have reviewed by December 3, 2019 (the date of the meet and confer

23  call) Walmart's ***December 13***, 2019 production, which Walmart would produce 10 days later.

24  Walmart's recent document productions are a post hoc, manufactured pretext for plaintiffs' dilatori-

25  ness.  Indeed, plaintiffs' claim that they supposedly discovered the relevance of the category manager

26  witnesses they now seek to depose, from recently produced documents of Walmart, is belied by the

27  fact that they filed their motion for leave to add these category managers as defendants, and to amend

28

**Joint Statement re Discovery Disagreement**

1   their complaint to plead their category management conspiracy theory, on **June 28**, 2019—over **four**

2   **months** before they first requested that defendants stipulate to expand the number of plaintiffs' depo-

3   sitions to allow them to take unfettered discovery into Walmart's category manager program.

4         During the December 3, 2019, meet and confer call, the only reason plaintiffs offered for their

5   supposed need to take the category manager-related depositions that tip them over their 10-deposition

6   limit, was that they are supposedly entitled to "conform the pleadings to the evidence" at trial, and

7   since they plan on seeking leave to amend their complaint during or after trial pursuant to Rule 15(b)

8   of the Federal Rules of Civil Procedure, to state their category manager conspiracy theory, they can

9   take discovery on that theory now.  Simonsen Decl., ¶ 3.  In other words, plaintiffs asked defendants

10  to stipulate to (and now ask this Court to order) a fishing expedition for evidence that might support

11  their "category management" conspiracy theory—a theory the Court has already expressly **denied**

12  them leave to plead.  (ECF No. 232.)  During the meet and confer call, counsel for Walmart explained

13  that plaintiffs are not entitled to pursue discovery on un-pled claims that the Court denied them leave

14  to plead.  Simonsen Decl., ¶ 3.  Plaintiffs' counsel asserted approximately six times during the course

15  of the meet and confer call that he was "mystified" by defendants' positions.  *Id.*

16        Mr. Dunne also claims in his declaration that during the December 3, 2019, meet and confer

17  call, plaintiffs "noted that Defendants' interrogatory responses and deposition notices state the rele-

18  vance of each of Stiles' proposed deponents."  Dunne Decl., ¶ 3.  Counsel for defendants recollect no

19  such statement by counsel for plaintiffs during the meet and confer.  Simonsen Decl., ¶ 3.

20        Next, Mr. Dunne claims that Exhibit 79 to his declaration—an email dated December 20,

21  2019—is "[a] true and correct copy of the email recapping the meet and confer" on December 3, 2019.

22  Dunne Decl., ¶ 3.  The December 20, 2019, email is an email plaintiffs sent, purporting to recap the

23  parties' **December 19**, 2019, meet and confer call.  Following the **December 3** meet and confer call,

24  Mr. Dunne instead sent the following email to counsel for Walmart:

25        Catherine (and whomever is purportedly supervising you on this matter at White and
26        Case):

27        Your intemperate and unnecessary threats over the past weeks have muddled, delayed,
      belabored, and generally slowed down a fundamentally cooperative, party-driven joint
28

process that is designed to provide the Court, by the Court's deadline, with all the information it needs to resolve certain discovery disputes.

Please stop harassing my team with threats as we work with your team to ensure that the Court has all the information it needs—clear, concise, and as clean as possible—to rule upon the disputes before it.

Perhaps you are newer to the discovery process, but that is no excuse, because you are purportedly being supervised by partners at White and Case. The purpose of civil discovery, including the discovery dispute process, is to facilitate the cooperative working-out of issues between parties—not to create false deadlines and supposed "gotchas" that occlude rather than clarifying the disputes actually before the Court.

We look forward to continuing to work with you and your firm to meet the Court's objectives here. We reject your attempts to weaponize cooperation.

Simonsen Decl., ¶ 4 & Ex. 1.  The "threats" referred to in Mr. Dunne's emails were counsel for Walmart's repeatedly insisting that plaintiffs uphold their end of the parties' agreement regarding the schedule to exchange joint statement drafts regarding a different discovery dispute.  *See* Declaration of Catherine S. Simonsen in Support of Walmart's Motion to Compel Plaintiffs' Further Responses to Interrogatories, ¶¶ 6-9.

Aware that they were out of time to file a motion to compel (given Judge England's Scheduling Order providing that the fact discovery deadline (January 10, 2020) was the deadline by which "all discovery shall have been conducted so that . . . any disputes relative to discovery shall have been resolved by appropriate order if necessary and, where discovery has been ordered, the order has been obeyed," ECF No. 54 at 2), on the evening of Friday, December 6, 2019, plaintiffs filed their Motion for Leave to Take Depositions in Excess of 10—in which they requested the 13 depositions outlined in their November 29, 2019, letter—and an ex parte application to shorten the time for hearing on their motion (which otherwise would not occur until the next available hearing date of the Court, which fell after the discovery cutoff date).  The Court denied plaintiffs' ex parte application and ordered the parties to prepare a joint statement regarding plaintiffs' motion.

On December 12, 2019, counsel for Walmart proposed a schedule for briefing the parties' joint statement.  On December 16, 2019, counsel for plaintiffs responded:

As for the joint statement on our motion to allow more than 10 depositions, you have already seen our arguments; we filed them in the *ex parte* motion.  You therefore know our position in detail and should start writing up your portions of the

1   joint statement now, so that we can insert them into a joint statement. We will be
2   adding Caroline Day to the motion as an additional desired deponent, and we will
    get you a draft of the joint statement by January 6 (for filing on January 8).

3   Counsel for Walmart responded that it was not reasonable for plaintiffs to provide their portion of

4   the joint statement only two days before the joint statement was due, giving Walmart only two days

5   to respond, particularly where plaintiffs were purporting to add an additional requested deposition to

6   their motion, and suggested a reasonable schedule for exchanging drafts of the joint statements re:

7   the four motions to be heard on January 15, 2019.  In response, Brian Dunne, responded:  "[W]e'll

8   get you a draft of our portions of the joint statement no later than January 6, 2020.  We'll try to get

9   you finished drafts earlier, . . . and in fact, we're happy to flip y'all an outline at some point—maybe

10  even a near-complete draft."  Plaintiffs did not "flip y'all an outline" or "even a near-complete draft"

11  before January 6, 2020.  Simonsen Decl, ¶ 5 & Ex. 2.

12      Instead, on January 6, 2020—two days before the joint statement was due to be filed—Mr.

13  Dunne sent counsel for defendants an email in which he announced that, now, plaintiffs would seek

14  not only the three additional depositions outlined in their motion, and not only those three deposi-

15  tions plus the lately-added Caroline Day, but also four additional depositions: Carmen Bauza (for-

16  merly of Walmart), and Rule 30(b)(6) depositions of Energizer, KISS, and Onyx.  Simonsen Decl.,

17  Ex. 3 at 5-7.  Later that evening, plaintiffs sent Walmart their portion of the joint statement.  Simon-

18  sen Decl., ¶ 6.

19      The parties have not met and conferred regarding plaintiffs' late-breaking announcement that

20  they would unilaterally add five depositions to their motion for leave to take three extra.  *Id.*, ¶ 7.

21  Mr. Dunne sent a number of emails on January 6 and 7, 2020, attempting to create the false record

22  that Walmart "refus[ed] to even have a phone call on our proposed" additional depositions.  Simon-

23  sen Decl., Ex. 4 at 3.  To the contrary, in response to Mr. Dunne's frantic emails in which he disin-

24  genuously tried to characterize Walmart as saying "no on a call," counsel for Walmart responded

25  that they were not available for a call that day due to preexisting commitments but were available for

26  a call later that week, and specifically proposed January 9, 2020.  *Id.* at 8, 2, 1.

27

28

**Joint Statement re Discovery Disagreement**

### a.       Meet and Confer re Plaintiffs' Interrogatories (Set Two)

On January 8, 2019, plaintiffs Sharidan Stiles and Stiles 4 U, Inc. served their first set of interrogatories on Walmart.  Simonsen Decl., Ex. 5.

On January 23, 2019, counsel for Walmart alerted prior counsel for plaintiffs that plaintiffs' first set of interrogatories exceeded the 25-interrogatory limit under Rule 33(a)(1) of the Federal Rules of Civil Procedure, including the discrete subparts.  Simonsen Decl., Ex. 6 at 2.  Walmart asked plaintiffs to identify 25 or fewer interrogatories, including discrete subparts, to which plaintiff wished for Walmart to respond.  *Id.*  In response, plaintiffs agreed to withdraw interrogatory nos. 1, 2, 6, 12, to bring the total number of interrogatories served, including subparts, to 25.  *Id.* at 1-2.  On February 7, 2019, Walmart responded to interrogatory nos. 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, and 15.  *Id.*, ¶ 11.  Walmart served supplemental responses to plaintiffs' first set of interrogatories on April 15, 2019, and December 13, 2019.  *Id.*

On November 5, 2019, plaintiff Sharidan Stiles (represented by new counsel) served a second set of interrogatories on Walmart.  *See* Motion (ECF No. 308) at 2.

On November 15, 2019, Walmart sent a letter to plaintiffs advising that plaintiffs had already exhausted the 25-interrogatory limit, including discrete subparts, provided by Rule 33(a), and asked plaintiff to withdraw her second set of interrogatories.  (ECF No. 308-2.)  On November 25, 2019, plaintiff sent a letter response, refusing to withdraw her second set of interrogatories.  Declaration of Brian Dunne in Support of Joint Statement ("Dunne Decl."), Ex. 81.  On December 5, 2019, Walmart served responses to plaintiffs' second set of interrogatories.  Simonsen Decl., Ex. 7.  Walmart objected to the three interrogatories in the second set on numerous grounds, including that plaintiffs had already exhausted their 25-interrogatory limit.  *Id.*

The parties met and conferred regarding Walmart's responses to plaintiff's second set of interrogatories on December 6, 2019.  Simonsen Decl., ¶ 13.  Walmart's counsel explained that Walmart would not waive its numerosity and other objections to plaintiff's second set of interrogatories but invited counsel for plaintiffs to propose a compromise whereby they narrowed and/or withdrew one or more of the interrogatories, and suggested that the first interrogatory in the second set (asking for

1    nearly 20 years' of information regarding Walmart's category managers in two departments) was par-

2    ticularly problematic.  *Id.*

3          Plaintiffs did not propose a compromise.  Instead, on December 16, 2019, plaintiffs sent an

4    email to Walmart in which they purported to summarize the meet and confer call from December 6,

5    2019, and stated their position that "we are at an impasse."  Simonsen Decl., ¶ 14 & Ex. 8.  Plaintiffs

6    advised that they would file a motion to compel.  *Id.*  Plaintiffs state in their portion of the joint state-

7    ment and in the Dunne Declaration that plaintiffs "received no acknowledgement or response," Dunne

8    Decl., ¶ 10, but Mr. Dunne's December 16, 2019, did not request a response and there was nothing to

9    respond to in light of plaintiffs' announcement that they would file a motion to compel and the fact

10   that plaintiffs apparently were declining to propose a compromise that would eliminate the need for

11   this Court's intervention.

12         The parties met and conferred again on December 19, 2019.  In his declaration, Mr. Dunne

13   claims that during the meet and confer call, plaintiffs' counsel "explained that the three interrogatories

14   were concretely drawn to defenses Walmart has expressly made in filings with the court—for example,

15   the identity of category managers.  Walmart's counsel responded that just because Walmart makes an

16   argument in a court filing in this matter, it does not constitute a 'claim or defense' relevant to this case

17   for discovery purposes."  Dunne Decl., ¶ 10.  Counsel for Walmart has no recollection of plaintiffs

18   claiming during the December 19, 2019, meet and confer call that plaintiff's second set of interroga-

19   tories were relevant to Walmart's defenses.  Simonsen Decl., ¶ 15.  That position is patently absurd,

20   as plaintiffs well know.  Walmart has not asserted a defense in this case that implicates Walmart's

21   category managers in any way.  The "court filing[s]" plaintiffs refer to are Walmart's (successful)

22   opposition to plaintiffs' motion to amend their complaint to allege a "horizontal" conspiracy among

23   Walmart's category managers, which the Court denied.  (ECF No. 278.)  Opposing a motion to pursue

24   an outlandish conspiracy theory that has no relationship to the actual claims in this case is not the same

25   thing as asserting a defense in an answer to the operative complaint.  Plaintiffs certainly did not explain

26   during the December 19, 2019, meet and confer call how their interrogatories seeking information

27

28

1    about "Walmart's document or data retention policy" and documents "Walmart believes were deleted"

2    are relevant to Walmart's defenses in this case (because they are not).  Simonsen Decl., ¶ 15.

3           Plaintiffs filed their Motion to Compel Walmart, Inc. to Respond to Plaintiffs' Interrogatories

4    (Set Two) on December 24, 2019.

5           As discussed above, plaintiffs refused to provide a draft of their portions of the joint statement

6    regarding their motion to compel until January 6, 2020, giving themselves weeks to prepare their por-

7    tion of the joint statement and Walmart less than two days to respond.

8    **II.**    **NATURE OF THE ACTION AND FACTUAL DISPUTES**

9        **A.**    **Nature of the Action**

10            **1.**    **Plaintiffs' Description**

11           This is a complex patent infringement and antitrust case with allegations spanning the course

12    of nearly six years.  The operative complaint includes claims for (1) violations of the Sherman Act;

13    (2) violations of the California Cartwright Antitrust Act; (3) two counts of patent infringement; (4)

14    trade dress infringement under the Lanham Act; (5) false advertising and false association under the

15    Lanham Act; and (6) intentional interference with prospective economic advantage.  (ECF No. 142.)

16           Walmart has maintained,



17    (ECF No. 232 at

18    1 (arguing that

19           Indeed, Walmart has taken the position that it

20    (ECF No. 250-4 at 4.)  However, Walmart's

21    recently-produced documents (on December 3 and 13, 2019) reveal the opposite, and in fact bolster

22    Stiles' antitrust claims.

23           Through recent discovery, Stiles learned that



24

25    (ECF No. 250-4

26

27    Walmart's documents confirm that

28



1

2    (Ex. 31

3

4                                (WM-STILES-0016391); Ex. 61

5

6                                                                    (WM-

7    STILES-0009404).)

8                              each of whom Stiles' seeks to depose

9

10

11

12

13                    (Ex. 32

14

15

16          (WM-STILES-0016902);

17

18                    Ex. 38

19                                                            WM-STILES-

20    0005299); Ex. 69                                            (WM-

21    STILES-0004398); Ex. 16

22

23    (WM-STILES-0005044); Ex. 19

24

25

26    (AII_00001928).)

27

28



1    Contrary to Walmart's prior court filings (*see* ECF No. 232; ECF No. 250-4),

3                                                              [2]  (Ex. 15

5            (WM-STILES-0005252); Ex. 56

7                              (WM-STILES-0016364); Ex. 43

10                                      (WM-STILES-0016187); Ex. 8

12        (WM-STILES-0015607); Ex. 57

16       (WM-STILES-0005114);  Ex.  25

19                       (WM-STILES-0009338).)

22                                        (Ex. 63

24                                              (WM-STILES-0009448); Ex.

[2] Notably, Walmart's counsel concedes that it has produced evidence of
.  (Dunne Decl. ¶ 11, Ex. 84 (Walmart letter dated Dec. 23, 2019) (admitting that
; *see, e.g.*, Ex. 85 (WM-STILES-0003288); Ex. 86 (WM-STILES-0003533); Ex. 87 (WM-STILES-0003569); Ex. 88 (WM-STILES-0003613).)

1   60 ███████████████████████████████████████████████████████████

2   ████████████████████████████████████████████████████(WM-STILES-0007468); Ex.

3   62 ██████████████████████████████████████████████████████████████████████

4   ███████████████████████████████████WM-STILES-0009439).)  Due to Walmart's

5   December document productions, there is now ample evidence that Walmart and horizontal competi-

6   tors of Stiles shared product pricing and output data with one another, used their privileged position

7   to control the relevant markets, and selectively "delete" Stiles from Walmart stores.

8          **2.**     **Defendants' Description**

9         *Note to Court:  This "Walmart's Contentions" section of the Statement of the Nature of the*

10  *Action is identical to the same section of the Statement of the Nature of the Action in the joint state-*

11  *ments re: (1) Walmart's Motion to Compel Plaintiffs' Further Responses and Production in Re-*

12  *sponse to Requests for Production, and (2) Walmart's Motion to Compel Plaintiffs' Further Re-*

13  *sponses to Interrogatories.*

14           **a.**     **Procedural History**

15        This lawsuit's origin dates back to July 11, 2014, when plaintiff Sharidan Stiles filed an ac-

16  tion against defendants Walmart and American International Industries ("AI") arising from plain-

17  tiffs' failed business relationship with Walmart.  *See* Complaint, *Stiles v. Wal-Mart, et al.* ("*Stiles*

18  *I*"), No. 2:14-cv-1637 (E.D. Cal. July 11, 2014), ECF No. 1.  Walmart had sold plaintiffs' personal

19  styling razors (the "Stiles Razor") in its stores for approximately five years, but decided in or around

20  2012 to offer its own Walmart branded razors, manufactured and supplied by AI, and to discontinue

21  sales of the Stiles Razor.  *See id.* ¶¶ 14-20.  Stiles asserted claims for trademark infringement, unfair

22  competition, and antitrust violations under federal and California state law.  *Id.* ¶¶ 22-49.

23        The complaint filed in *Stiles I* against Walmart and AI also named Pacific World Corporation

24  ("Pacific World") and Coty, Inc. ("Coty")—suppliers to Walmart that also served as category advi-

25  sors—as defendants, complaining that "confidential reports STILES sent to WAL MART were sub-

26  sequently forwarded from WAL MART'S Buyer to Defendant, PACIFIC WORLD, Inc. and to

27  Coty."  *See Stiles I*, ECF No. 4, ¶ 18 (filed Jul. 11, 2014).  Approximately two months later, Stiles

28

1   voluntarily dismissed her claims against Pacific World and Coty.  *See Stiles I*, ECF No. 28 at 3 (filed

2   Sept. 18, 2014); *Stiles I*, ECF No. 38 (order granting dismissal of claims against Pacific World and

3   Coty).  Approximately two months later, Stiles voluntarily dismissed the action after Walmart

4   moved to dismiss the first amended complaint.  *See Stiles I*, ECF Nos. 25, 40, 41.

5        While Walmart's motion to dismiss in *Stiles I* was pending, Stiles filed this second action on

6   September 25, 2014, complaining of the same failed business relationship alleged in *Stiles I*.  (ECF

7   No. 1.)  Walmart again moved to dismiss, in response to which Stiles filed a first amended com-

8   plaint.  (ECF No. 16.)  Walmart again moved to dismiss Stiles' antitrust claims.  (ECF No. 24.)  The

9   Court granted Walmart's motion to dismiss and granted Stiles leave to amend.  (ECF Nos. 39, 45.)

10       Stiles and plaintiff Stiles 4 U, Inc. filed a second amended complaint, again naming only

11  Walmart and AI.  (ECF No. 56.)  Walmart again moved to dismiss plaintiffs' antitrust claims.  (ECF

12  No. 64.)  The Court granted Walmart's motion to dismiss plaintiffs' antitrust claims and denied

13  plaintiffs' request for leave to amend.  The Court held that "while Plaintiff alleges that Defendants

14  excluded her from selling her product to Walmart, . . . Plaintiff fails to allege that she was precluded

15  from selling to any other potential purchaser. . . .  Plaintiff has offered no facts indicating that she

16  attempted to enter her defined market through these, or any other, channels and was denied because

17  her product failed at Walmart."  (ECF No. 101 at 8:20-9:8.)

18       Plaintiffs moved for reconsideration of the Court's order denying plaintiffs leave to amend

19  their complaint.  (ECF No. 104.)  The Court granted plaintiffs' motion and granted plaintiffs leave to

20  amend, based on plaintiffs' submission of additional allegations that plaintiffs "attempted to enter

21  the market through other retailers and [were] rejected because her product 'failed' at Walmart."

22  (ECF No. 141 at 8:16-19.)  On August 10, 2018, the Court issued a scheduling order setting a dead-

23  line for fact discovery of July 10, 2019.  (ECF No. 146.)

24       Plaintiffs filed their fourth amended complaint on July 11, 2018.  (ECF No. 142 ("FAC").)

25  The FAC is the operative complaint and it alleges causes of action for (1) violation of the federal

26  Sherman Antitrust Act, (2) violation of the California Cartwright Antitrust Act, (3)-(4) patent in-

27  fringement, (5) trade dress infringement, (6) false advertising and false association in violation of the

28

**Joint Statement re Discovery Disagreement**

1   federal Lanham Act (against Walmart only), and (7) intentional interference with prospective eco-

2   nomic advantage (against AI only).  (*Id.*)

3       Plaintiffs base their antitrust claims on an alleged agreement between Walmart and AI:

4           On August 19, 2014, Terri Cooper, Vice President of American Industries, called
            Plaintiff Sharidan Stiles, unprompted and unplanned, and admitted to Stiles that
5           Walmart had approached her, had given her the Stiles Razor, and asked American
            Industries to copy it.  American Industries agreed.
6
7   FAC, ¶ 58.  Plaintiffs claim this alleged agreement between Walmart and AI to copy the Stiles Razor

8   resulted in their exclusion from the relevant market.  *See id.*, ¶¶ 108, 115-16, 121.  Specifically,

9   plaintiffs allege that the termination of their relationship with Walmart caused other retailers to de-

10  cline to sell the Stiles Razor:

11          Stiles has attempted to sell her razors to numerous other retailers.  From 2011
            through the beginning of 2014, Stiles or sales representatives working on its behalf
12          made efforts to get Stiles into many retailers, including, but not limited to the follow-
            ing: Dollar General, Kroger, Ulta, Target, Walgreens, CVS, Rite Aid, Bed Bath and
13          Beyond, Stop&Shop, Raleys, Costco, Publix, Ahold USA/Royal, HEB, Dollar Tree,
            Family Dollar, Meijer, Ace Hardware, Whole Foods, QVC, Winco Foods, and Save
14          Mart.  Stiles was turned away each time.

15          The application process to become a supplier at other retailers requires poten-
            tial suppliers to provide sales data, often by retailer.  Stiles submitted this information,
16          including the information of her decreased sales and termination from Walmart each
            time she applied to supply another retailer.  She was rejected each time.
17
    *Id.*, ¶¶ 97-98.
18
19      Plaintiffs' antitrust claims are subject to the "rule of reason."  *See* FAC at 3 n.1 (confirming

20  plaintiffs' "Sherman Act and California Cartwright Act" claims are "rule of reason claims"); Order

21  (ECF No. 101) at 5-9 (holding plaintiffs had failed to allege a "per se" antitrust violation and there-

22  fore their antitrust claims were subject to the rule of reason, which requires proof of a relevant prod-

23  uct and geographic market, the defendant's market power in the relevant market, and anticompetitive

24  effects in the relevant market).

25      Plaintiffs allege the relevant product market is the market for "the manufacture and sale of

26  Disposable Personal Styling Razors," FAC, ¶ 79, which plaintiffs allege is a "distinct market from

27  the general disposable razor market or from battery-operated razors or from a single type use razor,

28  such as an eyebrow only, side shaving razor," *id.* ¶ 80.  Based on their exclusion of "general

16
**Joint Statement re Discovery Disagreement**

1   disposable razors" and "battery-operated razors" from their alleged relevant market, plaintiffs allege

2   that AI has a large share of the relevant market (which they could not allege if, as defendants main-

3   tain, the relevant product market includes all razors for shaving, not only "disposable personal styl-

4   ing razors"). *Id.*, ¶ 95.

5        Defendants moved to dismiss the antitrust claims in plaintiffs' FAC. (ECF No. 147.)  The

6   Court denied defendants' motion. (ECF No. 188.)  On April 18, 2019, defendants moved for recon-

7   sideration of the Court's order denying defendants' motion to dismiss or, in the alternative, for judg-

8   ment on the pleadings. (ECF No. 193.)  After briefing on that motion was complete, the Court or-

9   dered supplemental briefing on certain issues raised in the motion (ECF No. 228), which briefing

10  was complete on July 11, 2019 (*see* ECF Nos. 240, 241).  Defendants' motion for reconsideration or

11  judgment on the pleadings remains pending.

12       On May 24, 2019, plaintiffs filed notice of substitution of counsel. (ECF No. 217.)  On June

13  18, 2019, the Court granted the parties' stipulation to extend the case schedule by six months, which

14  extended the deadline to complete fact discovery to January 10, 2020. (ECF No. 229.)

15       On June 28, 2019, plaintiffs filed a "Motion Seeking Leave to Join Additional Defendants,"

16  in which plaintiffs sought leave to amend their antitrust claims to allege a much broader, allegedly

17  "horizontal" conspiracy among Walmart, AI, and "category advisors" Coty, Pacific World, and

18  Procter & Gamble Co. ("P&G") (two of which—Coty and Pacific World—plaintiff Stiles had sued,

19  under the same theory, in July 2014 before voluntarily dismissing her claims against these entities).

20  (ECF No. 232.)  On November 19, 2019, the Court denied plaintiffs' motion, holding that plaintiffs

21  had "fail[ed] to address Rule 16(b)'s good cause requirement or how they were diligent in seeking

22  leave to amend." (ECF No. 278 at 2:5-6.)  The Court explicitly held that plaintiffs' motion was a

23  motion under Rule 15(a) of the Federal Rules of Civil Procedure. (*Id.* at 1.)

24       Since the Court denied plaintiffs' motion to expand the case to allege a "horizontal" conspir-

25  acy, including some of Walmart's category managers, plaintiffs' counsel have repeatedly asserted

26  that plaintiffs are still entitled to pursue—and are pursuing—their category management conspiracy

27  theory that the Court denied them leave to plead, instead of the vertical agreement between Walmart

28

**Joint Statement re Discovery Disagreement**

1    and AI that plaintiffs actually allege in the FAC.

2         For example, in plaintiffs' description of the "nature of the action and factual disputes" in a

3    joint statement filed on December 4, 2019, plaintiffs stated, "At some point prior to trial, Plaintiffs

4    will seek to conform the operative pleading to the facts learned through discovery," and proceeded to

5    describe the case as follows:

6         Defendants Walmart and AI and Stiles' competitors, such as Coty Inc., Pacific World

7         Corporation ("PWC"), and Procter & Gamble Co., exercised their market power to
          eliminate Stiles from the disposable personal styling razor market and to fix prices.

8         (ECF No. 142 ¶ 109.) They conspired to remove the Stiles Razor from Walmart's
          shelves and replace it with knock-off products manufactured by Stiles' competitors.

9         (*Id.* ¶¶ 108, 118–19; Ex. 32 (July 28, 2014 Email from AI) (AII_00001592).)

10   ECF No. 284 at 13:27-14:9; *see also* ECF No. 282 at 7 (stating plaintiffs' determination to "con-

11   form[]" their complaint "to the facts learned through discovery" and arguing Walmart's "category

12   advisor program . . . is central to its antitrust violations"); ECF No. 283 at 7 (same).  As another ex-

13   ample, and as discussed more fully below, in response to Walmart's contention interrogatories—ask-

14   ing plaintiffs to identify the facts supporting their claim of an alleged agreement between Walmart

15   and AI, for example—plaintiffs have copied and pasted approximately 100 pages of argument that

16   has no resemblance at all to the FAC (the operative complaint), and instead purport to describe a

17   "horizontal" conspiracy to "fix prices" between Walmart's "category managers."  *See* Kiernan Decl.,

18   Ex. 7 at 26-125.

19                           **b.    Category Management**

20        For a retailer like Walmart, there may be hundreds (if not thousands) of product categories on

21   its retail shelves, and Walmart cannot reasonably have actionable intelligence on consumer demand

22   in each of these many categories.  Declaration of Esther Gifford (ECF No. 250) ("Gifford Decl."),

23   ¶ 3.  By focusing on the category (rather than particular brands or single products), retailers are able

24   to offer the best product assortment, organized in the most effective way on the shelves, and at prices

25   consumers are most willing to pay.  *See* ABA Section of Antitrust Law, Category Management Anti-

26   trust Handbook 13 (2010) ("ABA Handbook").  To effectively do so, however, retailers rely on cate-

27   gory "managers" or "captains"—typically, a leading supplier in the category that serves the function

28

1    of providing analysis and market expertise to Walmart, based on its much more detailed knowledge

2    and research of consumer preferences in the category.  *See* ABA Handbook at 19; Gifford Decl., ¶ 4.

3              Entering into a category management relationship with a key supplier is typically the best

4    way to obtain objective, up-to-date information and recommendations on the categories throughout

5    the store.  Gifford Decl., ¶ 4.

6                                                                            *Id.*; ECF No. 232-

7    2, Ex. 3 (March 16, 2015 email from Pacific World to Walmart responding to request for proposal

8    regarding category management of Beauty Accessories).

9              One of the key functions of a category manager is to provide data analysis as requested by

10   Walmart.

11                                                       Gifford Decl., ¶ 7.

12

13                 *Id.* ¶ 8.

14                                           *Id.*

15                                                                                       *Id.*

16             Category managers can access real-time sales data reflecting ***past*** retail sales prices and vol-

17   umes in Walmart stores—what plaintiffs term "prices and sales on a store-by-store basis" (Mot. at

18   6)—and use such access to conduct various analyses as requested by Walmart.  These requests might

19   include a request as standard as a weekly category report showing inventory by product (*e.g.*, ECF

20   No. 232-2, Ex. 7

21   or more specific analyses for a particular product or supplier (*e.g.*, ECF No. 232-2, Ex. 15 (email

22   from Coty to Walmart

23

24

25                                                       Gifford Decl., ¶ 10.

26

27            (*e.g.*, ECF No. 232-2, Ex.

28

**Joint Statement re Discovery Disagreement**

1 ████████████████████████████████████████████████████████

2 ████ Gifford Decl., ¶ 10. ███████████████████████████████

3 ████████████████████████████████████████████ *Id.* ¶ 11.

4   Whatever the input from the category manager, Walmart makes the final decisions █████

5 ███████████████████████████ on what new products to stock and what existing

6 products to delete from the store shelves.  *Id.* ¶ 12.  Further, Walmart makes the ultimate decision on

7 what retail price will be charged for every item in its stores.  *Id.* ¶ 12.

8   Category management programs are commonplace in the retail industry.  *Church & Dwight*

9 *Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 918 (N.D. Cal. 2012) ("[U]ndisputed evidence in the

10 record indicates that it is commonplace in the industry for manufacturers to suggest planogram de-

11 signs to retailers or provide retailers with other information to advocate for their brands, regardless

12 of whether those manufacturers serve as category captains.").  Such conduct is viewed as pro-com-

13 petitive and beneficial to consumers because it leads to better products at lower prices on retailers'

14 shelves.  *See* ABA Handbook at 18 ("The primary efficiency attributable to category captains de-

15 rives from the superior information possessed by the upstream supplier as to consumer preferences

16 for the products in the category, and perhaps for those products complementary to the category as

17 well.").[3]

18   **B.   Issues to be Determined at the Hearing**

19   The following discovery issues will need to be determined at the hearing:

20   **Motion to Compel Additional Depositions and/or Motion for Leave to Take Depositions**

21 **in Excess of 10**

22 _____

23 [3] The only reported decision to find an antitrust violation in the context of category management is
*Conwood v. United States Tobacco*, 290 F.3d 768, 774 (6th Cir. 2002).  The *Conwood* court, however,

24 confronted outright tortious conduct by the category captain—including destruction of competitors'
displays without approval from the retailer, training clerks to take advantage of "inattentive store

25 clerks" and providing misleading and false information to retailers regarding product sales (290 F.3d
at 778-79)—conduct plaintiffs do not allege here.  Nevertheless, the leading antitrust treatise has lam-

26 basted the *Conwood* decision as having "largely dispensed with proof that an antitrust violation had
occurred . . . permitting damages to be based on procompetitive conduct."  Phillip E. Areeda (late) &

27 Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application
§ 782a2 (3d & 4th eds. 2018, cum. supp. 2010-2017) ("Areeda").

28

1.    Whether Plaintiffs may take additional depositions above 10, to include taking the deposition of Caroline Day, Carmen Bauza, a corporate representative of Energizer, a corporate representative of KISS, and/or a corporate representative of Onyx.

**Motion to Compel Walmart, Inc. to Respond to Plaintiffs' Interrogatories (Set Two).**

1.    Whether Walmart must provide a substantive responses to Stiles' Interrogatories (Set 2).

III.   **THE CONTENTIONS OF EACH PARTY**

A.   **First Dispute: Plaintiffs' Request to Take 18 Depositions**

1.   **Plaintiffs' Contentions**

Because Defendants have refused to stipulate, Stiles seeks leave of the court to take the following depositions: (1) Terri Cooper (AI); (2) Sheri Davis (former Pacific World/AI); (3) Reuben Driggers (former AI); (4) Delight Slotemaker de Bruine (former AI); (5) Rule 30(b)(6) designee for AI; (6) Melanie Patrick (Walmart); (7) Heather Ronchetto (former Walmart); (8) Caroline Day (former Walmart); (9) Carmen Bauza (former Walmart); (10) Esther Gifford (Walmart); (11) Melanie Jones (current Pacific World); (12) Rule 30(b)(6) designee for Walmart; (13) Rule 30(b)(6) designee for Pacific World; (14) Rule 30(b)(6) designee for Coty; (15) Rule 30(b)(6) designee for P&G; (16) Rule 30(b)(6) designee for Energizer; (17) Rule 30(b)(6) designee for KISS; and (18) Rule 30(b)(6) designee for Onyx.

a.   **The Proposed Depositions Are Not Unreasonably Cumulative.**

The operative complaint contains six allegations over a span of nearly six years. Certain individuals were involved during different time periods, and therefore had access to different information and coordinated with different representatives. Stiles' 18 proposed depositions include representatives from six different third party corporations—each of which were either horizontal competitors and/or Category Advisors during the relevant time period and in categories where Stiles' products were sold. Each of the named individuals and/or corporate representatives for Defendants played a distinct role in Walmart's product distribution management, to include developing and implementing product

**Joint Statement re Discovery Disagreement**

1    strategies concerning price, marketing, stock levels, and store placement.  Each of the identified de-

2    ponents had unique interactions with Stiles that only he or she can testify to.

3         As explained below, each identified deponent will provide distinct testimony as a result of their

4    position, access to information, and/or communications with Stiles, Defendants, and/or third party

5    competitors.

6         1.     **Terri Cooper (AI)**: she is the Executive Vice President of AI; she was responsible for

7    product development at AI; she coordinated at AI to clone the Stiles Razor as early as 2005; and she

8    oversaw the concept, development; and production of the AI Micro Razor, which ███████████

9    ████████    (Ex. 1 (AII_00000619); Ex. 2 (AII_00002768); Ex. 3 (AII_00001590); Ex. 4

10   (AII_00002752).)

11        2.     **Sheri Davis (former Pacific World/AI)**: she was both a former Pacific World em-

12   ployee and a former Director of Sales at AI; she was directly involved with the placement of the AI

13   Micro Razor in Walmart in 2013; in 2011, she was involved with placing Brow Kits in Walmart; she

14   determined the pricing and placement of the AI Micro Razor in Walmart; and she has knowledge of

15   the Stiles Razor placement in Walmart during 2013—the same time frame when the AI Micro Razor

16   was also introduced to the market.   (Ex. 5 (AII 00000272); Ex. 6 (AII_00001949); Ex. 7

17   (AII_00002168); Ex. 8 (WM-STILES-0015607).)

18        3.     **Reuben Driggers (former AI)**: he was the former Brand Director at AI; he was re-

19   sponsible for packaging and supplying AI's Micro Razor to Walmart in 2013; from 2011 to 2012, he

20   oversaw the proposed modular promotion and brief for Ardell beauty products; he has knowledge of

21   AI's pitch to Walmart regarding AI's Mini Brow Shaper in 2013; and he has direct knowledge of the

22   finger grip design of the AI Micro Razor and how it was moved to the same position as the Stiles

23   Razor soft grip.  (Ex. 9 (AII_00001053); Ex. 10 (AII_00000217); Ex. 44 (AII_00000624).)

24        4.     **Delight Slotemaker de Bruine (former AI)**: she was responsible for sourcing the AI

25   Skinny Razor during 2011 to 2012; she has direct knowledge of AI's focus on achieving sales by

26   replacing the Stiles Razor in Walmart; she communicated with Walmart about replacing the Stiles

27

28

1  Razor; and she has knowledge of the Salon Perfect sales in 2011.  (Ex. 11 (AII_00000619); Ex. 44

2  (AII_00000624).)

3       5.  **30(b)(6) designee for AI**: knowledge of AI's organizational structure and the roles of

4  personnel involved in the management of product development and distribution; AI's business rela-

5  tionship with Walmart; AI's practices, processes, and procedures for entering into a sales agreement

6  to supply a product; and AI's participation in Walmart's category advisor program from January 1,

7  2003 to December 31, 2015.  (Ex. 5 (AII 00000272); Ex. 6 (AII_00001949); Ex. 7 (AII_00002168);

8  Ex.  8  (WM-STILES-0015607);  Ex.  9  (AII_00001053);  Ex.  10  (AII_00000217);  Ex.  11

9  (AII_00000619); Ex. 12 (AII_00002768); Ex. 13 (AII_00001590); Ex. 14 (STILES032445); Ex. 15

10  (WM-STILES-0005252);  Ex.  16  (WM-STILES-0005044);  Ex.  17  (AII_00000205);  Ex.  18

11  (AII_00000667); Ex. 19 (AII_00001928); Ex. 20 (AII_00002168).)

12       6.  **Melanie Patrick (Walmart)**: she was the Category and Consumer Insights – Walmart

13  Team Lead from 2012 to 2014; communicated with AI regarding "primary concerns" of adversely

14  affecting the performance of the Salon Perfect razors; she communicated regarding the pricing of the

15  Salon Perfect razors; she communicated with ████████████████████████████████████████

16  ████████████████████████████████████; and she communicated with AI regarding strategy

17  for the brow and lash category.  (Ex. 8 (WM-STILES-0015607); Ex. 19 (AII_00001928); Ex. 21

18  (AII_00001273); Ex. 22 (Doc. ID 6814).)

19       7.  **Heather Ronchetto (former Walmart)**: she was responsible for Walmart's Personal

20  Care Department – Wet Shave, Electric Shave, and Deodorant Categories; she has direct knowledge

21  of Walmart's purchasing decisions related to the Stiles Razor; she has knowledge of the weekly per-

22  formance reports of products in the Wet Shave Category; and she has knowledge of how the Stiles

23  Razor was ultimately cut from Walmart's shelves.  (Ex. 23 (WM-STILES-0004538); Ex. 24 (WM-

24  STILES-0002185); Ex. 25 (WM-STILES-0009338).)

25       8.  **Caroline Day (former Walmart)**: she was a buyer for Walmart's Beauty Department;

26  communicated directly with Pacific World and Coty Category Advisors regarding Stiles' submissions

27  to Walmart; she oversaw category management of the Beauty Department, having access to all

28

1   products sensitive information—to include the Beauty Accessory Line Review during 2011 and 2012;

2   she was responsible for determining which products would be placed in Walmart's Beauty Department;

3   and she had a substantial role in pricing of the AI Micro Razor.  (Ex. 26 (WM-STILES-0017713); Ex.

4   27 (WM-STILES-0017680); Ex. 28 (WM-STILES-0016456); Ex. 29 (WM-STILES-0001326); Ex.

5   30 (WM-STILES-0001328); Ex. 31 (WM-STILES-0016391); Ex. 32 (WM-STILES-0016902).)

6         9.    **Carmen Bauza (former Walmart)**: she was a Walmart Diversity Representative; she

7   was responsible for the pricing, placement, and promotions of the Stiles Razor; she has direct

8   knowledge of the Stiles Razor sales performance between 2008 and 2011; she conveyed Walmart's

9   expectations and goals to Stiles at the end of 2011, she set forth a 2012 business plan; and she com-

10  municated directly with Stiles regarding the elimination of the Stiles Razor from Walmart's stores.

11  (Ex. 33 (WM-STILES-0003259); Ex. 34 (WM-STILES-0003261); Ex. 35 (WM-STILES-0002578);

12  Ex. 36 (WM-STILES-0002307).)

13        10.   **Esther Gifford (Walmart)**: she was the senior buyer responsible for various categories

14  within Walmart's Beauty and Cosmetics department for approximately five years from October 2006

15  through November 2011; she has detailed knowledge as to how Walmart's category management pro-

16  gram operates and the role of category advisors in selecting products for sale in Walmart's stores.

17  (ECF No. 250-4; Ex. 38 (WM-STILES-0005299); Ex. 45 (WM-STILES-0002602); Ex. 48 (WM-

18  STILES-0017807); Ex. 57 (WM-STILES-0005114).)

19        11.   **Melanie Jones (current Pacific World)**: she was the Category Advisor for Pacific

20  World, likely for beauty accessories; she communicated directly with Stiles about the Stiles Razor; she

21  communicated with Walmart specifically about the Stiles Razors; she communicated directly with

22  Coty regarding an upcoming line review of products in Walmart's Beauty Department in 2013; and

23  she received cost and pricing information for the Stiles Razor.  (Ex. 22 (Doc. ID 6814); Ex. 39

24  (STILES009102); Ex. 40 (STILES019087); Ex. 41 (WM-STILES-0006999); Ex. 42 (Doc. ID 11189);

25  Ex. 31 (WM-STILES-0016391); Ex. 43 (WM-STILES-0016187); Ex. 76 (STILES018909 / Doc. ID

26  19156).)

27

28

**Joint Statement re Discovery Disagreement**

1      12.    **30(b)(6) designee for Walmart**: knowledge of Walmart's organizational structure and

2    the roles of personnel involved in the management of product distribution, including merchandise

3    managers, replenishment managers, inventory managers, planners, buyers, category advisors, and cat-

4    egory team assistants; Walmart's practices, processes, and procedures for entering into a sales agree-

5    ment to distribute a product; Walmart's practices, processes, and procedures for setting the sales strat-

6    egy for a product, including, but not limited to, strategy concerning price, marketing, stock levels, and

7    store placement; Walmart's category advisor program; and Walmart's practices, processes, and proce-

8    dures for selecting category advisors.  (Ex. 21 (AII_00001273); Ex. 22 (Doc. ID 6814); Ex. 39

9    (STILES009102); Ex. 40 (STILES019087); Ex. 44 (AII_00000624); Ex. 45 (WM-STILES-0002602);

10   Ex. 46 (WM-STILES-0017786); Ex. 47 (WM-STILES-0017804); (Ex. 48 (WM-STILES-0017807);

11   Ex. 49 (WM-STILES-0010165); Ex. 50 (WM-STILES-0010167); Ex. 15 (WM-STILES-0005252);

12   Ex. 51 (WM-STILES-0008948).)

13     13.    **30(b)(6) designee for Pacific World**: knowledge of Pacific World's organizational

14   structure and the roles of personnel involved in the management of product development and distribu-

15   tion; Pacific World's business relationship with Walmart; Pacific World's practices, processes, and

16   procedures for entering into a sales agreement to supply a product; and Pacific World's participation

17   in Walmart's category advisor program from January 1, 2003 to December 31, 2015.  (Ex. 52 (WM-

18   STILES-0003313);  Ex. 53 (Doc. ID 6800); Ex. 54 (Doc. ID 6811); Ex. 15 (WM-STILES-0005252);

19   Ex. 42 (Doc. ID 11189); Ex. 38 (WM-STILES-0005299); Ex. 14 (STILES032445).)

20     14.    **30(b)(6) designee for Coty**: knowledge of Coty's organizational structure and the roles

21   of personnel involved in the management of product development and distribution; Coty's business

22   relationship with Walmart; Coty's practices, processes, and procedures for entering into a sales agree-

23   ment to supply a product; and Coty's participation in Walmart's category advisor program from Jan-

24   uary 1, 2003 to December 31, 2015.  (Ex. 55 (STILES018909); Ex. 56 (WM-STILES-0016364); Ex.

25   57 (WM-STILES-0005114).)

26     15.    **30(b)(6) designee for P&G**: knowledge of P&G's organizational structure and the

27   roles of personnel involved in the management of product development and distribution; P&G's

28

1   business relationship with Walmart; P&G's practices, processes, and procedures for entering into a

2   sales agreement to supply a product; and P&G's participation in Walmart's category advisor program

3   from January 1, 2003 to December 31, 2015.  (Ex. 58 (WM-STILES-0001961); Ex. 59 (WM-STILES-

4   0003327); Ex. 60 (WM-STILES-0007468); Ex. 61 (WM-STILES-0009404); Ex. 62 (WM-STILES-

5   0009439);  Ex. 63 (WM-STILES-0009448); Ex. 64 (WM-STILES-0009687); Ex. 65 (WM-STILES-

6   0015769); Ex. 25 (WM-STILES-0009338).)

7         16.    **30(b)(6) designee for Energizer**: knowledge of Energizer's organizational structure

8   and the roles of personnel involved in the management of product development and distribution; En-

9   ergizer's business relationship with Walmart; Energizer's practices, processes, and procedures for en-

10  tering into a sales agreement to supply a product; and Energizer's participation in Walmart's category

11  advisor program from January 1, 2008 to December 31, 2015.  (Ex. 66 (WM-STILES-0009442); Ex.

12  67 (WM-STILES-0008655); Ex. 61 (WM-STILES-0009404); Ex. 68 (WM-STILES-0004551); Ex.

13  69 (WM-STILES-0004398); Ex. 64 (WM-STILES-0009687); Ex. 25 (WM-STILES-0009338).)

14        17.    **30(b)(6) designee for KISS**: knowledge of KISS's organizational structure and the

15  roles of personnel involved in the management of product development and distribution; KISS's busi-

16  ness relationship with Walmart and AII; and KISS's practices, processes, and procedures for entering

17  into a sales agreement to supply a product.  (Ex. 70 (Doc. ID 7006); Ex. 71 (AII_00000667); Ex. 72

18  (AII_00000205).)

19        18.    **30(b)(6) designee for Onyx**: knowledge of Onyx's organizational structure and the

20  roles of personnel involved in the management of product development and distribution; Onyx's busi-

21  ness relationship with Walmart; and Onyx's practices, processes, and procedures for entering into a

22  sales agreement to supply a product.  (Ex. 73 (Doc. ID 30811); Ex. 74 (WM-STILES-0011000); Ex.

23  75 (STILES002349).)

24        Therefore, each deposition is necessary to "uncover evidence of invidious, pattern or intent"

25  that is involved Stiles' antitrust claims.  *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 217 (D.C.

26  Del. 1985); *see also Cortez v. Arizona*, No. CV09526TUCDCBCRP, 2010 WL 11485030, at *3 (D.

27  Ariz. Sept. 2, 2010) (granting Plaintiffs' motion for five additional depositions because Plaintiffs

28

1    offered specific reasons for their request to depose each of these five additional people); *Cyntegra,*

2    *Inc. v. IDEXX Laboratories, Inc.*, 2007 WL 9701999 at *4 (C.D. Cal. Jun 29, 2007) ("In antitrust cases,

3    courts have generally allowed liberal discovery.").

4              **b.    Plaintiffs Have Not Been Able to Obtain the Requested Discovery**
                       **by Other Means.**
5
         As described in Stiles' previous motion to compel (ECF No. 279) and supporting joint state-
6
     ment (ECF No. 284), Stiles has struggled to obtain discovery from Defendants in this case.  In addition,
7
     deposition testimony is distinct from written discovery, and it is especially significant in antitrust cases
8
     because "relevant business documents pertaining to the antitrust conspiracy may not exist and covert
9
     behavior may have to be proven through less direct means."  *In re Microcrystalline Cellulose Antitrust*
10
     *Litigation*, 221 F.R.D. 428, 429–30 (E.D. Pa. 2004) (commenting on broad scope of permissible dis-
11
     covery in antitrust cases).
12
         Because this case centers on multiple antitrust and patent violations, a significant number of
13
     critical documents consist of dense Excel spreadsheets containing numerous products, cost projec-
14
     tions, and sales data.  Only through depositions can Stiles parse out the information contained in these
15
     spreadsheets and correlate the data to pricing and stocking decisions.  Without context—to be provided
16
     by the designated deponents—the spreadsheets will either be open to misinterpretation or exist without
17
     being assigned proper weight at trial.[4]
18
              **c.    The Proposed Depositions Are Within the Scope of Rule 26(b)(1).**
19
         Stiles' requested deponents are likely to give testimony relevant to the claims at issue.  As
20
     evidenced above, each identified deponent advised Walmart as to product selection, price point, quan-
21
     tity selection, and placement in relevant product categories at Walmart where Stiles' products were
22
     carried, and therefore will likely have relevant information related to Stiles' claims.
23

24

25    ───────────────────
      [4] Notably, most, if not all, of Stiles' identified deponents are outside the jurisdiction of this Court.
26    Thus, at trial, Stiles will not be able to compel key witness testimony from these deponents.  Stiles
      may be forced to rely on deposition transcripts and/or video recordings in lieu of live testimony.  This
27    reality makes the requested depositions even more critical.

28

**Joint Statement re Discovery Disagreement**

1       Regarding Walmart's six deponents,[5] Stiles alleges that Walmart played a pivotal role in the

2   multi-year price and output fixing scheme which resulted in her exclusion from the market.  Through

3   discovery, Stiles has learned that ███████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████ (*see* ECF No.

5   250-4), and it is how ████████████████████████████████████████████████████████

6   ██████████████████████████████  From Category Advisors to buyers, each Walmart deponent

7   interacted with various competitors at different points in time and, most importantly, will provide tes-

8   timony as to how product information was shared and impacted pricing and stocking decisions.  Such

9   testimony is relevant to Stiles' antitrust and patent claims.

10      As to AI's five deponents,[6] Stiles alleges that Walmart and AI entered into an unlawful agree-

11  ment to knock-off the Stiles Razor design then sell the infringing Ardell Razor in Walmart stores.

12  Discovery to date has revealed that ███████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████████████████

14  ███████████████████████████████████████  Each designated AI deponent will be

15  capable of providing testimony as to how AI ██████████████████████████████████████████

16  ██████  all of which is critical to Stiles' patent claims.

17      The seven third party deponents,[7] fall into at least one of the following categories:  served as a

18  Walmart Category Advisor in categories where Stiles' products were sold; acted as a direct horizontal

19  competitor of Stiles during the relevant time period; and/or had access to Stiles confidential design,

20  promotions, or sales data via Walmart.  The deposition testimony these third parties may provide will

21  be relevant to Stiles' allegations of horizontal price fixing and Defendants' pattern and practice of

22  copying products to sell in retail stores.

23

24  _____

    [5] Of the six Walmart deponents identified, it is possible that one of the deponents will also serve as

25  Walmart's 30(b)(6) witness.

    [6] Of the five AI deponents identified, it is possible that one of the deponents will also serve as AI's

26  30(b)(6) witness.

27      [7] Stiles has identified Melanie Jones of PWC and a PWC 30(b)(6) witness; it is possible that these
    individuals will be one and the same.

28

**Joint Statement re Discovery Disagreement**

1    These third-party depositions are necessary because a number of the documents and issues of

2    testimony requested would not be in possession of either Defendants or Stiles.  (*See generally* Docu-

3    ments produced by Pacific World, Ex. 42 (Doc. ID 11189); Ex. 76 (Doc. ID 19156).)  Moreover, De-

4    fendants' pleadings and discovery responses are believed to contain misrepresentations that these

5    third-party witness can impeach.  For example, Stiles could inquire of Energizer as to Walmart's nar-

6    rative regarding which companies served as Category Advisors.  (*Compare* Declaration of Esther

7    Gifford in Support of Walmart's Opposition to Plaintiff's Motion Seeking Leave to Join Additional

8    Defendants (ECF No. 250-4) ████████████████████████████████████████████████

9    ████████████ *with* Ex. 66 ██████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████████████████

11   ██████████████████████████████████████ (WM-STILES-0009442).)

12   The deponents are proportional to the needs of the case.  18 depositions are exceptionally effi-

13   cient and economical considering the scope of the case.  *See Garnett v. ADT LLC*, 14-cv-02851-WBS-

14   DAD, 2015 WL 12942061, at *2 (E.D. Cal. Dec. 2, 2015) (granting *ex parte* motion to continue class

15   certification hearing and to allow the defendant to take 20 depositions).  Walmart is a global company

16   and the largest retailer in the world by revenue.  Walmart sold Stiles' products for nearly 6 years while

17   it also hired representatives from the largest manufacturing companies in the world, such as Pacific

18   World, Coty, P&G, and Energizer to serve as Category Advisors who received access to Stiles' and

19   other direct competitors' marketing and sales data.  The web of communications among these parties—

20   specifically, the knowledge and access to information regarding the Stiles Razor design and price

21   point—more than establishes good cause for the possibility of Stiles requiring 18 depositions.

22   Each of the other considerations under Rule 26(b)(1) weigh in favor of good cause for addi-

23   tional depositions in this case.  Antitrust and willful patent infringement violations by some of the

24   world's largest and most impactful companies—including the knocking-off of a patented, domesti-

25   cally-produced product by a Chinese manufacturer at the behest of Defendants—have an impact that

26   extends beyond this narrow case, and it is both privately and publicly important that Stiles has the

27   ability to prove her well-plead claims, including through depositions clarifying, explaining, and

28

1    authenticating Defendants' and third parties' damning document production.  *See Mitsubishi Motors*

2    *Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 634–35 (1985) (emphasizing the national inter-

3    est and "fundamental importance to American democratic capitalism of the regime of the antitrust

4    laws").  Defendants' alleged conduct resulted in the elimination of Stiles' products from the market,

5    caused substantial damages to Stiles, and spanned more than a decade.  The operative Complaint con-

6    tains seven causes of action, all of which have proceeded past the Motion to Dismiss stage.  This

7    justifies Stiles' request for five additional depositions.

8         Moreover, the additional expense of these depositions would not be unduly burdensome for

9    Defendants because the parties have set a deposition schedule that allows for multiple depositions to

10   take place back-to-back at the same location (*e.g.*, Bentonville, Arkansas and Los Angeles, California).

11   (Dunne Decl. ¶ 12.)  Therefore, counsel will not be required to make excessive travel and lodging

12   arrangements while still being able to attend depositions.

13            **d.    Courts Do Not Apply the "Exhaustion Rule" Where the Complex-
                      ity of the Case Warrants More than Ten Depositions.**
14

15        Stiles is not required to exhaust all 10 of her depositions before she can seek leave for addi-

16   tional depositions.  Many courts, including those in this district, "have departed from this 'exhaustion

17   rule' where the complexity of the case clearly warranted more than ten depositions."  *Aerojet Rock-

18   etydyne, Inc. v. Global Aerospace, Inc.*, 2018 WL 5993585 at *1 (E.D. Cal. Nov. 6, 2018); *see also*

19   *Del Campo v. American Corrective Counseling Servs., Inc.*, 2007 WL 3306496 at *6 (N.D. Cal. Nov.

20   6, 2007) ("[I]t would be prejudicial to require Plaintiffs to choose the ten depositions to take before

21   they know whether they will be granted more."); *C&C Jewelry Mfg., Inc. v. West*, 2011 WL 767839 at

22   *2 (N.D. Cal. Feb. 28, 2011) ("While some courts require a party to exhaust the 10-deposition limit

23   before seeking to take more, that is certainly not true in every case.").

24        The complexity of the present case obviates application of the exhaustion rule. Similar to how

25   the *C&C Jewelry* court authorized more than 19 depositions without application of the exhaustion rule

26   when there were only two parties involved in a patent action seeking declaratory relief.  *C&C Jewelry*

27   *Mfg., Inc.*, 2011 WL 767839 at *1–2.  Here too, Stiles' request for leave to take 18 depositions is taken

28   in an abundance of caution and is far more compelling than the situation presented in *C&C Jewelry*

1  because Stiles alleged complex antitrust claims in addition to patent infringement claims against de-

2  fendants far larger in size.  *See* Annotated Manual for Complex Litigation (Fourth) § 30 (2007) ( "An-

3  titrust litigation can . . . involve voluminous documentary and testimonial evidence, extensive discov-

4  ery, complicated legal, factual, and technical (particularly economic) questions, numerous parties and

5  attorneys, and substantial sums of money, calling for the application of techniques and procedures for

6  the management of complex litigation.").

7        The purpose of discovery is to remove surprise from trial preparation so the parties can obtain

8  evidence necessary to evaluate and resolve their dispute.  *See Cable & Computer Tech., Inc. v. Lock-*

9  *heed Saunders, Inc.*, 175 F.R.D. 646, 650 (C.D. Cal. 1997).  This is what Stiles is trying to accomplish

10  in this case.  Therefore, the depositions Stiles proposes are necessary.

11        **2.     Walmart's Contentions**

12        **a.     Plaintiffs Failed to Meet and Confer With Respect to Five of the
             Eighteen Depositions for Which They Seek Leave.**

13
14        The Local Rules of this Court do not endorse ambush tactics and clearly require that no issue

15  be raised in a joint statement without having first been the subject of a conference of the parties. Local

16  Rule 251 requires that "a motion made pursuant to Fed. R. Civ. P. 26 through 37 and 45, including any

17  motion to exceed discovery limitations . . . ***shall not*** be heard ***unless*** (1) the parties have conferred

18  and attempted to resolve their differences, and (2) the parties have set forth their differences and the

19  bases therefor in a Joint Statement re Discovery Disagreement." L.R. 251(b) (emphasis added).  With

20  respect to the conference requirement, the Rule is clear:  "Counsel ***shall confer*** in advance of the filing

21  of the motion . . . in a good faith effort to resolve the differences that are the subject of the motion."

22  *Id.* (emphasis added).  The joint statement "shall specify with particularity . . . (1) The details of the

23  conference," L.R. 251(c)(1), i.e., the conference must take place before the filing of the joint statement.

24        At the outset, regarding five of the witnesses plaintiffs now seek leave to depose, there was no

25  such conference (because plaintiffs sprung these witnesses on defendants at the last minute—in the

26  case of four of them, two days before the joint statement was due to be filed, and mere hours before

27  plaintiffs provided defendants with their portions of this joint statement).  Plaintiffs fail to satisfy the

28  standards set out in Local Rule 251 with respect to the following witnesses: Carmen Bauza, Caroline

1  Day, 30(b)(6) designee for Energizer, 30(b)(6) designee for KISS, and 30(b)(6) designee for Onyx.

2  For this reason alone, the Court should deny plaintiffs' request for leave to depose these witnesses.

3          **b.      Plaintiffs Failed to Properly Notice Their Motion with Respect to**
           **Five of the Eighteen Depositions for Which They Seek Leave.**
4

5          Plaintiffs filed their notice of motion and motion on December 6, 2019.  (ECF No. 288.)  The

6  notice of motion and motion are clear:  plaintiffs moved for leave to take *three* additional depositions

7  beyond the 10 allowed under the Federal Rules.  Carmen Bauza, Caroline Day, 30(b)(6) designee for

8  Energizer, 30(b)(6) designee for KISS, and 30(b)(6) designee for Onyx do not appear anywhere in

9  plaintiffs' notice of motion or motion and are not part of the requested relief to be adjudicated at the

10 hearing.  Indeed, mere hours before serving plaintiffs with their joint statement, and with no prior

11 notice that they would do so, plaintiffs revealed that they would not limit the joint statement to the

12 matters in the notice of motion or to the contents of the parties' telephonic meet and confers on this

13 topic.  Instead, abandoning any claim that they had "carefully sought a narrow list of deponents that

14 comprises just thirteen individuals and corporations," ECF No. 288 at 1, plaintiffs inappropriately

15 expanded the scope of their motion to ***eighteen individuals***.  *See* ECF No. 288 at 3-6.  Whereas in

16 their motion just one month ago plaintiffs assured defendants and the Court that ***thirteen*** depositions

17 "is exceptionally efficient and economical," ECF. No. 288 at 9, plaintiffs say the exact same now about

18 ***eighteen*** depositions.  The Court should not reward such deliberate disregard for the Federal Rules of

19 Civil Procedure.  *See* Fed. R. Civ. P. 7(b)(1)(C) (A "motion must…(C) state the relief sought.").

20         **c.      Plaintiffs Fail to Make the Required Particularized Showing That**
           **Eighteen Depositions are Necessary.**

21         "Federal Rule of Civil Procedure 30 presumptively limits a party to ten depositions; a party

22 may only exceed this number with leave of court or by stipulation of the parties."  *Nevis v. Rideout*

23 *Mem'l Hosp.*, 2019 U.S. Dist. LEXIS 188550, at *5-6 (E.D. Cal. Oct. 30, 2019) (citing Fed. R. Civ.

24 P. 30(a)(2)(A)(i)).  The parties adopted this limitation in submitting their Rule 26(f) statement to the

25 Court.  (ECF No. 149 at 3, ¶ 6.)  "A party seeking to exceed the presumptive limit bears the burden

26 of making a 'particularized showing' of the need for additional depositions."  *Rideout Mem'l Hosp.*,

27 2019 U.S. Dist. LEXIS 188550, at *5-6 (citation omitted).  "Many courts considering requests to

28

1   exceed the standard limits for the number of . . . depositions—including this court—have required

2   the party requesting additional . . . depositions to make a particularized showing as to why additional

3   discovery is necessary ***before*** proceeding to evaluate whether the request is consistent with Rule

4   26(b)(2).” *Krause v. Hawaiian Airlines, Inc.*, 2019 U.S. Dist. LEXIS 133880, at *11-13 (E.D. Cal.

5   Aug. 7, 2019) (citations and internal quotations omitted) (emphasis added); *Waterbury v. Scribner*,

6   2008 U.S. Dist. LEXIS 53142, at *21 (E.D. Cal. May 7, 2008) (“Pursuant to FRCP 33(a), once the

7   moving party has made a particularized showing, the Court shall grant leave if it is consistent with

8   FRCP 26(b)(2).”).  In making the required particularized showing, plaintiffs must clearly articulate

9   “why the[] depositions are necessary to substantiate [their] claims.” *Lloyd v. Valley Forge Life Ins.*

10  *Co.*, 2007 U.S. Dist. LEXIS 40526, at *6 (W.D. Wash. Mar. 23, 2007).

11       As an initial matter, far short of making the particularized showing that plaintiffs need more

12  than 10 depositions, plaintiffs concede—in the first sentence of their argument—that their number of

13  necessary depositions could in fact be fewer than ten.  Motion (ECF No. 288) at 8; *see also* Joint

14  Statement, *supra* (stating that “Stiles’ request for leave to take 18 depositions is taken ***in an abun-***

15  ***dance of caution***”) (emphasis added).  Indeed, plaintiffs further equivocate as to the necessity.  On

16  the one hand, plaintiffs represent to the Court that they may “be able to take all necessary deposi-

17  tions without conducting more than ten,” *id.*; but on the other hand, they caution it may well be “im-

18  possible to obtain the necessary discovery . . . with [only] ten deponents,” *id.* at 2.  On this basis

19  alone, the Court should find that plaintiffs have failed to make the required particularized showing

20  that they require in excess of ten depositions and deny plaintiffs’ motion.  *See Archer Daniels Mid-*

21  *land Co. v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 587 (D. Minn. 1999) (“[T]he drafters of Rule 30

22  clearly did not contemplate that depositions should . . . be available without a showing of need.”);

23  *Whittingham v. Amherst Coll.*, 163 F.R.D. 170, 171 (D. Mass. 1995) (denying plaintiff’s request for

24  additional depositions because plaintiff’s proffered list of “individuals who could ***potentially*** be de-

25  posed” was insufficiently specific) (emphasis added).

26       Plaintiffs’ internally inconsistent arguments aside, they fail to make the required particular-

27  ized showing for more than 10 depositions.  Whether certain deposition testimony may assist

28

**Joint Statement re Discovery Disagreement**

1   plaintiffs to "assign proper weight at trial" to "dense Excel spreadsheets," is foreign to any precedent

2   on what qualifies as the required particularized showing that the depositions are necessary.  Moreo-

3   ver, all of the "spreadsheets" cited by plaintiffs were *produced by Walmart and/or AI*.  If anyone is

4   going to "parse" and explain them to plaintiffs, it is Walmart and AI witnesses who are already on

5   plaintiffs' list of desired deponents, not third parties that did not produce the documents.  Indeed, for

6   this reason, the Court "***must*** limit" the number of depositions—because the discovery plaintiffs

7   claim they seek from the seven third-party witnesses would be "unreasonably cumulative or duplica-

8   tive." Fed. R. Civ. P. 26(b)(2)(C)(i); *see Waterbury*, 2008 U.S. Dist. LEXIS 53142, at *21 (court

9   may only grant leave for additional depositions only if consistent with Rule 26(b)(2)); *Owino v.*

10   *CoreCivic, Inc.*, 2019 U.S. Dist. LEXIS 111808, at *8 (S.D. Cal. July 3, 2019); *EEOC v. Freeman*,

11   2012 U.S. Dist. LEXIS 86198, at *4 (D. Md. June 21, 2012) (citing *Nicholas v. Wyndham Int'l, Inc.*,

12   373 F.3d 537, 543 (4th Cir. 2004)) ("If further depositions on the same issues would yield infor-

13   mation already provided in prior depositions, then those further depositions should be excluded as

14   'unreasonably cumulative or duplicative.'").

15       Plaintiffs assert that "each identified deponent advised Walmart as to product selection, price

16   point, quantity selection, and placement in relevant product categories at Walmart where Stiles'

17   products were carried."  Plaintiffs cite nothing for this false assertion, which falls woefully short of

18   the required particularized showing.

19       Similarly, plaintiffs assert without citation that "[e]ach of the identified deponents had unique

20   interactions with Stiles that only he or she can testify to."  They provide no explanation for why, for

21   example, Stiles' alleged "direct horizontal competitors" had "unique interactions with Stiles," or

22   why, if they did, those "interactions" would be relevant to this case.

23       Plaintiffs next assert that "[t]hrough discovery, Stiles has learned that Walmart's category

24   management system . . . is how horizontal competitors gained access to Stiles' (among other compet-

25   ing products) sales, price, costs, and capacity data."  This false assertion conveniently, too, lacks a

26   single citation.  Plaintiffs omit to mention, for example, that far from learning "through discovery"

27   about Walmart's category management program, plaintiffs based the original complaint they filed

28

1   against Walmart and AI in *Stiles I* on the allegedly "improper" role of Coty and Pacific World in the

2   category management process at Walmart.  Indeed, the only documents plaintiffs cite for the propo-

3   sition that Melanie Jones at Pacific World, for example, "received cost and pricing information for

4   the Stiles Razor," are an email and attachment thereto that ***plaintiff Stiles herself sent to Ms. Jones***

5   ***and attached as an exhibit to her original complaint filed five and one-half years ago***.  Compare

6   Dunne Decl., Exs. 39-40, with *Stiles I*, ECF No. 1, Exhibit C.

7          Next, plaintiffs assert that "[t]he seven third party deponents, fall into at least one of the fol-

8   lowing categories: served as a Walmart Category Advisor in categories where Stiles' products were

9   sold, acted as a direct horizontal competitor of Stiles during the relevant time period, and/or had ac-

10  cess to Stiles confidential design, promotions, or sales data via Walmart."  Plaintiffs again cite noth-

11  ing for this assertion.  Who "had access to Stiles [sic] confidential design," for example?  Plaintiffs

12  do not say.  Who was "a direct horizontal competitor of Stiles," and with respect to which of its/their

13  products?  Plaintiffs do not say.  How can plaintiffs square their allegation in the FAC that the rele-

14  vant market in which plaintiffs competed was limited to "Disposable Personal Styling Razors,"

15  FAC, ¶ 79, with their apparent allegation now that Procter & Gamble's generic shaving products

16  competed with the Stiles Razor?  Plaintiffs do not explain.  Self-serving *ipse dixit* is not the particu-

17  larized showing required to exceed the 10-deposition limit under the Federal Rules.

18         Plaintiffs say that the seven third-party deponents they have identified "will be relevant to

19  Stiles' allegations of horizontal price fixing," but ***there are no such allegations in the FAC***.  To the

20  contrary, the FAC itself expressly alleges:  "In this Fourth Amended Complaint, Stiles . . . ***re-al-***

21  ***lege[s] and amend[s] the § 1 Sherman Act and California Cartwright Act rule of reason claims*** as

22  permitted by the Court in its June 20, 2018, Order."  FAC at 3 n.1 (emphasis added).  And this Court

23  held long ago that "Plaintiff has not alleged facts sufficient to state a claim of per se illegal antitrust

24  conduct."  Order (ECF No. 101) at 5:23-24.

25         Plaintiffs appear to hold the profoundly mistaken belief that, because the Court sustained a

26  motion to dismiss the antitrust claims in the FAC, they can now pursue through discovery any theory

27  of antitrust violation they want, despite the fact that the theory they now wish to pursue—a

28

1   widespread "category management" conspiracy theory—appears nowhere in the FAC, involves dif-

2   ferent parties engaging in different conduct at different time periods, and supposedly is subject to the

3   "*per se*" rule of illegality rather than the rule of reason.  Plaintiffs circularly argue (1) that they have

4   a right to amend the pleadings "at any time" in the future to conform the pleadings to their new anti-

5   trust conspiracy theory (citing Federal Rule of Civil Procedure 15(b)), and (2) that because the

6   pleadings could be so conformed later, they are entitled to pursue that theory now, and abandon the

7   alleged illegal agreement pled in the FAC.

8        Plaintiffs are wrong.  Federal Rule of Civil Procedure 15(b)—"Amendments ***During and Af-***

9   ***ter Trial***" (emphasis added)—is "not applicable in [the pre-trial] context."  *Mackovich v. United*

10  *States Gov't*, 2008 U.S. Dist. LEXIS 124630, at *8 (E.D. Cal. May 13, 2008) (denying plaintiff's

11  motion for a continuance pending further discovery and denying plaintiff's motion seeking leave to

12  amend).  As is nearly universally recognized, "[t]he purpose of Rule 15(b) is to conform the plead-

13  ings to conform to the issues actually ***tried***."  *Cole v. Layrite Prods. Co.*, 439 F.2d 958, 961 (9th Cir.

14  1971) (emphasis added); *see* 3 Moore's Federal Practice - Civil § 15.18 (2019) ("A court may grant

15  leave to amend to conform the pleadings to the evidence ***presented at trial.***") (emphasis added).

16       Plaintiffs have it backwards: the scope of discovery is defined by the "claims and defenses"

17  asserted in the operative pleadings.  Fed. R. Civ. P. 26(b)(1).[8]  In order to pursue a new theory of an-

18  titrust liability—particularly one involving a horizontal agreement among Walmart, AI, and

19  Walmart's category managers to "fix prices" and "share information" rather than a single, vertical

20  agreement between Walmart and AI subject to the rule of reason—plaintiffs must amend their com-

21  plaint to plausibly allege such a theory.  Indeed, plaintiffs knew that when they moved the Court to

---

22

23   [8] Plaintiffs' suggestion that antitrust cases are afforded a special, "liberal application of discovery rules" does not give them license to circumvent the baseline relevancy standard of Rule 26(b)(1) that, of course, applies to "***all*** civil actions" in federal district courts, and not any less to antitrust cases.  *See*

24   Fed. R. Civ. P. 1 (emphasis added); *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 299-301 (D.D.C. 2000) (performing exhaustive relevance analysis under Rule 26(b)(1) and concluding information

25   sought by motion to compel was only "marginally" relevant, "if at all"; denying motion to compel); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2012 U.S. Dist. LEXIS 74000, at *20 (E.D. Cal.

26   May 29, 2012) (denying motion to compel because information sought "is irrelevant" and "not at issue" for plaintiff's Sherman Act Section 1 claim); *see also C&C Jewelry Mfg. v. West*, 2011 U.S.

27   Dist. LEXIS 24706, at *2-3 (N.D. Cal. Feb. 25, 2011) ("Although the scope of discovery under the Federal Rules is broad, ***it is not unfettered***.") (emphasis added).

28

1  amend their complaint and join additional parties—a motion the Court considered to be a motion for

2  leave to amend *prior to trial* under Rule 15(a)—to assert the very theory on which they are now try-

3  ing to seek expansive discovery.  ***The Court denied their motion***.  (ECF No. 278.)  Plaintiffs are the

4  masters of their complaint.  They pled a simple vertical agreement between Walmart and AI subject

5  to the rule of reason, and that defines the scope of discovery here.

6        Rule 15(b) serves a narrow purpose:  "A court may grant leave to amend to conform the

7  pleadings to the evidence presented at trial."  3 Moore's Federal Practice - Civil § 15.18 (2019).

8  Whether leave is to be granted depends on ***whether the opposing party consented to try the issues***

9  ***for which the evidence was introduced***.  *See id.*  The analysis of whether consent was given, and if

10  so, whether the consent was express or implied, decidedly focuses on the parties' conduct at trial.

11  *See id.*; *see also Jenkins v. Union Pac. R.R.*, 22 F.3d 206, 213 (9th Cir. 1994) (denying leave to

12  amend the pleadings even where plaintiff introduced evidence on the issue at trial because plaintiff

13  "had been on notice" of the issue "for at least a year"; finding undue delay and prejudice to defend-

14  ants); *Casey v. Lewis*, 43 F.3d 1261, 1268 (9th Cir. 1994) (finding defendants consented to trial of an

15  issue because defendants failed to object to plaintiffs' introduction of trial testimony on direct exam-

16  ination).  As such, Rule 15(b) "is not applicable" pre-trial.  *See Mackovich*, 2008 U.S. Dist. LEXIS

17  124630, at *8.

18        Regardless, far from consenting to try plaintiffs' fabricated "category manager" conspiracy

19  theory, ***defendants (successfully) opposed plaintiffs' motion for leave to amend*** their FAC (for the

20  fifth time) to state their brand new proposed antitrust claims, and have never expressly or impliedly

21  consented to their being tried (now or ever).  *See Juergens v. Watt*, 2009 U.S. Dist. LEXIS 41194, at

22  *9 (N.D. Miss. May 15, 2009) ("[W]hen a party objects to the introduction of evidence on a new is-

23  sue, the opposing party cannot later seek to amend the pleadings to conform to the evidence on the

24  ground that the party impliedly consented to the trial of that issue."); *see, e.g.*, *Med. Ctr. of Cent.*

25  *Ga., Inc. v. Denon Dig. Emple. Benefits Plan*, 2005 U.S. Dist. LEXIS 46957, at *12-14 (M.D. Ga.

26  May 4, 2005) ("[T]he language of 15(b), and the cases interpreting it, make clear that this Rule is not

27  a mechanism for amending pleadings before trial.  . . .  JSLA's reliance on this portion of the Rule

28

1   ignores the significance of the first sentence, which requires that the issues in question in fact

2   be *tried by express or implied consent*. . . .   In addition, and to no one's surprise, the issues high-

3   lighted by JSLA as warranting amendment of the pleadings—that Denon has acted in bad faith and

4   been stubbornly litigious—have not been consented to by Denon, either expressly or impliedly. Con-

5   sequently, JSLA's motion for leave to amend under Rule 15(b) is denied.").

6      Moreover, plaintiffs disingenuously underplay the scope of their planned depositions of the

7   seven third-party witnesses.  Whereas plaintiffs tell the Court they need a Rule 30(b)(6) deposition

8   of these third parties (e.g., Pacific World) to question them about:

9      knowledge of Pacific World's organizational structure and the roles of personnel involved
10     in the management of product development and distribution; Pacific World's business re-
       lationship with Walmart; Pacific World's practices, processes, and procedures for entering
11     into a sales agreement to supply a product; and Pacific World's participation in Walmart's
       category advisor program from January 1, 2003 to December 31, 2015,
12

13  the actual subpoenas plaintiffs served on these entities earlier this week tell a different story:  plain-

14  tiffs plan to use these depositions to engage in a fishing expedition to support their un-pled category

15  manager conspiracy theory, which the Court expressly denied them leave to plead.  *See* Simonsen

16  Decl., ¶ 16 & Ex. 9 (subpoena to Procter & Gamble); *id.*, Ex. 10 (subpoena to Energizer); *id.*, Ex. 11

17  (subpoena to Coty); *id.*, Ex. 12 (subpoena to Pacific World); *see, e.g., id.*, Ex. 9, ¶ 5 (subpoena to

18  Procter & Gamble) ("The nature and extent of any interactions between (a) Procter & Gamble em-

19  ployees serving as a category advisor to Walmart for the Wet Shave Category at any point during the

20  period of January 1, 2007, to October 1, 2014, and (b) Procter & Gamble employees serving as a cat-

21  egory advisor to any other retailer (besides Walmart) for wet shave products at any point during the

22  period of January 1, 2007, to October 1, 2013.").  This noticed topic has absolutely nothing to do

23  with plaintiffs' allegations in the FAC, as articulated by the Court:  "[T]he *only agreement* alleged in

24  the [complaint] is that Walmart—as a retailer—propositioned AI—as a manufacturer/supplier—to

25  make a knock off of the Stiles Razor to be sold at Walmart under Walmart's brand, and AI agreed."

26  ECF No. 101 at 7 (emphasis added).

27     In any event, even if the Court accepts as true plaintiffs' false assertion that they seek to de-

28  pose the identified third parties solely to understand their organizational structure and sales

1   "practices, processes, and procedures" and gain information about how they entered into sales agree-

2   ments and the category advisor program with Walmart, a general desire to understand the relation-

3   ship between Walmart and non-party entities falls woefully short of a "particularized showing as to

4   why additional discovery is necessary" to support plaintiffs' alleged vertical agreement between

5   Walmart and AI. *See Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2006 U.S. Dist. LEXIS

6   59095, at *11-12 (D.N.J. Aug. 18, 2006) ("To meet this requirement of a particularized showing of

7   need, the moving party must go beyond general assertions regarding the potential relevance of the

8   proposed deponents' testimony to demonstrate that the probable testimony of each proposed depo-

9   nent is essential to the moving party's case.") (citing *Archer Daniels Midland Co.*, 187 F.R.D. at

10   587)); *Smith v. Ardew Wood Prods.*, No. C07-5641 FDB, 2008 U.S. Dist. LEXIS 93855, at *4 (W.D.

11   Wash. Nov. 6, 2008) ("Defendants instead rely on very generalized bases in support of the motion,

12   none of which warrant exceeding the ten deposition limit.").

13   Plaintiffs' reliance on *C&C Jewelry Mfg. v. West*, 2011 U.S. Dist. LEXIS 24706 (N.D. Cal.

14   Feb. 25, 2011), and *Aerojet Rocketdyne, Inc. v. Glob. Aero., Inc.*, 2018 U.S. Dist. LEXIS 190035

15   (E.D. Cal. Nov. 6, 2018), is misplaced, because in those cases the additional depositions led to infor-

16   mation necessary to claims ***actually*** asserted.  In *C&C Jewelry*, the plaintiff sought a declaratory

17   judgment that the plaintiff did not infringe defendant's patent, and each of the additional depositions

18   was of a witness whose testimony was central to the merits of the patent claim.  *C&C Jewelry Mfg.*,

19   2011 U.S. Dist. LEXIS 24706, at *4 ("C&C says that each witness has experience or knowledge

20   about designs, processes and techniques relevant to its obviousness and non-infringement defenses;

21   patent prosecution history; or to West's claimed inventive steps.").

22   The facts of *Aerojet* involved two separate engine failures, an underlying contract and settle-

23   ment agreement between the plaintiff and a third party, and an indemnity suit against the defendant

24   insurance company.  *Aerojet Rocketdyne, Inc.*, 2018 U.S. Dist. LEXIS 190035, at *5-8.  In every in-

25   stance where the *Aerojet* court permitted defendants to take additional depositions (and the court did

26   not do so in every instance), the deponent was a high-level member of the plaintiff corporation and

27   personally involved in one or more of the following: the engine failures, the underlying contract

28

**Joint Statement re Discovery Disagreement**

1   negotiations with the third party, the settlement agreement, or the insurance agreement.  *See id.* at

2   *12-18.  As in *C&C Jewelry*, the additional depositions in *Aerojet* were clearly necessary to resolv-

3   ing the dispute.  Far from the additional deponents in *C&C Jewelry* and *Aerojet*, the third-party wit-

4   nesses plaintiffs wish to depose are not parties to this action, were not employed by the defendants,

5   and cannot provide any information relevant to the claims as pled in the FAC that party witnesses

6   cannot provide.

7       Plaintiffs next assert that "[t]hese third party depositions are necessary" because "[d]efend-

8   ants' pleadings and discovery responses are believed to contain misrepresentations that these third

9   party witness can impeach."  In support of this claim, plaintiffs confusingly cite to an (accurate) dec-

10  laration of Esther Gifford of Walmart, in which she (accurately) stated that P&G served as category

11  manager in Wet Shave.  That (as plaintiffs contend) Energizer may also have served as category ad-

12  visor in Wet Shave does not render Walmart's representation that P&G served as category advisor in

13  Wet Shave inaccurate.  In any event, plaintiffs certainly do not need to depose Energizer to discover

14  whether it was a category advisor—indeed, they appear to have already concluded based on docu-

15  ments produced in this case that it was, and on that basis have subpoenaed Energizer for a deposi-

16  tion.

17      Finally, to be clear, plaintiffs' proposed depositions are irrelevant to any of Walmart's de-

18  fenses in this action.  The scope of discovery under Rule 26(b)(1) only encompasses defenses actu-

19  ally asserted, and not phantom defenses that have not been asserted.  *See* Fed. R. Civ. P. 26(b)(1);

20  *see also id.* (Advisory Committee Notes, 2000 Amendments) ("The Committee intends that the par-

21  ties and the court focus on the ***actual claims and defenses involved in the action***.") (emphasis

22  added).  For this fundamental principle, *O'Boyle v. GC Servs.*, 2018 U.S. Dist. LEXIS 82991 (E.D.

23  Wis. May 17, 2018), is instructive.  There, the plaintiff brought claims under the Federal Debt Col-

24  lection Practices Act and argued that certain interrogatories and requests for production of docu-

25  ments were within the scope of discovery based on the defense the plaintiff ***anticipated*** the defend-

26  ant would assert.  *See id.* at *13-16.  Problematically, the defendant had not asserted that defense.

27  *See id.* at *13.  The court denied all five of plaintiff's motions to compel based on that particular

28

**Joint Statement re Discovery Disagreement**

1   defense, explaining, "[u]ntil and unless [the defendant] pleads a § 1692k(c) 'bona fide error' de-

2   fense, information regarding such a defense is not relevant under Rule 26(b)(1)." *Id.* at *13-17.

3     Here, plaintiffs are even farther afield than the plaintiffs in *O'Boyle*. Whereas, the plaintiffs

4   in *O'Boyle* sought discovery based on anticipated defenses to claims they actually alleged, plaintiffs

5   here seek extensive discovery based on anticipated defenses to claims that were ***not*** alleged. Indeed,

6   elsewhere, plaintiffs have disingenuously argued that, "In advancing [its] defenses, Walmart has ex-

7   plained in detail that its category management program proves that its conduct is procompetitive."

8   Plaintiffs cite exclusively to *Walmart's opposition to plaintiffs' Motion* for Leave to Join Additional

9   Parties, in which Walmart *opposed* plaintiffs' attempt to amend their complaint to assert a new, hori-

10  zontal "category management" conspiracy. *See* ECF No. 250 (Walmart's Opposition to Plaintiffs'

11  Motion for Leave to Join Additional Parties). Simply put, Walmart does not assert any defense to

12  the FAC that its category management program is pro-competitive, because the FAC makes no claim

13  that the category management program is anti-competitive. The Court should not entertain any of

14  plaintiffs' arguments that they are entitled to more than ten depositions based on "defenses" Walmart

15  has not asserted.

16      **d.**  **Plaintiffs Failed for Eleven Months to Pursue the Discovery They**

17          **Now Seek through Eighteen Depositions.**

18    The court must similarly limit leave for additional depositions if the party seeking leave has

19  had ample opportunity to obtain the information by discovery in the action. *See* Fed. R. Civ. P.

20  26(b)(2)(C)(ii); *Krause*, 2019 U.S. Dist. LEXIS 133880, at *13 (denying motion for additional inter-

21  rogatories because, *inter alia*, "plaintiff has had ample opportunity to obtain the information already

22  in this action"); *Schmidt v. Fid. Nat'l Title Ins. Co.*, 2009 U.S. Dist. LEXIS 8065, at *13 (D. Haw.

23  Feb. 3, 2009); *Windisch v. Hometown Health Plan, Inc.*, 2011 U.S. Dist. LEXIS 151486, at *19 (D.

24  Nev. Jan. 13, 2011).

25    Here, plaintiffs have "had ample opportunity to obtain the information by discovery in the

26  action," and plaintiffs' request now is therefore inconsistent with Rule 26(b)(2)(C)(ii). Plaintiffs'

27  request for additional depositions comes more than six months after their failed attempt to assert

28  their concocted "category manager" conspiracy theory on which they now seek discovery, and over

1    five years after plaintiff Sharidan Stiles apparently believed she might have a claim against

2    Walmart's category managers (before promptly dismissing those claims and never re-asserting

3    them).  Rather than glean the organizational structure and sales "practices, processes, and proce-

4    dures" of Pacific World, Coty, P&G, Energizer, KISS, and Onyx at any time in the last five years,

5    plaintiffs have waited until the end of fact discovery to seek such information.  Plaintiffs' delay in

6    seeking additional information from the prospective deponents is of plaintiffs' own making, and the

7    Court should deny plaintiffs' request for their lack of diligence.

8            **e.      Plaintiffs' Motion is Premature as Plaintiffs Have Not Yet Ex-
                       hausted All of the Ten Depositions to Which They are Entitled.**
9

10           Federal Rule of Civil Procedure 30 presumptively limits a party to ten depositions, *see* Fed.

11   R. Civ. P. 30(a)(2)(A), and courts rarely permit a party to overcome that presumption without having

12   first exhausted the first ten depositions.  *See, e.g.*, *Acosta v. Sw. Fuel Mgmt.*, 2018 U.S. Dist. LEXIS

13   54680, at *20 (C.D. Cal. Mar. 28, 2018) (quoting *Finazzo v. Hawaiian Airlines*, 2007 U.S. Dist.

14   LEXIS 34606, 2007 WL 1425241, *3 (D. Haw. 2007) ("'Courts generally do not grant leave to take

15   additional depositions until the moving party has exhausted the ten depositions permitted as of right

16   under Rule 30(a)(2)(A).'"); *Lloyd*, 2007 U.S. Dist. LEXIS 40526, at *5 ("Rule 30(a)(2)(A) clearly

17   contemplates that a party has already taken ten depositions before a motion is filed seeking leave of

18   court for a proposed deposition that would result in more than ten depositions being taken under this

19   rule.").[9]

20           The exhaustion rule serves a sound, important purpose, and there are no features of this liti-

21   gation that warrant a departure from it here.  As courts have noted, the exhaustion rule ensures that

22   the moving party makes an "informed request" for additional depositions, respectful of the limita-

23   tions of Rules 26(b)(1) and (2), and therefore leading to relevant and non-duplicative information.

24   *Archer Daniels Midland Co.*, 187 F.R.D. at 587 ("At a minimum, [the defendant] should

25

26   [9] One court merged the exhaustion rule with the particularized showing standard, finding it "impossi-
     ble for [a party] to demonstrate that particularized showing" where the party had only taken one dep-
     osition before requesting leave for more than ten.  *See Smith v. Ardew Wood Prods.*, 2008 U.S. Dist.
27   LEXIS 93855, at *3 (W.D. Wash. Nov. 6, 2008).  Of course, here, plaintiffs had taken ***no*** depositions
     at the time they filed their motion.

28

1  appropriately exhaust its current quota of depositions, in order to make an informed request for an

2  opportunity to depose more witnesses . . .").  Naturally, an assessment of whether depositions in ex-

3  cess of ten are necessary and will lead to relevant, non-duplicative information requires a survey of

4  the information that the moving party did—and did not—collect from the first ten depositions.  *See*

5  *Alaska Elec. Pension Fund*, 2006 U.S. Dist. LEXIS 59095, at *18 ("Plaintiffs' failure to exhaust

6  their available depositions before moving for leave to take additional depositions precludes in this

7  instance an informed determination of whether their proposed additional depositions would satisfy

8  the standard promulgated in Federal Rules 30(a)(2)(A) and 26(b)(2).").

9       Where courts have departed from the exhaustion rule, they did so "where the complexity

10 ***clearly*** warrant[ed] more than ten depositions" and, as a result, "[i]t would [have] be[en] inefficient"

11 to require repetitive motions for additional depositions.  *Del Campo*, 2007 U.S. Dist. LEXIS 87150,

12 at *17 (emphasis added); *Couch*, 2011 U.S. Dist. LEXIS 110342, at *3-4 ("[C]ourts have departed

13 from this exhaustion rule where the complexity of the case ***clearly*** warranted more than ten deposi-

14 tions.") (emphasis added).  For example, the court in *Del Campo* specifically noted the case's clear

15 complexity when it granted leave for additional depositions, explaining, "[t]his is a putative class ac-

16 tion seeking to certify a state-wide class going back as far as 1997.  There are five Plaintiffs and

17 eleven Defendants remaining in the suit."  *Id.* at *15-16.  In *Kress v. Price Waterhouse Coopers*,

18 2012 U.S. Dist. LEXIS 137681 (E.D. Cal. Sep. 25, 2012), the court permitted 25 depositions in a na-

19 tionwide, 1,709-member class action lawsuit, and its ruling relied extensively on other, similar com-

20 plex class action cases that are not relevant to any of the features of this litigation.  *Id.* at *10-16.

21 Yet even in *Kress*, a complex case by any definition, the court permitted twenty-five additional dep-

22 ositions only after the moving party had exhausted the first ten.  *Id.* at *3.

23      However, even in clearly complex cases, "complexity" is not a talisman that resolves all mo-

24 tions for additional depositions in the movant's favor.  Indeed, courts have also recognized that the

25 objective underlying Rule 26(b)(2)—that is, to "'enable the courts to keep tighter rein on the extent

26 of discovery'"—is particularly important in complex cases.  *See Alaska Elec. Pension Fund*, 2006

27 U.S. Dist. LEXIS 59095, at *13 (quoting Fed. R. Civ. P. 26(b), Notes of Advisory Committee on

28

1   1993 Amendments); *see also Kress*, 2012 U.S. Dist. LEXIS 137681, at \*14-15 (granting in part de-

2   fendants' motion for leave to take seventy-five depositions; permitting only twenty-five).  As the

3   court reasoned in *Alaska Elec. Pension Fund*, "rather than temper the need for judicial scrutiny of

4   expansive discovery, the complexity of the case *underscores* the Court's role in ensuring that the

5   massive volume of potentially relevant information does not become an obstacle to efficient resolu-

6   tion of the matter."  *Id.* at \*13 (emphasis added).  "The Court best satisfies this role by evaluating

7   any motion for leave to take additional depositions *against the backdrop of information already ob-*

8   *tained in permitted depositions*."  *Id.* (emphasis added).

9        Plaintiffs have not made a sufficient showing of "complexity" to warrant departure from the

10   exhaustion rule.  Long ago, the Court held that the conspiracy that plaintiffs have actually pled is a

11   simple and bilateral one between Walmart and AI:  "[T]he only agreement alleged in the SAC is that

12   Walmart—as a retailer—propositioned AI—as a manufacturer/supplier—to make a knock off of the

13   Stiles Razor to be sold at Walmart under Walmart's brand, and AI agreed."  ECF No. 101 at 7:9-12;

14   *see* ECF No. 188 at 7:11-16 ("Plaintiff's allegations suggest a three-part agreement amongst Defend-

15   ants: first, Defendants agreed that AI would produce a 'knockoff' Stiles Razor for sale under the Sa-

16   lon Perfect brand; second, Walmart would in turn sell AI's Ardell branded razor; and finally, once

17   the Salon Perfect razor was produced, Defendants would split the market with the Salon Perfect ra-

18   zor being sold at Walmart, and the Ardell at other retailers.").  While plaintiffs argue their horizontal

19   conspiracy theory involving Walmart's category managers is "complex," the agreement plaintiffs

20   have actually pled is decidedly not, and plaintiffs do not even attempt to show otherwise.

21          **f.    Plaintiffs' Motion Violates the Parties' Agreement in Their Rule**
             **26(f) Joint Discovery Plan.**
22

23        The parties' Rule 26(f) Joint Discovery Plan provides an additional basis upon which to deny

     plaintiffs' motion.  As plaintiffs and defendants agreed, "the limitations on discovery imposed under
24
     the Federal Rules of Civil Procedure and the Local Rules of Practice for the United States District
25
     Court, Eastern District of California will apply."  (ECF No. 149 at 3, ¶ 6.)
26

27

28

### g. Adding Plaintiffs' Excess Deponents to the Already-Packed Deposition Schedule Over the Next Month Would Impose an Undue Burden on Defendants

Plaintiffs argue that "the additional expense of these depositions would not be unduly burdensome for Defendants because the parties have set a deposition schedule that allows for multiple depositions to take place back-to-back at the same location (*e.g.*, Bentonville, Arkansas and Los Angeles, California). (Dunne Decl. ¶ 12.) Therefore, counsel will not be required to make excessive travel and lodging arrangements while still being able to attend depositions." As an initial matter, whereas the parties have engaged in a cooperative and productive exchange to schedule the vast majority of the depositions in this case, with respect to P&G, Pacific World, Coty, and Energizer, plaintiffs simply unilaterally noticed these depositions on January 6, 2020, for their own preferred dates with absolutely no consultation with defendants. Simonsen Decl., ¶ 16. Plaintiffs noticed two of these depositions— P&G and Energizer—for the same date—January 23, 2020—in two different cities—New York, New York, and Columbus, Ohio. Plaintiffs noticed the other two depositions for January 21, 2020, in New York, New York, and January 17, 2020, in Los Angeles, California. *Id.*, Exs. 9-12. The parties had already agreed to three other depositions the week of January 20, 2020 (a holiday): a deposition in Tampa, Florida on January 22, 2020, and a deposition in Lake County, Illinois on January 24, 2020, and a deposition in Bentonville, Arkansas on January 24, 2020. *Id.*, ¶ 16. Nothing about this schedule as plaintiffs have attempted to unilaterally modify it "allows for multiple depositions to take place back-to-back at the same location." To the contrary, it requires multiple attorneys representing multiple parties to fly all around and across the country and cram to prepare for depositions in which plaintiffs will apparently pursue discovery on un-pled claims of which defendants have no valid notice and that plaintiffs were expressly denied leave to plead. The Court should not allow plaintiffs to weaponize their undue delay in noticing depositions to further prejudice defendants.

### B. Second Dispute: Walmart's Refusal to Provide Substantive Responses to Plaintiffs' Interrogatories (Set 2)

Stiles served Walmart with Plaintiffs' Second Set of Interrogatories on November 5, 2019, consisting of the following three interrogatories:

> INTERROGATORY NO. 16: IDENTIFY all category advisors to
> Walmart for any categories related to Plaintiffs or Plaintiffs' products,

including but not limited to the wet shave category and the beauty accessories category, at any time during the period of January 1, 2002, to the present.

INTERROGATORY NO. 17: DESCRIBE Walmart's document or data retention policy, including but not limited to how documents or data are organized and/or categorized for purposes of the policy, when the policy was instituted, and the length of time that each type of document is retained and how it is retained.

INTERROGATORY NO. 18: IDENTIFY all DOCUMENTS and tangible things that (1) were requested from Walmart by Plaintiffs in this action which (2) Walmart believes were deleted.

### 1.    Plaintiffs' Contentions

These three interrogatories are relevant to Stiles' claims.  They are based on relevant information that Stiles learned through discovery.  For example, Interrogatory No. 16 seeks information regarding the role of Walmart's category advisor program, which is directly relevant to Stiles' antitrust claims.  Interrogatory Nos. 17 and 18 are targeted at Walmart's document retention policies so that Stiles can determine what, if any potentially relevant documents, no longer exist.  These interrogatories are not vague such that Walmart cannot determine how to properly respond nor are they so broad such that they would cause an undue burden on Walmart.  Setting aside the validity of Stiles' interrogatories, Walmart has no grounds to refuse to provide substantive responses.

First, Plaintiffs are not limited to only 25 interrogatories.  There are two plaintiffs in this litigation, thus, they are jointly entitled to 50 total interrogatories.  Federal Rule of Civil Procedure 33(a)(1) limits the number of interrogatories that "a party" may serve to "25 written interrogatories."  The rule applies "per party," not "per side."  Plaintiffs have only served one set of interrogatories, consisting of 15 interrogatories.  Therefore, Plaintiffs have not exhausted their 50 interrogatories, which they are permitted to serve.  *See Trevino v. ACB Am., Inc.*, 232 F.R.D. 612, 614 (N.D. Cal. 2006) (granting motion to compel responses to interrogatories where two plaintiffs served 32 interrogatories, attributing the first 25 interrogatories to first plaintiff and the remaining interrogatories to second plaintiff); *Zamora v. D'Arrigo Bros. Co. of Cal.*, Case No. C04-00047 JW (HRL), 2006 WL 931728 at \*3 (D. Ore. 2006) (granting motion to compel and holding that four plaintiffs could jointly "serve a total of 100 interrogatories on defendant").

1      Second, there is no agreement between Stiles' previous counsel and Walmart.  Despite this

2  Court's admonishment to Walmart at the December 11 hearing, "I trust we won't be hearing anything

3  further about the agreement," Walmart has again claimed that there is an "agreement" between the

4  parties that Plaintiffs would withdraw certain interrogatories because they were over the limit of 25.

5  (ECF No. 306 (December 11, 2019 Hearing Transcript) at 17:2–3.).  Stiles' counsel's understanding

6  was that four interrogatories out of 15 were withdrawn, leaving 11 interrogatories for one Plaintiff and

7  25 interrogatories for the other Plaintiff.  Regardless, at no point did Plaintiffs' waive the right to serve

8  25 interrogatories each.

9      In addition, while counsel for Walmart includes an email chain as Exhibit 6 to the Simonsen

10  Declaration, and, in its portion of this joint statement (Page 7, *supra*), claims that chain shows an

11  "agreement"—the email chain demonstrates that opposite.  In fact, Plaintiff's prior counsel unequiv-

12  ocally stated that there was *no agreement* on that point.  (*See* Exhibit 6 to Simonsen Declaration).

13      Nonetheless, in summarizing the meet and confer history (*supra* at 7), Walmart brazenly mis-

14  represents the contents of these communications to make it seem like there was an agreement.  In

15  relevant part, in its section of this Joint Motion, Walmart states

16          On January 23, 2019, counsel for Walmart alerted prior counsel for plaintiffs
          that plaintiffs' first set of interrogatories exceeded the 25-interrogatory limit under
17          Rule 33(a)(1) of the Federal Rules of Civil Procedure, including the discrete subparts.
          Simonsen Decl., Ex. 6 at 2.  Walmart asked plaintiffs to identify 25 or fewer inter-
18          rogatories, including discrete subparts, to which plaintiff wished for Walmart to re-
          spond.  *Id*.  In response, plaintiffs agreed to withdraw interrogatory nos. 1, 2, 6, 12,
19          to bring the total number of interrogatories served, including subparts, to 25.  *Id*. at
          1-2.  On February 7, 2019, Walmart responded to interrogatory nos. 3, 4, 5, 7, 8, 9,
20          10, 11, 13, 14, and 15.  *Id*., ¶ 11.  Walmart served supplemental responses to plaintiffs'
          first set of interrogatories on April 15, 2019, and December 13, 2019.  *Id*.
21

22  (*See* Section I(B)(a), *supra* Page 7 (emphasis added).)  However, here is what Plaintiffs' prior counsel

23  *actually said* in response to Walmart's demands and assertion that "plaintiffs' First set of Interroga-

24  ries contains more than the 25 interrogatories, including subparts . . ." allowed under Rule 33:

25

26

27

28

1

**From:** Jamie Miller <jmiller@aliotolaw.com>

2

**Sent:** Tuesday, January 29, 2019 4:47 PM
**To:** Kiernan, Hallie <hallie.kiernan@whitecase.com>

3

**Cc:** W&C Walmart-Stiles Team <WCWalmartStilesTeam@whitecase.com>; Mentzer, Stefan
<smentzer@whitecase.com>
**Subject:** RE: Stiles v. Walmart - First Set of Interrogatories

4

Hallie:

5

While we do not agree with Walmart's characterization of Plaintiffs' Interrogatories, to ensure that we receive
timely responses as to some of them (since Walmart has said that in the absence of this identification, it will

6

object to all on numerosity grounds), following are the Interrogatories we would like Walmart to respond to:
Interrogatories:

7

3, 4, 5, 7, 8, 9, 10, 11, 13, 14, and 15
Please let me know if you have any questions.

8

Best,
Jamie

9   (Ex. 6 to Simonsen Declaration at Page 3 (emphasis added).)  Simply put, as with Walmart's baseless

10  assertions that Plaintiffs' prior counsel had agreed to a limit on the number of document custodians

11  and search terms in the first round of briefing on motions to compel—when in fact no such agreement

12  exists—there was also never any agreement from Plaintiffs' prior counsel that it had served 25 inter-

13  rogatories, including subparts.  Rather, Plaintiffs' prior counsel, in the spirit of cooperation and because

14  Walmart indicated it was going to "object to all of the interrogatories on numerosity grounds," Plain-

15  tiffs' prior counsel merely agreed to narrow the number of interrogatories to which it wanted Walmart

16  to respond "to ensure that we receive timely responses."  (*Id.*).

17        Third, of the 11 remaining interrogatories in Set One, Walmart only objected on numerosity

18  grounds to Interrogatory No. 4:

19        INTERROGATORY No. 4: For the Salon Perfect Micro Razor and the
          Salon Perfect Precision Shaper, state:

20

21        a. The applications or end uses for each product; and

22        b. The identity fall substitutes for each product, and for each substitute,
          describe any differences in the substitutes' pricing, applications or end

23        uses, and technical characteristics, including blade measurements.

24        c. A description of your process of and the factors you consider when
          setting or negotiating p ices for each product, including pricing strate-

25        gies, practices, and policies, as well as specific costs, customer types or
          attributes, and specific competitors and products;

26

27

28

**Joint Statement re Discovery Disagreement**

d. The identity of all documents relating to the technical characteristics, applications or end uses, substitutes, and factors relating to setting or negotiating prices for each product; and

e. The identity of all persons responsible for creating or monitoring pricing strategy and setting aid negotiating prices for each product.

Even if Stiles were to concede that this interrogatory consisted of 10 sub-parts, that would still leave one Plaintiff with five interrogatories and the other Plaintiff with 25 interrogatories.

For the foregoing reasons, Walmart must respond to Plaintiffs' Interrogatories (Set Two).

**2.      Walmart's Contentions:**

  **a.      Plaintiffs' Interrogatories (Set 2) Exceed the 25 to Which They are Entitled.**

    ***i.*      **Plaintiffs Are Only Nominally Separate and Entitled to No More Than 25 Interrogatories.**

"Unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. P. 33(a)(1). Courts and leading treatises have recognized, "where, as here, the parties are acting in unison and are represented by the same counsel, they may be treated as one party for purposes of the interrogatory limits." *Gucci Am., Inc. v. Exclusive Imps. Int'l*, 2002 U.S. Dist. LEXIS 14837, at *16-17 (S.D.N.Y. Aug. 12, 2002) (citing Wright & Miller, 8A Fed. Prac. & Proc. Civ. 2d § 2168.1 (2002))); *Vinton v. Adam Aircraft Indus.*, 232 F.R.D. 650, 664 (D. Colo. 2005) ("[C]ommentators on Rule 33 have expressed a belief that 'in some instances nominally separate parties should be considered one party for purposes of the 25-interrogatory limitation.'"); *Jerry Beeman & Pharmacy Servs., Inc. v. Anthem Prescription Mgmt., Inc.*, 2017 U.S. Dist. LEXIS 191720, at *10 (C.D. Cal. Nov. 17, 2017). Parties may be considered only nominally separate when (1) they are represented by a single attorney, (2) there is unity of action, or (3) there is a legal relationship between parties. *See 21X Capital Ltd. v. Werra*, 2007 U.S. Dist. LEXIS 75487, at *2-3 (N.D. Cal. Oct. 2, 2007) (citing Wright & Miller, 8A Fed. Prac. & Proc. Civ. 2d § 2168.1 (2d ed. 1994)).

Under any analysis, Plaintiffs Sharidan Stiles and Stiles 4 U, Inc, are separate only in name, and are therefore entitled to no more than 25 interrogatories. At no point in any litigation involving the issues here have plaintiffs ever been represented by separate attorneys. Plaintiffs are represented

1   by one law firm and have been from the very outset of this litigation (though plaintiffs' current firm

2   substituted in for their prior counsel earlier this year).  Plaintiffs have uniformly proceeded in lock-

3   step throughout all stages of this litigation.  Indeed, plaintiffs propounded, in unison, each of the 25

4   interrogatories in their first set to Walmart.  *See* Simonsen Decl., Ex. 5 ("***Plaintiff Sharidan Stiles***

5   ***and Stiles 4 U, Inc.'s*** Interrogatories to Defendant Walmart, Inc." (Set One)) (emphasis added); *id.*

6   at 1 (Plaintiffs . . . ***Sharidan Stiles, an individual, and Stiles 4 U, Inc.***, under Federal Rule of Civil

7   Procedure 33, request that Defendant . . . Walmart, Inc. . . . answer the following interrogato-

8   ries . . . .") (emphasis added).

9        Finally, Sharidan Stiles and Stiles 4 U are legally related.  Sharidan Stiles filed articles of in-

10   corporation for "Stiles Personal Care, Inc." in the State of California in 2009, later amended to re-

11   brand as "Stiles 4 U, Inc."  *See* Simonsen Decl., ¶ 17 & Exs. 13-14.  Stiles listed herself not only as

12   the ***sole*** director, but also as the Chief Executive Officer, the Secretary, the Chief Financial Officer,

13   and the agent for service of process.  *Id.*, Ex. 13.  As recently as September 2019, Sharidan Stiles has

14   affirmed with the State of California that all such information is unchanged from previous filings.

15   *Id.*, Ex. 15.

16             ***ii.***       **Plaintiffs Have Met Their Limit of 25 Interrogatories In-**

17                       **cluding Discrete Subparts.**

18        "Parties cannot evade th[e] presumptive limitation [of 25 interrogatories] through the device

19   of joining as subparts questions that seek information about discrete separate subjects." *Johnson v.*

20   *Chau*, 2019 U.S. Dist. LEXIS 15011, at *8 (E.D. Cal. Jan. 30, 2019) (quoting Rule 33(a) Advisory

21   Committee Notes to the 1993 Amendment) (internal quotations omitted).  "[I]nterrogatory subparts

22   are to be counted as one interrogatory 'if they are logically or factually subsumed within and neces-

23   sarily related to the primary question.'"  *Id.* at *8-9 (citing *Safeco of America v. Rawstrom*, 181

24   F.R.D. 441, 445 (C.D. Cal. 1998)).  "[D]iscrete or separate questions should be counted as separate

25   interrogatories, notwithstanding they are joined by a conjunctive word and may be related." *Kendall*

26   *v. GES Exposition Servs.*, 174 F.R.D. 684, 685-86 (D. Nev. 1997); *Mount Hamilton Partners, LLC v.*

27   *Google Inc.*, 2013 U.S. Dist. LEXIS 104556, at *4 (N.D. Cal. July 25, 2013) (citing *Kendall*, 174

28   F.R.D. at 686) ("[Q]uestions seeking information about separate subjects count as several

1    interrogatories.”).

2         Though they initially propounded interrogatories numbered 1 through 25, Walmart at the

3    time alerted plaintiffs that their “25” interrogatories in fact far out-numbered 25 as many of them

4    contained discrete subparts, and asked plaintiffs to withdraw a sufficient number to bring the total,

5    including discrete subparts, to at or below 25.  *See* Simonsen Decl., Ex. 6 at 2.  Based on Walmart’s

6    numerosity position, plaintiffs withdrew interrogatory nos. 1, 2, 6, and 12.  *Id.* at 1.  Thus, plaintiffs

7    propounded interrogatories numbered 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, and 15.  *See* Simonsen Decl.,

8    Ex. 5.  In doing so, plaintiffs reached the 25-interrogatory limit by a conservative count of the dis-

9    crete subparts.

10        Walmart has not made any false characterizations of the emails as alleged by plaintiffs.  As

11   the Joint Statement clearly states on page 9, “plaintiffs agreed to withdraw interrogatory nos. 1, 2, 6,

12   12 to bring the total number of interrogates served, including discreet subparts, to 25.”  The email

13   chain attached to the Simonsen Declaration unequivocally shows that plaintiffs’ former counsel did

14   indeed agree to withdraw interrogatories 1, 2, 6, and 12.  Plaintiffs’ mischaracterization of

15   Walmart’s statements in the Joint Statement are without merit and clearly incorrect based on the ex-

16   hibits.

17            **(a)    Interrogatories Nos. 5, 11, and 14 Are Each One In-
                      terrogatory**
18
         Interrogatory nos. 5, 11, and 14 each only consider one subject, and therefore each counts as
19
     only one single interrogatory.  Interrogatory no. 5 requests information surrounding Walmart’s rela-
20
     tionship with AI vis-à-vis the Salon Perfect Micro Razor.  Interrogatory no. 11 requests information
21
     supporting Walmart’s affirmative defense.  Interrogatory no. 14 seeks detail on prior art in defense
22
     of plaintiffs’ patent claims.
23
             **(b)    Interrogatory No. 3 Includes Two Discrete Subparts**
24
         Interrogatory no. 3 requests unrelated responses to two factually distinct inquiries.  Plaintiffs
25
     sought defendants’ relevant product market and relevant geographic market.  These are two vastly
26
     separate subjects and separate factual inquiries.  *See Brown Shoe Co. v. United States*, 370 U.S. 294,
27
     325 (1962).  The relevant product market is a question of fact that assesses “cross-elasticity of
28

1  demand: whether consumers view the products as substitutes for each other." *See Rebel Oil Co. v.*

2  *Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995).  The relevant geographic market, meanwhile,

3  assesses the "area of effective competition where buyers can turn for alternate sources of supply."

4  *Saint Alphonsus Med. Ctr. - Nampa, Inc. v. Saint Luke's Health Sys.*, 778 F.3d 775, 784 (9th Cir.

5  2015).

6          **(c)**       **Interrogatory No. 4 Includes Six Discrete Subparts**

7        Interrogatory no. 4 contains six discrete subparts.  To begin, plaintiffs request information

8  about two different Walmart products, the Salon Perfect Micro Razor and the Salon Perfect Preci-

9  sion Shaper.

10        In subpart (a), plaintiffs request information about "[t]he applications or end uses for ***each***

11  product" (emphasis added), which counts as two discrete subparts.

12        Subpart (b) begins with two discrete inquiries and, while it may quickly blossom into an ines-

13  timable number more, defendants contend it conservatively counts as two.  Initially, plaintiffs re-

14  quest the "substitutes for ***each*** product," and this clearly qualifies as two discrete subparts.  Plaintiffs

15  then request differences between the Salon Perfect Micro Razor and ***all*** of its substitutes along di-

16  mensions such as "pricing, applications or end uses, and technical characteristics, including blade

17  measurements."  Plaintiffs then request all the same differences with respect to the Salon Perfect

18  Precision Shaper and its substitutes.  At the most conservative estimate, subpart (b) contains two dis-

19  crete factual inquiries.  If one product's substitutes—and the catalog of characteristics of that substi-

20  tute—is counted as a single interrogatory, then the fact that plaintiffs request such information for

21  two products results in two discrete subparts.

22        Subpart (c) requests a description of pricing strategy for both the Salon Perfect Micro Razor

23  and the Salon Perfect Precision Shaper, with reference to how prices are negotiated, typical practices

24  and policies, and several other factors.  As such, this subpart counts as two interrogatories.

25          **(d)**       **Interrogatory Nos. 7, 8, 13, and 15 Each Contain**
26                       **Two Discrete Subparts.**

27        Similarly, Interrogatory nos. 7, 8, 13, and 15 each contain two discrete subparts because each

28  numbered request seeks information for two products or two patents.  Interrogatory no. 7 requests

quarterly sales data for each of the Salon Perfect Micro Razor and the Salon Perfect Precision Shaper.  Interrogatory no. 8 requests how Walmart became aware of the '468 patent and the '389 patent.  Interrogatory no. 13 seeks the bases of Walmart's denial of willful infringement with respect to the '468 patent and the '389 patent.

Interrogatory no. 15 contains at least two discrete subparts because it seeks distinct information for the Salon Perfect Micro Razor and the Salon Perfect Precision Shaper.  Specifically, plaintiffs request identification of, *inter alia*, the "customers, distributors, [or] manufacturers" of each product.  In addition to identification, plaintiffs subsequently request volume and sales data for each such "customer[], distributor[], [or] manufacturers" of each product.

               **(e)**     **Interrogatories Nos. 9 and 10 Each Contain Three Discrete Subparts.**

Interrogatory no. 9 requests the bases for Walmart's Sixth Affirmative Defense and Counts 1, 3, and 5 of its Answer and Counterclaims with respect to purported trade dress, patent '468, and patent '389.  Similarly, Interrogatory no. 10 requests the bases for Walmart's Seventh Affirmative Defense and Counts 2, 4, and 6 of its Answer and Counterclaims with respect to purported trade dress and each of the two patents.  In each case, plaintiffs seek the bases for each of three defenses and counterclaims, and therefore Interrogatories nos. 9 and 10 each contain three discrete subparts.

Because plaintiffs already served (and Walmart answered) 25 interrogatories, including discrete subparts, they are not entitled to anymore.

         **b.**     **Defendants Did Not Waive Numerosity Objections When Plaintiffs Served 25 Interrogatories Including Discrete Subparts.**

Plaintiffs argue—without citation to authority—that since Walmart did not make numerosity objections to the interrogatories Walmart *did* answer (after plaintiffs withdrew enough to bring the total served in set one to 25), Walmart has waived the position that the interrogatories amounted to 25 including discrete subparts.

A party must raise an objection to interrogatories "in a timely manner."  *United States ex rel. Proctor v. Safeway, Inc.*, 2018 U.S. Dist. LEXIS 194313, at *6 (C.D. Ill. Nov. 14, 2018) (citing Fed. R. Civ. P. 33(b)(4)).  After plaintiffs had withdrawn enough interrogatories to make the total served,

1  including discrete subparts, 25, there was no numerosity problem with plaintiffs' first set of interrog-

2  atories for Walmart to object to.  *See* Fed. R. Civ. P. 33(a)(1) ("[A] party may serve on any other

3  party *no more than* 25 written interrogatories, including all discrete subparts.") (emphasis added).

**c.**    **Plaintiff's Interrogatories Are Not Relevant to Any Party's Claims or Defenses**

Only information relevant to any party's claims or defenses, if the discovery is proportional

to the needs of the case, is discoverable.  Fed. R. Civ. P. 26(b)(1).  For the reasons discussed above,

plaintiffs' first interrogatory in her second set (interrogatory no. 16)—which asks Walmart to iden-

tify all of the category advisors in two departments over the course of nearly 20 years—is not re-

motely tethered to the allegations in the FAC or defendants' defenses, as discussed above.  The FAC

alleges a simple vertical agreement between Walmart and AI, not a "horizontal conspiracy" among

category advisors.

For the proposition that interrogatory nos. 17 and 18 seek relevant information, plaintiffs

merely assert that they "are targeted at Walmart's document retention policies so that Stiles can de-

termine what, if any potentially relevant documents, no longer exist."  This is not a relevance argu-

ment; it is a description of why plaintiffs want the information:  yet another fishing expedition (this

time, it appears, in the speculative hope of finding some evidence of spoliation).  The Court should

deny plaintiffs' motion to compel Walmart to answer plaintiff's second set of interrogatories.

Dated: January 8, 2020

Respectfully submitted,

**Pierce Bainbridge Beck Price & Hecht LLP**

By:    /s/ Brian J. Dunne
        Brian J. Dunne (SBN 275689)
        *bdunne@piercebainbridge.com*
        Yavar Bathaee (SBN 282388)
        *yavar@piercebainbridge.com*
        David Hecht (*pro hac vice*)
        *dhecht@piercebainbridge.com*
        355 South Grand Avenue, 44th Floor

**Joint Statement re Discovery Disagreement**

1
        Los Angeles, California 90071
        (213) 262-9333

2
        **Dhillon Law Group Inc.**

3
        Harmeet K. Dhillon (SBN 207873)
        *harmeet@dhillonlaw.com*

4
        Nitoj Singh (SBN 265005)
        *nsingh@dhillonlaw.com*

5
        177 Post Street, Suite 700
        San Francisco, CA 94108

6
        (415) 433-1700

7
        *Attorneys for Plaintiffs Sharidan Stiles and Stiles 4*

8
        *U, Inc.*

9
Dated: January 8, 2020        **White & Case LLP**

10

11
    By:   */s/ Catherine S. Simonsen*
        Bryan A. Merryman (SBN 134357)
        *bmerryman@whitecase.com*

12
        Catherine S. Simonsen (SBN 307325)
        *catherine.simonsen@whitecase.com*

13
        555 S. Flower Street, Suite 2700
        Los Angeles, CA 90071-2433

14
        Telephone: (213) 620-7700
        Facsimile: (213) 452-2329

15

16
        Bijal V. Vakil (SBN 192878)
        *bvakil@whitecase.com*

17
        Jeremy Ostrander (SBN 233489)
        *jostrander@whitecase.com*

18
        3000 El Camino Real
        Two Palo Alto Square, Suite 900

19
        Palo Alto, CA  94306

20
        Telephone: (650) 213-0300
        Facsimile:  (650) 213-8158

21
        STEFAN M. MENTZER (admitted pro hac vice)

22
        smentzer@whitecase.com

23
        1221 Avenue of the Americas, Floor 49
        New York, NY  10020

24
        Telephone: (212) 819-8200
        Facsimile:  (212) 354-8113

25
        *Attorneys for Defendant Walmart Inc.*

26

27

28

**Joint Statement re Discovery Disagreement**