UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARIDAN STILES, et al., | No.  2:14-cv-02234-DAD-DMC |
| Plaintiffs, | |
| v. | ORDER GRANTING DEENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT, IN PART |
| WALMART, INC., et al., | |
| Defendants. | (Doc. Nos. 193, 265, 457, 473, 518) |

Plaintiff Sharidan Stiles ("Stiles") is the inventor of the "Stiles Razor," a patented disposable razor with a narrow blade for precise shaving.  Many years ago, defendant Walmart, Inc. ("Walmart") agreed to sell the Stiles Razor in its stores, but about ten years ago, Walmart terminated the relationship.  In this action, Stiles now alleges Walmart and its supplier, defendant American International Industries ("America"), worked together to create and sell two knockoff razors.  She claims these knockoff razors infringe her patents, violate trademark and antitrust law, and interfered with her economic interests.

This matter is before the court on the motions for partial summary judgment filed by defendants Walmart and American (collectively, "defendants").  ECF Nos. 457, 473.  The court held a hearing by videoconference and took the motions under submission on March 30, 2021.

/////

*See* Minutes, ECF No. 541; Hr'g Tr., ECF No. 558.[1]  Attorneys Joseph Alioto, Josephine Alioto, and Tatiana Walker appeared on behalf of plaintiff Stiles.  Attorney Catherine Simonsen appeared on behalf of defendant Walmart.  Attorneys Roy Anderson and Zachary Page appeared on behalf of defendant American.  For the reasons explained below, the pending motions for partial summary judgment will be granted, in part.

## BACKGROUND

Stiles, Walmart, and American disagree about many parts of their history.  At this stage, the court must assume that Stiles would prove her version of the story, and it must draw all inferences from the evidence presented on summary judgment in her favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).  Accordingly, this order describes her history with Walmart and American from that perspective.

Stiles invented the Stiles Razor, a disposable razor with a narrow blade only an eighth of an inch wide.  She is the patentee of both a design patent and a utility patent, and the Stiles Razor is an embodiment of both.  *See generally* U.S. Design Patent No. 542,468 (the Design Patent), Fourth Am. Compl. Ex. A, ECF No. 142; U.S. Patent No. 9,108,329 (the Utility Patent), Fourth Am. Compl. Ex. B, ECF No. 142.  Stiles markets and sells the razor to people who want more precision than a wider-bladed disposable razor can offer, for example with goatees, moustaches, sideburns, eyebrows, and bikini lines.  *See* Stiles Razor Co. Business Plan, Merryman Decl. Ex. 70 at 3, 10–11, ECF No. 458-3.

Walmart first started selling the Stiles Razor in 2005.  *See, e.g.*, Stiles Email (Sept. 26, 2005), Merryman Decl. Ex. 170 at 15, ECF No. 553-1; Gifford Dep. at 38–39, Merryman Decl. Ex. 220, ECF No. 460-1.  After a successful trial period, Walmart put the Stiles Razor in more than 3,000 of its stores.  *See* March 2008 Modular Matrix Rep., Merry Decl. Ex. 171 at 3, ECF No. 553-1.  It was shelved with other hair-removal products in the "wet shave" department, including standard-size razors, eyebrow razors, tweezers, waxing strips, and other depilatories.  Gifford Decl. ¶ 4, ECF No. 457-3; Gifford Dep. 38–39, ECF No. 460-1.

---

[1]  On August 25, 2022, this case was reassigned to the undersigned.  ECF No. 584.

1       Despite some early success, sales of the razor did not meet Walmart's or Stiles's

2 expectations in the long term.  *See* Emails, "Re: Sidekick POS" (Oct. 3–13, 2008), Merryman

3 Decl. Ex. 172, ECF No. 553-1.  They tried to pursue new strategies and lower prices.  *See, e.g.*,

4 Emails, "Don Ryan follow up" (Sept. 25–30, 2009), Merryman Decl. Ex. 142, ECF No. 552-2

5 (discussing an "extended opportunity to reach [Walmart's] 2010 sales goals"); Emails, "Stiles

6 Razor Price Change/Update on Sell-In" (Nov. 9, 2009–Feb. 25, 2010), Alioto Decl. Ex. 3, ECF

7 No. 549 (discussing price reductions).  Walmart, however, remained unsatisfied.  *See, e.g.*,

8 Ronchetto Dep. 193–94, 197–200, Merryman Decl. Ex. 218, ECF No. 460-1 (testifying razors

9 took a long time to sell and were not meeting the goal of six units per store per week); Email,

10 "RE: Stiles Razor Item #210295 and #293929 (2008 number)" (June 16, 2009), Merryman Decl.

11 Ex. 139, ECF No. 552-2 ("[T]his item does not produce enough [dollars] for [Walmart] to feature

12 it.").

13       In 2009 and 2020, a consultant investigated on Stiles's behalf and discovered her razors

14 were not on Walmart's shelves in the expected places.  *See supra* Emails "Stiles Razor Price

15 Change" at 0858.  Prices were also too high.  *See id.* at 0863.  Stiles asked Walmart to reduce the

16 prices of the razors.  *See id.*  It did, and sales improved in some stores.  *See id.* at 0857.  But sales

17 did not reach overall goals, and Walmart removed the Stiles Razor from its shelves.  *See id.*

18       Walmart did not cut Stiles off completely.  It moved her razors to the "beauty" department

19 in 2011.  Gifford Decl. ¶ 5.  Still, sales did not meet Walmart's benchmarks.  *See, e.g.*, Email,

20 "FW: Spring 2012 modular Line Review Guidelines and deadlines" (July 11, 2011), Merryman

21 Decl. Ex. 149, ECF No. 552-4.  Rearranging products on the shelves, promoting the razor, and

22 increasing the number of stores that offered the razor did not reverse declining sales.  *See* Email,

23 "RE: Spring 2012 Accessories Prematrix" (July 9, 2011), Merryman Decl. Ex. 24, ECF No. 550-8

24 Email, "RE: Recap" (Oct. 11, 2011), Merryman Decl. Ex. 132, ECF No. 552-1; "Stiles Analysis

25 WM Request Revised 10.17.11.xlsx," Merryman Decl. Ex. 133, ECF No. 552-2.  Walmart

26 eventually terminated the relationship completely in May 2012.  *See* Letter (May 30, 2012),

27 Merryman Decl. Ex. 28, ECF No. 550-9.  Stiles found other buyers for her razor, *see* Pls.' Resp.

28 Walmart Stmt. Facts No. 22, but losing the Walmart contract cost her dearly, *see generally*

DeMario Rep., Alioto Decl. Ex. 17, ECF No. 524-2.

Stiles believes she now knows the reason for her declining sales:  Walmart wanted those sales for itself.  In 2011, when Walmart moved her razors to the beauty department, it was already offering a similar razor: the "Precision Shaper," sourced from American and sold under the "Ardell" brand name.  Cooper Decl. ¶ 4, ECF No. 457-4; Salon Perfect Product Catalog at 13, Merryman Decl. Ex. 4, ECF No. 458-1.  The two razors are pictured below; note that to save space, the two are not shown at the same scale:

**Stiles Razor**                                  **Precision Shaper**

   

   

*See* Hines Decl., App'x Evid. Pt. 1, ECF No. 473-1.  American also supplied many other beauty products to Walmart.  *See* Emails, "Complete Bullet Notes from Walmart Meeting-Esther Gifford

4

2/14/2011" (Feb. 18, 2011), Alioto Decl. Ex. 6, ECF No. 549.  In 2011, a Walmart buyer was already speaking with American about selling a "skinny razor pack."  *See* Emails, "Complete Bullet Notes from Walmart Meeting-Esther Gifford 2/14/2011" (Feb. 18, 2011), Alioto Decl. Ex. 6, ECF No. 549.  American told Walmart "outright" that it wanted to "replace" the Stiles Razor.  *See id.* at 2.  Notes from a sales meeting suggest Walmart wanted to drop Stiles because she sold just one product.  *See id.* ("[Walmart] benefits from not needing a one sku vendor.").

American soon proposed a three-pack of "skinny" razors at a cost and price point similar to the Stiles Razor.  *See* Davis Dep. at 207, Alioto Decl. Ex. 24, ECF No. 524.2; Alioto Decl. Ex. 8, ECF No. 549.  The timing of American's proposal left little doubt of its intention to take Stiles's place in Walmart stores:  American sent Walmart a "New Project Request Form" showing a package of disposable razors side by side with the Stiles Razor, and it proposed a launch date on December 1, 2012—the last day Walmart was obligated to purchase any razors from Stiles.  *See* Alioto Decl. Ex. 10, ECF No. 549; Letter (May 30, 2012) Merryman Decl. Ex. 28, ECF No. 550-9.  American was also working hard with a foreign supplier to mimic the Stiles Razor.  *See, e.g.*, Pls.' Resp. American Stmt. Facts No. 26, ECF No. 525; Pls.' Add'l Stmt. Facts Nos. 3–4, ECF No. 522.  It was using "photographs and physical samples of the Stiles razor as references."  American Resp. Stmt. Add'l Facts No. 4, ECF No. 535-2.

At first, Walmart decided not to buy American's proposed "skinny" razors, *see* Day Dep. at 114–17, Merryman Decl. Ex. 219, ECF No. 460-1, but it eventually did, and it put them on store shelves in 2013, *see* Day Dep. at 117–20.  American's razor, which was eventually called the "Micro Razor," is pictured below (on the right side of each pair) alongside drawings of the Stiles Razor (on the left) that were included as figures two and four of Stiles's Design Patent:

/////

/////

/////

/////

/////

/////



*See* Design Patent figs. 2, 4; Page Decl. ¶ 8, ECF No. 473-1; Evid. App'x Pt. 2 Ex. 39, ECF No. 473-2.

Stiles filed a lawsuit against Walmart, American, and two other companies in this court in 2014. *See* Compl., No. 14-1637 (E.D. Cal. July 11, 2014), ECF No. 1; Am. Compl., No. 14-1637 (E.D. Cal. July 15, 2014), ECF No. 4. She was not represented by counsel at the time. *See id.* She dismissed that case voluntarily after Walmart and American moved to dismiss, *see* No. 14-1637, ECF Nos. 25, 26, 40–43, and filed a second action—this one—against Walmart and American only, in September 2014, *see* Compl., ECF No. 1. Stiles has been represented by counsel throughout most of this case, including in discovery and during extensive pretrial litigation, and is currently represented by counsel.[2] This case is proceeding on plaintiff's Fourth Amended Complaint, ECF No. 142, which includes the following seven claims:

1.  Walmart and American's agreement to sell the Micro Razor is an illegal agreement to restrain trade under the Sherman Antitrust Act, 15 U.S.C. § 1. *See id* at 31–32.

2.  The same agreement violates the California Cartwright Act. *Id.* at 33.

3.  American's razors infringe the Design Patent. *Id.* at 33–34.

4.  American's razors infringe the Utility Patent. *Id.* at 34–35.

/////

---

[2]  Because plaintiff's counsel has not filed a substitution of attorney or a motion to withdraw as counsel of record on behalf of plaintiff, plaintiff remains represented by counsel. For this reason, the court will disregard plaintiff's recent *pro se* filings, which were entered on the docket in this action on September 9, 2022. ECF Nos. 586, 587.

5.    Both razors violate Stiles's rights to the trade dress she uses for the Stiles Razor under the Lanham Act.  *Id.* at 35–36.

6.    Walmart (but not American) falsely advertised its own razor and the Stiles Razor, and it drew false associations between its razor and the Stiles Razor.  *Id.* at 36–37.

7.    American wrongly and intentionally interfered in Stiles's relationship with Walmart in violation of California tort law.  *Id.* at 37–38.

Plaintiff Stiles asserts the first five claims against both defendants, the sixth against Walmart, and the seventh against American.  She seeks the award of damages (including treble damages), a permanent injunction, declaratory judgment, attorneys' fees and costs, and interest.  *See id.* at 39–40.

However, not all of these claims originally brought by plaintiff remain live.  Stiles has agreed to dismiss or withdraw her trade dress claims.  *See* Email from Dan Terzian to Catherine Simonsen et al. (May 15, 2020), Merryman Decl. Ex. 200, ECF No. 459-1; Email from Dan Terzian to Eric Engel et al. (May 19, 2020); Merryman Decl. Ex. 201, ECF No. 459-1.  She has also agreed to withdraw her claim that the Precision Shaper violates the Design Patent, but not the Micro Razor.  *See id.*  The court will therefore dismiss these claims pursuant to plaintiff's withdrawal and agreement to dismiss them.

Walmart and American now move for partial summary judgment as to several of plaintiff's remaining claims.  Walmart moves for summary judgment in its favor on the two antitrust claims and the false advertising claims.  *See generally* Walmart Mot., ECF No. 457.  American moves for summary judgment in its favor as to the remaining design patent claim; the utility patent claim, but only as to the Precision Shaper; and on plaintiff's claim for intentional interference with prospective economic advantage.  *See generally* American Mot., ECF No. 473.  Stiles opposes both motions, which are fully briefed.  *See* Opp'n Walmart, ECF No. 524; Opp'n American, ECF No. 519; Walmart Reply, ECF No. 538; American Reply, ECF No. 535.

**LEGAL STANDARD**

A court may grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

7

The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact . . . ." *Matsushita*, 475 U.S. at 585. In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . . or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## ANALYSIS

### A.     Antitrust (Claims 1 and 2)

Stiles asserts antitrust claims under both federal law (the Sherman Act) and California law (the Cartwright Act). *See* Fourth Am. Compl. ¶¶ 144–59. The parties address these claims together. *See* Walmart Mot. at 9 & n.21; Opp'n Walmart at 9 n.17. This order does the same since the Ninth Circuit has "recognized that Cartwright Act claims raise basically the same issues as do Sherman Act claims," and "California state courts follow federal cases in deciding claims

1    under the Cartwright Act." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 n.4 (9th Cir. 1988).

2           Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies "in

3    restraint of trade or commerce."  *Ohio v. Am. Express Co.*, ___ U.S. ___, 138 S. Ct. 2274, 2283

4    (2018) (quoting 15 U.S.C. § 1).  Although that language refers broadly to any "restraint," the

5    Supreme Court "has long recognized that Congress intended to outlaw only unreasonable

6    restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  Some restraints "are unreasonable *per*

7    *se* because they 'always or almost always tend to restrict competition and decrease output.'"  *Am.*

8    *Express*, 138 S. Ct. at 2283 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723

9    (1988)).  But that is a "small group."  *Id.*  Most restraints "are judged under the 'rule of reason.'"

10   *Id.* at 2284 (quoting *Bus. Elecs.*, 485 U.S. at 723).  Stiles relies on the rule of reason here.  *See*

11   Fourth Am. Compl. at 3 n.1; *see also* Mem. & Order (Mar. 29, 2019) at 6–8, ECF No. 188.

12          In rule-of-reason cases, courts "conduct a fact-specific assessment" of "the restraint's

13   actual effect."  *Am. Express*, 138 S. Ct. at 2284 (quotation marks omitted) (quoting *Copperweld*

14   *Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)).  The goal is to divide restraints that are

15   harmful to consumers, and thus unlawful, from restraints that are in consumers' best interest,

16   which the law does not bar.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S.

17   877, 885–86 (2007).  A fact-finder tasked with deciding whether a restraint is reasonable might

18   take a wide variety of circumstances into account when making this decision—for example, the

19   specifics of the business, the defendant's market power, the structure of the market, the "history,

20   nature, and effect" of the restraint, and the way the business looked before and after the restraint

21   was imposed.  *State Oil*, 522 U.S. at 10.  The evidence relied upon to make these decisions is

22   normally presented in three steps.  First, the plaintiff has the burden to show the restraint has a

23   "substantial anticompetitive effect that harms consumers in the relevant market."  *Am. Express*,

24   138 S. Ct. at 2284.  Second, if the plaintiff succeeds, the burden shifts to the defendant to show it

25   was not motivated by any illegal goal, but rather some "procompetitive" intent.  *Id.*  Third, if the

26   defendant proves that point, the plaintiff may yet prevail if it shows the defendant could have

27   achieved its goals by other means less destructive of competition.  *See id.*

28   /////

9

1   Here, the parties focus on the first part of this test.  *See* Walmart Mot. at 9–10, 13–20;

2   Opp'n Walmart at 9–19.  A plaintiff can carry its burden in that first part of the test with either

3   direct or indirect evidence.  *Am. Express*, 138 S. Ct. at 2284.  Direct evidence is proof of lower

4   market supply, higher market prices, or lower quality.  *See id.*  Indirect evidence is a combination

5   of proof that the defendants had "market power" and "some evidence" that the alleged restraint

6   reduced competition.  *See id.*

7   Stiles's evidence is not direct.  She has not cited proof that the supply of razors declined,

8   that prices increased, or that quality declined.  At most, her evidence might suggest Walmart and

9   American encountered some problems in designing and sourcing a working razor, but quickly

10   solved those problems.  *See generally* Alioto Decl. Ex. 12, ECF No. 549.  Stiles relies instead on

11   an indirect theory:  that Walmart and American had market power and reduced competition.  *See*

12   Opp'n Walmart at 14–18.  According to the complaint, Walmart and American conspired to

13   exclude Stiles from a "nationwide market for Disposable Personal Styling Razors."  Fourth Am.

14   Compl. ¶ 78.  Before this case was reassigned to the undersigned, another district judge of this

15   court accurately described plaintiff Stiles's legal theory as an allegation of a "three-part

16   agreement" between Walmart and American:

17   • American would produce a knockoff razor.

18   • Walmart would sell the knockoff at its own stores under the "Salon Perfect" brand.

19   • American would sell to other retailers under the "Ardell" brand.

20   Mem. & Order (Mar. 29, 2019) at 7.  The defendants' ultimate goal, in other words, was to take

21   over the whole U.S. market for disposable personal styling razors and keep prices artificially

22   high.  *See* Fourth Am. Compl. ¶¶ 66, 79, 108.a., 180.e., 108.g.

23   It is unnecessary to decide whether a jury could agree that Walmart and American kept

24   prices too high.  Stiles does not have standing to sue her competitors for driving up prices.  *See*

25   *Matsushita*, 475 U.S. at 582–83.  She, like her competitors—and unlike consumers—would

26   *benefit* from artificially inflated prices.  *See id.*  If prices increased and consumers were forced to

27   pay more, they could sue; Stiles cannot.  *See id.*

28   /////

1    Stiles's claims are about more than just prices.  She also claims Walmart and American

2    excluded her from the market.  That exclusion was likely harmful to her business, but the

3    Sherman Act does not offer a remedy for every commercial wrong.  *See Am. Ad Mgmt., Inc. v.*

4    *Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999).  The Sherman Act protects "competition," not

5    "competitors."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).  So,

6    Stiles must allege and prove more than just that her business suffered.  She must also demonstrate

7    that her injury is "of the type the antitrust laws were intended to prevent" and that her damages

8    flow from the conduct the law prohibits.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S.

9    328, 334 (1990) (quoting *Brunswick*, 429 U.S. at 489).  Stiles has not come forward with

10   evidence on summary judgment she could rely upon in proving these points.

11   Her first obstacle is proof of damages.  Stiles cannot recover damages for an antitrust

12   violation if she cannot "segregate the losses caused by acts which were not antitrust violations

13   from those that were."  *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159–60 (9th Cir.

14   2015) (alterations omitted) (quoting *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372

15   (9th Cir. 1992)).  Stiles admits that her evidence does not permit her to tie her damages to a

16   Sherman Act violation.  *See* Opp'n Walmart at 18–19.  She argues instead that she can prevail

17   without that evidence.  *See id.* at 19 n.40.  That is incorrect, as recognized above.  "The first step

18   in a damages study is the translation of the legal theory of the harmful event into an analysis of

19   the economic impact of that event."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013)

20   (emphasis omitted) (quoting Fed. J. Cntr., Reference Manual on Scientific Evidence 432 (3d ed.

21   2011)); *see also Magnetar*, 801 F.3d at 1159–60 (holding that summary judgment was correctly

22   granted against a plaintiff whose only evidence of damages was an expert opinion that did not

23   "separate the damages attributable to the patent action from other possible causes of losses").

24   The problem is not, as Stiles contends, that her damages are "uncertain in respect of their

25   amount," but rather that her damages "are not the certain result of the wrong."  *Story Parchment*

26   *Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931).

27   Stiles's second obstacle is the drawing of the boundaries of the relevant market.  When a

28   plaintiff relies on indirect evidence, as Stiles does here, it is necessary to "define" the market:

1    who was competing, what were they selling, and where.  *See Am. Express*, 138 S. Ct. at 2285 &

2    n.7; *see also, e.g.*, *Rebel Oil Co., Inc. v. A. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

3    "Without a definition of the market there is no way to measure the defendant's ability to lessen or

4    destroy competition."  *Am. Express*, 138 S. Ct. at 2285 (alterations omitted) (quoting *Walker*

5    *Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)).

6         A market is "the area of effective competition."  *Id.* (quoting 2 Julian O. Kalinowski, et

7    al., Antitrust Laws and Trade Regulation § 24.01[4] (2d ed. 2017)).  It "encompasses notions of

8    geography as well as product use, quality, and description."  *Tanaka v. Univ. of S. Cal.*, 252 F.3d

9    1059, 1063 (9th Cir. 2001) (quoting *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th

10   Cir. 1988)).  Two indicators define a market's boundaries, one on the demand side and one on the

11   supply side.  First, on the demand side, is the "reasonable interchangeability of use" between a

12   product and its substitutes.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  If, all

13   else equal, people are willing to substitute one product for another when the price of one product

14   changes, they are in the same market—or, in economic parlance, if the "cross-price elasticity of

15   demand" is nonzero.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469

16   (1992).  More simply, if people "view the products as substitutes, the products are part of the

17   same market," *Rebel Oil*, 51 F.3d at 1435, even if the two goods are not perfectly fungible,

18   *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013).

19   Second, on the supply side, if producers can easily and cheaply begin supplying product X rather

20   than product Y, then those products are in the same market.  *See Rebel Oil*, 51 F.3d at 1436.

21        Market definition is easier to understand with some context.  The market for auto parts

22   offers an example of the demand-side indicator.  *See Gorlick*, 723 F.3d at 1025–26.  Suppose the

23   plaintiff argues that a particular brand of auto parts is in a market of its own.  *See id.*  On a motion

24   for summary judgment, that plaintiff can prevail if it cites evidence showing the price of the

25   branded auto part is insensitive to the prices of parts from other brands—even if the parts and

26   their prices are not identical.  *See id.*  Competition between retail gas stations in a given city

27   offers an example of the supply side indicator.  *See Rebel Oil*, 51 F.3d at 1436–37.  Some stations

28   sell gas full service:  an attendant comes to every car, checks the oil and tires, washes the

1   windows, and pumps the gas.  *See id.* at 1430.  Others offer only gas, and they sell it only to

2   people who are willing to pump it themselves and pay with cash.  *See id.*  All of these stations

3   would be in the same market if the full-service stations in the city could quickly and cheaply

4   begin offering self-service gas for cash.  *See id.* at 1436–37.  College soccer programs offer an

5   example illustrating the role of geography.  *See Tanaka*, 252 F.3d at 1063–64.  Colleges recruit

6   star high-schoolers from all over the country, and the very nature of intercollegiate sports is

7   regional competitive play among similar teams, so the recruiting market would be wider than any

8   particular school or city, even if some high schoolers have life-long dreams to play for a

9   particular college team.  *See id.* at 1063–64.

10      Here, Stiles argues the relevant market is the U.S. market for disposable styling razors

11   with blades narrower than a quarter of an inch.  *See* Opp'n Walmart at 13–14.  The only evidence

12   she cites to support that claim is the report and deposition testimony of her retained expert,

13   Donald R. House, Ph.D.  *See id.* (citing House Rep., Alioto Decl. Ex. 18, ECF No. 524-2, and

14   House Dep. Excerpts, Alioto Decl. Ex. 19, ECF No. 524-2); *see also* Merryman Decl. Ex. 229,

15   ECF No. 460-2 (reproducing further deposition excerpts).  His report and opinions, however, do

16   not establish the existence of a triable question of fact on the relevant questions—demand,

17   supply, or geography.

18      On the demand side, House does not offer opinions about several potential substitutes that

19   could likely accomplish the "detailed" or "precise" removal of hair, which is the alleged purpose

20   of the Stiles Razor, *see* Fourth Am. Compl. ¶ 1.  He performed no analysis, for example, of

21   consumer preferences for disposable razors as compared to tweezers, waxing strips, eyebrow

22   razors, bikini razors, or depilatories.  *See* House Dep. at 88–89, 96–97, 111–12.  Nor did he report

23   the results of any investigation into consumers' preferences for wider or narrower blades.  He

24   compared only "standard disposable razors" and "personal electric razors."  *See* House Rep at 5;

25   House Dep. at 99–100.  House's opinions about those razors also rest on vague assertions about

26   what is "understood" and "expected."  *See* House Rep. at 5.  He received no data and considered

27   none.  House Dep. at 90.  House could not and did not measure the cross-price elasticity of

28   demand.  *See id.*  And in his deposition, he testified only that he was "aware"—from unspecified

1   sources—that people "generally are not persuaded" to substitute an electric razor for a disposable

2   razor.  *Id.*  House guessed that if he had reviewed the data, he might have discovered "maybe a

3   five percent change[] in price."  *See id.*

4          House's opinions also contradict undisputed demand-side evidence.  As summarized

5   above, the relevant antitrust market includes all reasonably interchangeable products, even if they

6   are not perfectly fungible.  *See Gorlick*, 723 F.3d at 1025.  Contrary to the conclusions reached by

7   House, the record before the court on summary judgment shows that many sellers and products

8   competed with Stiles to satisfy the demand for products that could achieve precise hair removal.

9   For example, before she filed her complaint in this action, Stiles created a spreadsheet of

10  "competition razors," listing several dozen products.  *See* Suppl. Merryman Decl. & Ex. 247,

11  ECF Nos. 518-1 & 518-2.[3]  She also created a business plan that described her "target

12  population" as "the entire shaving market," because people were "already using wide blades" for

13  the purposes she would market the Stiles Razor.  *See* Stiles Razor Company Business Plan at 2–3,

14  Merryman Ex. 70, ECF No. 458-3.  She identified Gillette, Schick, Wilkinson & Sword, and BIC

15  as her "competitors" in that market.  *Id.* at 4, 8.  Stiles acknowledged her competitors' razors

16  shared a "concept" with hers.  *See* Email from Sharidan Stiles to Don Ryan (Sept. 8, 2009),

17  Merryman Decl. Ex. 86, ECF No. 458-6.  She also pitched her razor to Walmart as a substitute for

18  "the current eyebrow shavers," which were already in stores.  Ltr. from Sharidan Stiles (May 4,

19  2004), Merryman Decl. Ex. 19, ECF No. 458-1.  A proposed package for the Stiles Razor

20  advertised it as a replacement for "tweezing and waxing."  *See* Merryman Ex. 33 at 4, ECF No.

21  458-2.  Other documents in the record do the same.  *See, e.g.*, Stiles Razor Event Profile,

22  Merryman Ex. 75, ECF No. 458-4.

23         Nor does House address evidence about the supply side of the relevant market.  Again, he

24  considered only the differences between disposable and electric razor production.  *See* House

25  Rep. at 5.  Rather than facts, data, and analysis, House offers only the assertion that the

26  "production of disposable styling razors and electric styling razors [is] vastly different."  *Id.*  He

27  ───────────────────

28  [3]  Walmart's unopposed motion to supplement the record with this document, ECF No. 518, will
    be granted.

1    does not explain why producers of other disposable razors could not mimic the Stiles Razor as

2    Walmart and American allegedly did, or as Stiles claimed that several others had already done in

3    2009.  *See supra* Sept. 8, 2009 Email.

4        House's opinions with respect to geography are also lacking.  They are derivative of his

5    opinions regarding competitors.  He would testify that because "there were no competing

6    products" for the Stiles Razor, and because the Stiles Razor was sold only in the United States,

7    the United States was the relevant geographic market.  *See* House Rep. at 5.  These premises have

8    no support in fact, as described above.

9        A jury could not rely on House's opinions at trial.  "Expert testimony is useful as a guide

10   to interpreting market facts, but it is not a substitute for them."  *Brooke Grp. Ltd. v. Brown &*

11   *Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).  Expert opinions can defeat a motion for

12   summary judgment only when the reports or affidavits underlying those opinions explain their

13   factual basis.  *See Rebel Oil*, 51 F.3d at 1435.  House's report does not do that.  As summarized

14   above, he makes claims about what information is "understood" and "expected," and he offers

15   guesses about what the data might have proven if he had obtained and analyzed it.  He does not

16   account for shifts in production on the supply side.  That deficiency alone renders his opinions

17   unreasonable.  *See Rebel Oil*, 51 F.3d at 1436.

18       In addition, although inferences are drawn in favor of the nonmoving party at summary

19   judgment, "antitrust law limits the range of plausible inferences" a court can draw, and a party

20   cannot prevail if the "factual context" renders its economic theories implausible.  *Matsushita*, 475

21   U.S. at 587–88.  Similarly, if "undisputed facts about the structure of the market" render an

22   expert's theories "economically unreasonable," that expert's opinion could not support a jury

23   verdict in the plaintiff's favor.  *Rebel Oil*, 51 F.3d at 1435–36.  When, as here, the undisputed

24   evidence *contradicts* an expert's opinions, no trial is necessary to determine what weight to give

25   those opinions; judgment may be granted as a matter of law.  *See Brooke Grp.*, 509 U.S. at 242.

26       In sum, Stiles's evidence could not "sustain a jury verdict on the issue of market

27   definition," and therefore "summary judgment is appropriate."  *Rebel Oil*, 51 F.3d at 1435.  But

28   even if Stiles had produced evidence upon which a reasonable jury could define the market as she

1   proposes, another shortfall would remain.  Stiles would be required to prove at trial that Walmart

2   and American "actually injured competition" within the relevant market.  *Gorlick*, 723 F.3d at

3   1025.  Stiles has not cited any evidence before the court on summary judgment that would permit

4   her to do so.

5          Although the elimination of an economic rival reduces the number of competitors in the

6   market, that reduction does not necessarily offend the Sherman Act.  *Rebel Oil*, 51 F.3d at 1433.

7   Consumers fare best when scarce resources are "allocated to their best use."  *Id.*  So the death of

8   one competitor might be evidence of a competitive *success*.  *See, e.g.*, *United States v. Aluminum*

9   *Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) (Hand, J.) ("The successful competitor, having been

10  urged to compete, must not be turned upon when he wins.").  The Ninth Circuit and district courts

11  within this Circuit have thus often reiterated that "the elimination of a single competitor, standing

12  alone, does not prove anti-competitive effect."  *Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir.

13  1992) (emphasis omitted) (quoting *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir.

14  1979)).[4]  The exclusion must harm the broader "competitive process."  *Cascade Health Sols. v.*

15  *PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008).

16         Walmart has carried its initial burden at summary judgment to negate this element of

17  Stiles's claim.  *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102

18  (9th Cir. 2000).  It is undisputed that competition in this arena was fierce even after Stiles was

19  allegedly excluded.  Many sellers and producers competed for business from shoppers looking for

20  products to help with detailed or precise hair removal.  For example, a Revlon executive with

21  many years' experience in the consumer products industry, including at Walmart, testified at her

22  deposition that hair removal products from several brands were competing for consumer dollars

23  after Walmart allegedly conspired to exclude Stiles.  Day Dep. at 78–79, Merryman Decl. Ex.

24  _____

25  [4] *See also Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989);
    *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988); *Rutman Wine Co. v. E. & J.*

26  *Gallo Winery*, 829 F.2d 729, 734 (9th Cir. 1987); *Wahoo Int'l, Inc v. Phix Dr., Inc.*, No. 13-cv-
    1395-GPC-BLM, 2015 WL 11237667, at *5 (S.D. Cal. Feb. 19, 2015); *GSI Tech. v. United*

27  *Memories, Inc.*, No. 15-cv-1081-PSG, 2014 WL 1572358, at *3 (N.D. Cal. Apr. 18, 2014);
    *AFMS, LLC v. United Parcel Serv. Co.*, No. 10-cv-05830-MMM-AJW, 2011 WL 13128436, at

28  *16 (C.D. Cal. Nov. 23, 2011).

219, ECF No. 460-1.  The same executive agreed the market was fiercely competitive and innovative—and that Stiles was not innovating.  *See id.* at 80–82.  Walmart's records establish that it sold competing razors from several other brands after Stiles was allegedly excluded.  *See* Merryman Decl. Exs. 13–18, 165, 185, ECF Nos. 458-1, 550-5, 550-6, 550-7, 553-1, 553-2.  Other retailers sold competing products as well.  *See id.* Exs. 9, 17, ECF No. 550-4, 550-7.  An executive from American would also testify at trial that many suppliers sell "small-headed razors and small side-shaving razors for detailed shaving applications" to U.S. retailers.  *See* Cooper Decl. ¶ 5, ECF No. 457-4; *see also* Def.'s Stmt. Facts ¶¶ 21, 23, ECF No. 461 (collecting further evidence of the same points).  In addition, Stiles sold her razors through other channels after Walmart terminated their relationship.  *See* Pls.' Resp. Walmart Stmt. Facts No. 22.

Because Stiles would bear the burden at trial to prove that competition suffered, and because Walmart has carried its initial burden at summary judgment, Stiles can prevail only if she is able to cite "particular parts of materials in the record" to prove that some factual dispute may be resolved in her favor.  *See* Fed. R. Civ. P. 56(c)(1).  She has not done so.  Nor does House, the economic expert, opine that competition actually suffered.  He concluded only that Stiles's exclusion was "consistent with" harm to competition.  House Rep. at 5, 13.

Stiles argues instead that her exclusion from the market is evidence enough.  *See, e.g.*, Opp'n Walmart at 18 (arguing the alleged "conspiracy between Walmart and [American] . . . unlawfully restrained trade by eliminating Stiles from the market").  As summarized above, the Ninth Circuit has held otherwise and this district court cannot disregard that holding.  The exclusion of one competitor is evidence of "antitrust injury" only if it is emblematic of some broader effect on the market, such as the exclusion of an "entire class" of suppliers.  *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001).  Stiles cannot prove that is so.

The two decisions Stiles relies upon in her opposition to the pending motion do not show otherwise.  In the first, *Poller v. Columbia Broadcasting System, Inc.*, the operator of a defunct local ultra-high-frequency television station alleged that CBS (the national broadcaster) had conspired to exclude it from the local market.  *See* 368 U.S. 464, 465–67 (1962).  The Supreme

17

1    Court held that summary judgment had been improperly granted.  *Id.* at 467.  The evidence could

2    have permitted a jury to find that CBS had successfully enacted a plan to stem the growth of all

3    ultra-high-frequency stations rather than exercising benign contractual rights without ill will.  *See*

4    *id.* at 468–73.  The evidence could have permitted a jury to find that CBS had invested in a

5    competing frequency standard and had planned for stations using that alternative standard to

6    dominate.  *See id.* at 472.  Here, by contrast, Stiles offers no evidence on summary judgment of

7    broad-based exclusions or plans for market-wide domination.  Her evidence would not permit a

8    reasonable jury even to define the relevant market in the way she proposes.

9          The second case Stiles relies upon is *Klor's, Inc., v. Broadway-Hale Stores*, 359 U.S. 207

10   (1959).  *See* Opp'n Walmart at 17 n.38.  *Klor's* was a case of a "group boycott," that is,

11   "concerted refusals by traders to deal with other traders," as opposed to "a single trader refusing

12   to deal with another."  359 U.S. at 212.  The plaintiff in *Klor's* had alleged "a wide combination"

13   against it among "manufacturers, distributors and a retailer."  *Id.*  This type of combination, the

14   Court explained, "clearly" has a "monopolistic tendency" by its very nature.  *Id.*  Stiles has

15   presented no similar evidence here of combinations with naturally monopolistic tendencies.  She

16   merely has alleged that one retailer and one supplier acted against her, and the undisputed

17   evidence on summary judgment shows the market for similar razors remained competitive.

18         Accordingly, Walmart's motion for summary judgment in its favor as to plaintiff's claims

19   one and two will be granted.  The court need not and does not reach Walmart's remaining

20   arguments.  *See* Walmart Mot. §§ III.B, D, E, H.  Because the reasoning above applies equally to

21   the claims brought against both Walmart and American, summary judgment will be granted as to

22   plaintiff's claims one and two in favor of American as well.  Summary judgment as to plaintiff's

23   antitrust claims also moots the pending motion for reconsideration at ECF No. 193, which is

24   accordingly denied.

25   **B.    Design Patent (Claim 3)**

26         In her next claim, Stiles alleges Walmart and American infringed her design patent.  *See*

27   Fourth Am. Compl. at 33–34.  As summarized above, she has withdrawn that claim for one of the

28   allegedly infringing razors (the Precision Shaper), but not the other (the Micro Razor).  *See*

1  American Mot. at 12–13.  In light of its withdrawal, plaintiff's design patent claim with regard to

2  the Precision Shaper will be dismissed.  The remainder of this section of this order addresses only

3  the Micro Razor.

4          "An infringement analysis entails two steps."  *Markman v. Westview Instruments, Inc.*, 52

5  F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  "The first step is

6  determining the meaning and scope of the patent claims" in dispute, i.e., claim construction.  *Id.*

7  This "is an issue for the judge."  517 U.S. at 391; *see also Lanard Toys Ltd. v. Dolgencorp LLC*,

8  958 F.3d 1337, 1341 (Fed. Cir. 2020) (outlining these steps in the context of design patents).  For

9  design patents, claim construction is typically an exercise in comparing pictures.  *Crocs, Inc. v.*

10  *Int'l Trade Comm'n*, 598 F.3d 1294, 1302–03 (Fed. Cir. 2010).  "Words cannot easily describe

11  ornamental designs."  *Sport Dimension, Inc. v. Coleman Co., Inc.*, 820 F.3d 1316, 1320 (Fed. Cir.

12  2016).  Verbal claim constructions also risk undue emphasis on "particular features" rather than

13  "the design as a whole."  *Id.*  But because design patents protect only "the novel, ornamental

14  features of the patented design," the court may identify and factor out any "functional" aspects of

15  the design.  *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997); *see also*

16  *Sport Dimension*, 820 F.3d at 1320; *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365,

17  1372 (Fed. Cir. 2006).  Moreover, unlike other parts of claim construction for design patents, the

18  distinction between ornamental and functional features "may benefit from verbal or written

19  guidance."  *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015).

20          The second step of the infringement analysis is a comparison between the accused and

21  patented designs.  *See Lanard*, 958 F.3d at 1341.  For design patents, the comparison is from the

22  perspective of an "ordinary observer," not an expert.  *Gorham Co. v. White*, 81 U.S. 511, 526,

23  528 (1871).  The plaintiff must prove that "an ordinary observer, familiar with the prior art

24  designs, would be deceived into believing that the accused product is the same as the patented

25  design."  *Crocs, Inc.*, 598 F.3d at 1303.  Ornamental features are not compared "in isolation."

26  *Lanard*, 958 F.3d at 1337.  "Minor differences" do not "prevent a finding of infringement."

27  *Crocs, Inc.*, 598 F.3d at 1303 (quoting *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d

28  985, 991 (Fed. Cir. 1993)).  The test instead compares "similarities in overall designs."  *Id.*

1   (quoting *Ethicon Endo-Surgery, Inc.*, 796 F.3d at 1335).  A side-by-side comparison is usually

2   best.  *See, e.g.*, *Crocs, Inc.*, 598 F.3d at 1304.  Although the fact-finder, not the judge, makes the

3   comparison in this second step, a district court may grant summary judgment as to

4   noninfringement if "the accused design could not reasonably be viewed as so similar to the

5   claimed design that a purchaser familiar with the prior art would be deceived by the similarity

6   between the claimed and accused designs, inducing him to purchase one supposing it to be the

7   other."  *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670 (Fed. Cir. 2008) (en banc)

8   (citation and quotation marks omitted).  The Federal Circuit has often affirmed such orders.  *See,*

9   *e.g.*, *Lanard*, 958 F.3d at 1347; *Design Ethicon*, 796 F.3d at 1315; *Egyptian Goddess*, 543 F.3d at

10  683; *OddzOn*, 122 F.3d at 1407.

11      Here, Stiles's design patent claims the "ornamental design for a personal styling razor" as

12  depicted in four figures:



Design Patent figs. 1–4.

At the first step, claim construction, several functional features of this design must be

factored out.  The razor's narrow head is functional. It allows detailed or precise shaving.  The

handle is also set at an angle from the shaving head and is long enough to allow for a comfortable

shaving position, so the handle angle and length are functional.  The razor's design also includes

1   a gripping surface for a secure hold and precise control, another functional feature.  Some of these

2   features are in fact claimed in Stiles's related utility patent, *see* Utility Patent claims 1 and 11, and

3   "concomitant utility patents" can offer "useful guidance" in deciding whether a design is

4   functional, *Ethicon*, 796 F.3d at 1331 (quotation marks omitted) (quoting *Berry Sterling Corp. v.*

5   *Pescor Plastics, Inc.*, 122 F.3d 1452, 1455 (Fed .Cir. 1997)).

6           The design includes at least four ornamental aspects.  Two are prominent.  First, the

7   gripping surface is cylindrical or tubular, and it has a constant radius along the handle's axis.

8   That radius is always wider than the handle itself.  Second, the end of the razor opposite the

9   shaving head is flat, not rounded.  These features contribute to the design's overall minimalistic

10  and angular appearance.

11          Turning then to the second step, a side-by-side comparison of the two designs shows they

12  are dissimilar overall (Stiles on the left; American on the right):



21

1   *See* Design Patent figs. 1–4; Page Decl. ¶ 8, ECF No. 473-1; Evid. App'x Ex. 39, ECF No. 473-2.

2           Although the two designs share functional elements—a narrow shaving head, a handle set

3   at an angle from the shaving head, and a gripping surface—their designs differ on the whole.  The

4   two prominent ornamental features described above illustrate why that is the case.  First, the grip:

5   in the American design, the grip is much wider than the handle, but in only one dimension, and

6   the bulge has a diamond-like shape.  In the Stiles design, by contrast, the grip is a cylinder with a

7   constant radius, as described above.  The American grip is also contoured and textured, whereas

8   the Stiles grip is angular and smooth.  Second, the end of the handle:  the American design is

9   rounded; the Stiles design is flat.  Overall, these and other features give the American razor a

10   flowing, contoured look and the Stiles Razor an angular, minimalistic look.  Differences like

11   these have led district courts to grant summary judgment of non-infringement, and these orders

12   have survived appellate challenges.  *See, e.g.*, *Lanard Toys Ltd. v. Toys "R" Us-Delaware, Inc.*,

13   No. 15-849, 2019 WL 1304290, at *15–18 (M.D. Fla. Mar. 21, 2019), *aff'd*, *Lanard*, 958 F.3d

14   1337 (distinguishing a "slender and elongated" design from a "thicker, more stunted" design);

15   *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, No. 11-0871, 2014 WL 10212172, at *10–13 (S.D.

16   Ohio Jan. 22, 2014), *aff'd in relevant part*, 796 F.3d 1312 (distinguishing the "overall contoured

17   shape" of one design to the "overall linear shape" of the other).

18           The differences described above are subject to no factual disputes.  That is true despite

19   Stiles's claims that differences are harder to see when the razors are still in their packaging.  *See*

20   Opp'n American at 8–9.  If this case went to trial, a jury would not compare the razors in their

21   packages or even the razors themselves.  The correct comparison is between the accused and

22   claimed *designs*.  *Lanard*, 958 F.3d at 1344.  But in any event, the differences described above

23   are plain even when the razors are still in their packaging:

24   /////

25   /////

26   /////

27   /////

28   /////

22




*See* Fourth Am. Compl. at 3–4.

Similarly, Stiles objects to any comparisons between the black and white sketches from her design patent figures with a full-color photograph of the American razor. *See, e.g.*, Pls.' Resp. American Stmt. Facts Nos. 3–6, ECF No. 521. They are, she says, "very different images of the two products," implying that differences in color and image quality might distract from the razors' similarities. *See id.* But such comparisons are common and proper. *See, e.g.*, *Lanard*, 958 F.3d at 1340. The court has also relied on none of the color and quality differences about which Stiles protests. Nor do the opinions of Stiles's retained expert, Matthew Marzynski, necessitate a trial. Rather, he agrees the razors' handles have different designs. *See* Marzynski Rep. at 21–22, Alioto Ex. 1, ECF No. 519-2.

Finally, Stiles's arguments about a conspiracy with "the Chinese" do not prove infringement. *See* Opp'n American at 9. At most, this evidence might establish that American wanted its razor to work as well as the Stiles Razor. It would not show that an ordinary observer might mistake one of those razors for the other, and that is the relevant test. *See Egyptian Goddess*, 543 F.3d at 670.

Accordingly, American's motion for summary judgment on plaintiff's design patent claim with regard to the Micro Razor will be granted. In addition, although only American moves for summary judgment in its favor as to this claim, the law and evidence are the same for Stiles's
/////

23

1  design claims brought against Walmart as well, and therefore the court will grant summary

2  judgment as to claim three in favor of both defendants.

3  **C.     Utility Patent (Claim 4)**

4         American also moves for summary judgment in its favor as to Stiles's utility patent

5  claims.  The court will first address plaintiff's claims related to the Precision Shaper.

6         1.     Precision Shaper

7         American argues that the Precision Shaper does not infringe the utility patent.  That patent

8  has two independent claims, both for a "personal shaving razor for shaving unwanted hair from a

9  body surface."  *See* Utility Patent 10:10–25, 11:5–12:11.  The first independent claim describes a

10 razor comprising "a handle portion" and "a head portion attached to said handle portion."  *Id.* at

11 10:12–13.  The head portion in turn as comprised of "a razor blade having two corner portions

12 and a straight cutting edge portion."  *Id.* at 10:13–15.  That "straight cutting edge portion" extends

13 "beyond all other parts of said head portion along said straight cutting edge portion by about 0.02

14 inch."  *Id.* at 10:18–20.  The "head portion and blade are less than or equal to ¼ inch wide."  *Id.* at

15 10:24–25.  The patent's eleventh claim is the only other independent claim.  Among other

16 limitations, the eleventh claim includes similar limitations to the first:  a "head portion" and

17 "straight cutting edge portion . . . extending beyond all other parts of said head portion along said

18 straight cutting edge portion by about 0.02 inch . . . wherein said head portion and blade are less

19 than or equal to about ¼ inch wide . . . ."  *Id.* at 11:5–12:10.

20        A device infringes a utility patent "literally" if "every limitation recited in the claim is

21 found in the accused device."  *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1341

22 (Fed. Cir. 2016).  To determine whether the accused device literally infringes at the summary-

23 judgment stage, the court follows the two-step process described in the previous section of this

24 order:  first construing the claims and second comparing those claims to the elements of the

25 accused device.  *See Markman*, 52 F.3d at 976; *accord, e.g.*, *Telemac Cellular Corp. v. Topp*

26 *Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).

27        At the first step, American takes the position that no construction is necessary here.  It

28 assumes the utility patent's independent claims can be understood as having their "plain and

1 ordinary meaning." *See* American Mot. at 18 & n.1. Stiles responds that claim construction is a

2 "necessary prerequisite to determining patent infringement." *See* Opp'n American at 11. Stiles is

3 incorrect in this regard. Claim construction "is not an obligatory exercise." *U.S. Surgical Corp.*

4 *v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Stiles has identified no claims in need of

5 construction, so there is no "actual dispute" regarding the scope of the patent's claims, and no

6 construction is necessary in this case. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*

7 *Ltd.*, 521 F.3d 1351, 1360, 1362 (Fed. Cir. 2008). The patent's terms have their "ordinary and

8 customary meaning," i.e., the meaning each word "would have to a person of ordinary skill in the

9 art." *Id.* at 1360.

10       Accordingly, the court moves to the second step: comparing the claimed and accused

11 products. As noted above, this "is a question of fact." *V-Formation, Inc. v. Benetton Group SpA*,

12 401 F.3d 1307, 1310 (Fed. Cir. 2005). For that reason, the court may grant summary judgment

13 only if "no reasonable jury" could agree based upon the evidence presented that American's razor

14 contains every limitation in the patent's independent claims. *See id.* In more practical terms, if

15 American proves beyond dispute that any limitation does *not* appear in its razor, then it is entitled

16 to summary judgment that the razor does not literally infringe. *See Telemac*, 247 F.3d at 1330.

17       American has carried that burden. Its razor does not satisfy the limitations in the patent's

18 independent claims. First, the cutting head of American's razor includes a safety guard that

19 extends beyond the blade edge. *See* Metcalf Rep. at 3, 12–16, Evid. App'x Ex. 24, ECF No. 473-

20 1. Both independent claims in Stiles's utility patent, by contrast, include a limitation that the

21 razor's "straight cutting edge portion" must extend "beyond all other parts of said head portion

22 along said straight cutting edge portion by about 0.02 inch." Utility Patent at 10:18–20, 11:5–

23 12:10. Second, the shaving head of the American razor is about one half inch wide. *See* Metcalf

24 Rep. at 4, 12. The blade itself is 0.4 inches wide. *See id.* at 13. By contrast, both independent

25 claims in Stiles's utility patent include a limitation that the razor's shaving head must be no wider

26 than 0.25 inches. *See* Utility Patent at 10:24–25, 11:5–12:10. Because the American razor does

27 not satisfy these limitations, no reasonable jury could conclude that it literally infringes the utility

28 patent.

1   Stiles concedes that her patent includes the limitations described above.  *See* Pls.'s Resp.

2   American Stmt. Facts Nos. 22–23.  She cites no evidence before the court on summary judgment

3   that could show American's razor satisfies those limitations.  *See id*. Nos. 24–26, 35–36.  She

4   instead objects to the admissibility of the evidence American would rely upon at trial to prove the

5   dimensions of its razor:  the opinions of Stephen Metcalf and photographs and measurements by

6   Stephen P. Hines.  *See* American Stmt. Undisp. Fact Nos. 24–26, 35–36.  Metcalf has a degree in

7   mechanical engineering and worked in consumer product design and development for Gillette.

8   *See* Metcalf Rep. at 1, 5–6.  His experience includes several years' work with intellectual

9   property related to razors.  *See id.*  Hines has a bachelor's degree in industrial design and several

10   decades of experience in photography, engineering, and optical technology.  *See* Hines Decl.

11   ¶¶ 1–8, Evid. App'x Ex. 24, ECF No. 473-1.  Hines took photographs of the Stiles and American

12   razors and found their dimensions using instruments capable of measurements accurate to the

13   hundredth or thousandth of an inch.  *See id.* ¶ 9.  He describes his methods in a sworn declaration,

14   to which are attached his photographs and measurements.  *See id.*  Metcalf interpreted Hines's

15   photographs and measurements.  *See* Metcalf Rep. at 3–4.  At trial, Metcalf would testify that in

16   his experience, the American razor does not fit the description of the utility patent.  *See id.*

17   Stiles offers no reason to doubt Metcalf's and Hines's methods, data, or opinions.  She

18   also has presented no evidence raising a doubt about the accuracy or authenticity of Hines's

19   photographs and measurements.  Metcalf's and Hines's testimony and opinions are admissible

20   evidence.  Hines has personal knowledge of his own measurements and photographs and could

21   offer lay opinion about them.  *See* Fed. R. Evid. 602, 701.  He could also offer expert testimony

22   given his qualifications and experience with optical technology.  *See* Fed. R. Evid. 702.  Metcalf

23   is qualified by his experience to offer opinions about the photographs, the parts of the razors they

24   depict, and the differences between American's razor and the limitations in the utility patent from

25   the perspective of a person having ordinary skill in the art.  *See* Fed. R. Evid. 702–703, 704(a);

26   *see also Snellman v. Ricoh Co., Ltd.*, 862 F.2d 283, 287 (Fed. Cir. 1988) ("[E]xpert testimony is

27   admissible . . . to give an opinion on the ultimate question of infringement.").

28   /////

1    Stiles contends summary judgment in favor of American cannot be granted based on

2 Metcalf's interpretation of Hines's photographs because that interpretation is inadmissible

3 hearsay.  *See* Pls.' Resp. American Stmt. Facts Nos. 24–26, 35–36.  This objection would be

4 moot if Hines testified at trial as he has declared under penalty of perjury.  In any event, experts

5 may rely on "facts or data in the case that the expert has been made aware of or personally

6 observed." Fed. R. Evid. 703.  These facts or data need not be admissible if experts in the field

7 "would reasonably rely on those kinds of facts or data in forming an opinion on the subject." *Id.*

8 A jury may even consider that otherwise inadmissible data when its probative value substantially

9 outweighs any risk of unfair prejudice.  *See id.*  Stiles does not argue the photographs and

10 measurements before the court on summary judgment would be unfairly prejudicial; there is no

11 reason to believe they would be.  Her objection to that evidence will therefore be overruled.

12    Stiles also urges the court to deny summary judgment so that she can cross-examine

13 Metcalf.  *See* Pls.' Resp. American Stmt. Facts Nos. 24–26, 35–36.  A plaintiff's desire to cross-

14 examine a witness does not provide a basis upon which to deny summary judgment. *See, e.g.*,

15 *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983).  Stiles protests

16 similarly that Metcalf was not deposed in this action.  *See* Pls.' Resp. American Stmt. Facts Nos.

17 24–26, 35–36.  But discovery is closed in this case, and Stiles does not explain why she did not

18 depose Metcalf or how she was unjustly prevented from doing so.  The court declines to reopen

19 discovery for that purpose.  Stiles has neither shown "good cause" to amend the court's

20 scheduling order, *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)

21 (citing Fed. R. Civ. P. 16(b)), nor explained what information she hopes to obtain from Metcalf,

22 *see Fam. Home and Fin. Ctr., Inc. v. Fed. Home Loan Mort'g Corp.*, 525 F.3d 822, 827 (9th Cir.

23 2008) (citing Fed. R. Civ. P. 56(d)[5]).  In sum, the evidence before the court on summary judgment

24 is undisputed, and it establishes that no reasonably jury could find that American's razor literally

25 infringes the utility patent.

26 /////

27 
_____

28 [5]  At the time *Family Home* was decided, the relevant rule was found in subsection (f).  *See* Fed.
R. Civ. P. 56, Advisory Committee Comments to 2010 Amendment.

1        The absence of literal infringement is not necessarily the end of the utility patent claim.

2   "If patents were always interpreted by their literal terms, their value would be greatly

3   diminished."  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 731

4   (2002).  "Unimportant and insubstantial substitutes for certain elements could defeat the patent,

5   and its value to inventors could be destroyed by simple acts of copying."  *Id.*  For that reason, "a

6   product or process that does not literally infringe upon the express terms of a patent claim may

7   nonetheless be found to infringe if there is 'equivalence' between the elements of the accused

8   product or process and the claimed elements of the patented invention."  *Warner-Jenkinson Co. v.*

9   *Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997).  The test for equivalence can be expressed in

10  more than one way, but "the particular linguistic framework used is less important than whether

11  the test is probative of the essential inquiry:  does the accused product or process contain

12  elements identical or equivalent to each claimed element of the patented invention?"  *Id.* at 40.

13  The comparison must be element by element, limitation by limitation.  *See id.*

14       Because the doctrine of equivalents compares individual elements with individual

15  limitations, a plaintiff cannot defeat a motion for summary judgment with arguments or evidence

16  about overall similarity.  *See Network Com., Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed.

17  Cir. 2005) (citing *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567

18  (Fed. Cir. 1996)).  Summary judgment may be granted if the plaintiff does not "provide

19  particularized testimony and linking argument on a limitation-by-limitation basis that create[s] a

20  genuine issue of material fact."  *AquaTex Indus., Inc. v. Techniche Sol'ns*, 479 F.3d 1320, 1328–

21  29 (Fed. Cir. 2007).  Stiles has presented no such evidence here.  She argues only that the

22  American razor "performs substantially the same function" as the razor disclosed in her utility

23  patent.  Opp'n American at 12–13.  A jury could not find in her favor on this claim at trial based

24  upon the evidence presented on summary judgment.

25       Several limiting principles also restrict the reach of the doctrine of equivalents, and one of

26  these limits, the public dedication rule, is fatal to Stiles's claim of equivalence.  The public

27  dedication rule draws on "the fundamental principle" that claims, not specifications, define the

28  scope of patent protection.  *Johnson & Johnson Assocs. Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d

1    1046, 1052 (Fed. Cir. 2002) (en banc).  As a result, "when a patent drafter discloses but declines

2    to claim subject matter," the unclaimed subject matter is "dedicated" to the public.  *Id.* at 1054.

3    This rule prevents patentees from claiming an invention narrowly but later arguing in an

4    infringement suit "that the doctrine of equivalents should permit a finding of infringement

5    because the specification discloses the equivalents."  *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098,

6    1107 (Fed. Cir. 1996).  Application of the public dedication rule is a question of law.  *See Toro*

7    *Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1331 (Fed. Cir. 2004).

8          Here, Stiles claimed a razor with a "head portion and blade . . . less than or equal to ¼

9    inch wide."  Utility Patent at 10:24–25, 12:7–8.  But the specification discloses many other

10   potential widths:

11            Unlike prior razors, the present razors are specifically designed to
              enable the user to shave unwanted hair close to the skin with great
12            precision and detail. . . .  Certain embodiments are able to
              accomplish such effects because the size of the razor blades and/or
13            razor head are very small in comparison to conventional razor
              blades and because the handle allows for greater control of the razor
14            blade.  In some embodiments, the blade and/or the combined width
              of the blade and head portion of the razor is 1 inch, $^1/_2$ inch, $^3/_8$ inch,
15            $^1/_4$ inch, $^1/_8$ inch or any size or range of sizes in between any of
              these sizes.
16

17   *Id.* at 3:30–33.  Stiles therefore cannot argue now that the doctrine of equivalents permits her to

18   claim blades and shaving heads wider than ¼ inch.  As explained above, it is undisputed that the

19   head and blade of American's razor are wider than ¼ inch; they fall within the range disclosed in

20   the specification, but not in the independent claims.  *See* Metcalf Rep. at 4, 12, 13.  Thus,

21   American is entitled to summary judgment on Stiles's utility claim.  *See, e.g.*, *Johnson &*

22   *Johnson*, 285 F.3d at 1055 (holding that the patentee could not extend a claim for aluminum

23   circuit board substrates to sheets of steel or nickel alloy under the doctrine of equivalents just

24   because the specification disclosed steel and nickel alloys).

25         Stiles does not contend otherwise.  *See* Opp'n American at 12–13.  She argues instead that

26   "it is commonly necessary to design a head/blade assembly that is wider than [the] effective

27   width" of the blade itself.  *Id.* at 12.  This argument contradicts the unambiguous language of the

28   patent's independent claims.  *See* Utility Patent at 10:24–25, 12:7–8 (claiming a "head portion"—

1    not an "effective width"—of "less than or equal to ¼ inch wide").  If anything, her argument

2    *confirms* that a person having ordinary skill in the art would understand her patent as disclosing,

3    but not claiming, a head assembly of the size American employed.  *See Toro*, 383 F.3d at 1334

4    (affirming summary judgment of noninfringement based on the public disclosure rule because a

5    person having ordinary skill in the art would have understood the specification to disclose the

6    accused element).

7         Accordingly, American's motion for summary judgment as to Stiles's fourth claim with

8    regard to the Precision Shaper will also be granted.  Again, because the reasoning above applies

9    equally to the utility claims against both defendants, summary judgment will be granted on this

10   claim in favor of defendant Walmart as well.

11        2.    Micro Razor

12        American argues that Stiles cannot obtain damages for any infringement claims related to

13   the Micro Razor because American did not sell the Micro Razor during the term of the utility

14   patent.  American Mot. at 21–22.  "Generally, patent owners may only collect damages for patent

15   infringement that takes place during the term of the patent."  *Rosebud LMS Inc. v. Adobe Sys.*

16   *Inc.*, 812 F.3d 1070, 1073 (Fed. Cir. 2016).  Congress has created a "narrow exception to that

17   rule."  *Id.*  A patent owner can recover a "reasonable royalty" from anyone who "makes, uses,

18   offers for sale, or sells" an invention that is claimed in a published patent application during the

19   time the application is pending.  *See* 35 U.S.C.§ 154(d)(1).  The invention claimed in the

20   published application must be "substantially identical" to the invention claimed in the patent, *id.*

21   § 154(d)(2), and the "reasonable royalty" is available only if the infringer "had actual notice of

22   the published patent application," *id.* § 154(d)(1)(B).  Constructive notice is not enough, but the

23   applicant need not prove it took some "affirmative act" to give notice.  *Rosebud*, 812 F.3d

24   at 1074.

25        The person claiming damages under § 154(d) has the burden of presenting evidence

26   satisfying these requirements.  *See id.* at 1075.  For that reason, an alleged infringer is entitled to

27   summary judgment of a claim for damages if a plaintiff does not cite evidence a jury could rely

28   on to find (1) the defendant had actual notice of the application and (2) the invention claimed in

1    the application is substantially identical to the invention claimed in the issued patent.  *See id.*

2    (affirming summary judgment as to a damages claim on this basis).

3           Stiles does not dispute that American sold the Micro Razor only before the utility patent

4    was issued, not after.  She relies on § 154(d) to support her claim for damages, but she has not

5    cited evidence before the court on summary judgment that a jury could rely on to find that she

6    satisfied the requirements of that section.

7           First, Stiles could not prove at trial that the razor claimed in her application is

8    substantially identical to the razor claimed in the utility patent.  She concedes the application

9    claims a different razor; she argues only that the differences are "minor."  Opp'n American Mot.

10   at 16.  They are not.  Among other changes, the utility patent adds two limitations:  (1) that the

11   razor must not obstruct "any portion" of the "cutting edge" and (2) that the cutting edge must

12   extend "beyond all other parts" of the razor head.  *See* Pl.'s Resp. American Stmt. Facts Nos. 44–

13   48 (conceding these claims were changed).

14          Second, Stiles has not come forward with any evidence that a jury could rely on to find

15   American had actual notice of her application.  She relies on an expert report that discusses

16   similarities between the Stiles Razor and a prototype razor developed by American.  *See* Pls.'

17   Stmt. Add'l Facts No. 24, ECF No. 522 (citing Alioto Decl. Ex. 1, ECF No. 519-2, and Alioto

18   Decl. Ex. 11, ECF No. 547); *see also* Email from D. Mason (Sept. 18, 2006), Page Decl. Ex. 67,

19   ECF No. 554.[6]  This evidence cannot prove American's actual knowledge.  The prototype was

20   developed in 2006.  Stiles filed her utility patent application in 2007.  A prototype developed in

21   2006 cannot prove actual knowledge of an application not filed by Stiles until 2007.

22          American's motion for summary judgment will therefore be granted in part with respect to

23   Stiles's claims for damages related to the Micro Razor.  Because the reasoning above again

24   applies equally to the utility claims against both defendants, partial summary judgment will

25   granted in favor of American and Walmart with regard to Stiles' claims for damages related to the

26   ────────────────

27   [6]  The same document appears to have been filed with the court twice by mistake, at ECF Nos.
     554 and 555, where American intended to file two separate documents.  American will be
     directed to correct this error by filing a notice of *errata* along with the mistakenly omitted
28   document within seven days of the date of this order.

1   Micro Razor.  It is therefore unnecessary to determine whether the utility patent is enforceable or

2   valid.  *See* Clarification, ECF No. 542 ("If the Court determines that Plaintiffs are not entitled to

3   pre-issuance damages, American does not believe that a determination of unenforceability or

4   invalidity is necessary.").

5   **D.      False Advertising and False Association (Claim 6)**

6           Stiles also asserts trademark and false advertising claims against Walmart (but not

7   American) under the Lanham Act.  *See* Fourth Am. Compl. at 36–37.  The Lanham Act creates a

8   private right of action against anyone who uses a "false or misleading description of fact" that is

9   either "likely to cause confusion" about an "affiliation, connection, or association" with another

10  person or that "misrepresents the nature, characteristics, qualities, or geographic origin of his or

11  her or another person's goods."  15 U.S.C. § 1125(a)(1).  "Section 1125(a) thus creates two

12  distinct bases of liability: false association and false advertising."  *Lexmark Int'l, Inc. v. Static*

13  *Control Components, Inc.*, 572 U.S. 118, 122 (2014) (citations omitted).  Stiles originally asserted

14  both types of claims here, *see* Fourth Am. Compl. ¶¶ 182, 184–85 (false association); *id.* ¶ 183

15  (false advertising), but confirmed at the hearing on the pending motions that she has withdrawn

16  her false association claim, *see* Hr'g Tr. at 39–40, ECF No. 558.

17          To prevail on a false advertising claim, Stiles must prove the following elements at trial:

18  (1) Walmart made a false statement in a commercial advertisement that was either (a) "literally

19  false" or (b) true but misleading; (2) the statement "actually deceived or has the tendency to

20  deceive a substantial segment of its audience"; (3) "the deception is material," i.e., "it is likely to

21  influence the purchasing decision"; (4) Walmart "caused its false statement to enter interstate

22  commerce"; and (5) Stiles "has been or is likely to be injured as a result."  *Southland Sod Farms*

23  *v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

24          Stiles alleges Walmart showed her razor on its website even after Walmart terminated

25  their relationship.  *See* Fourth Am. Compl. ¶ 183.  According to her complaint, the website stated

26  that the razor was "out of stock."  *Id.*  This was misleading, she alleges, because it allowed

27  Walmart to market its own razors to people who had come to the website looking for the Stiles

28  Razor.  *See id.*  As explained in a previous court order, however, that theory of liability is not

32

1    viable absent evidence showing "that the statement actually conveyed the implied misleading

2    message" and "deceived a significant number of people."  Findings & Recommendations, ECF

3    No. 39, *adopted by* Order (Feb. 22, 2016), ECF No. 45 (citing *William H. Morris Co. v. Grp. W.,*

4    *Inc.*, 66 F.3d 255 (9th Cir. 1995)).  Stiles cites no such evidence here.  Rather, she cites only her

5    allegations.  *See* Pls.' Resp. Walmart Stmt. Facts ¶ 26, ECF No. 525.  "[A] party opposing a

6    properly supported motion for summary judgment may not rest upon mere allegation or denials of

7    his pleading."  *Anderson*, 477 U.S. at 256.

8           These allegations would also be insufficient even if supported by evidence.  Stiles alleges

9    only that people have said they were frustrated not to find her razors in Walmart stores.  She does

10    not allege that anyone mentioned misleading messages appearing on Walmart's website.  *See*

11    Fourth Am. Compl. ¶ 75; *cf.* Opp'n Walmart at 20 (citing no evidence); Pls.' Resp. Walmart

12    Stmt. Facts ¶ 26, ECF No. 525 (same).

13           Accordingly, Walmart's motion for summary judgment on Stiles's false advertising claim

14    will be granted.

15    **E.**    **Economic Interference (Claim 7)**

16           Stiles's final claim is for "intentional interference with prospective economic advantage."

17    *See* Fourth Am. Compl. at 37–38.  She alleges American undermined her relationship with

18    Walmart by "agreeing to create, manufacture, and distribute a knock off" of her razor.  *Id.* ¶ 131.

19           American argues this claim is untimely under the applicable statute of limitations.  *See*

20    American Mot. at 26.  A statute of limitations creates an affirmative defense.  *See Cal. Sansome*

21    *Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir.1995).  It is a defendant's burden to plead and

22    prove an affirmative defense at trial, *see id.*, so a defendant moving for summary judgment on the

23    basis of an affirmative defense must establish that based upon the evidence presented any

24    "reasonable jury" would find in its favor on that defense, *Snell v. Bell Helicopter Textron, Inc.*,

25    107 F.3d 744, 746 (1997).  For limitations-period defenses, a defendant must show that no jury

26    could reasonably conclude the claim was timely.  *See Wolf v. Travolta*, 167 F. Supp. 3d 1077,

27    1092 (C.D. Cal. 2016).

28    /////

1    The limitations period for the claim here—intentional interference with prospective

2    economic advantage—is two years.  *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788,

3    810 (9th Cir. 2007) (citing Cal. Code Civ. Proc. § 339).  Stiles first asserted that claim in an

4    amended complaint she filed in March 2015.  *See* First. Am. Compl. at 29–30, ECF No. 16.  But

5    the amendment focused on the same events alleged in her original complaint, which she filed on

6    September 25, 2014.  *See generally* Compl., ECF No. 1.  Her intentional interference claim thus

7    "relates back" to that date.  *See* Fed. R. Civ. P. 15(c)(1)(B) ("An amendment to a pleading relates

8    back to the date of the original pleading when . . . the amendment asserts a claim or defense that

9    arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the

10    original pleading . . . ."); *ASARCO, LLC v. Union P. R. Co.*, 765 F.3d 999, 1005 (9th Cir. 2014)

11    ("So long as a party is notified of litigation concerning a particular transaction or occurrence, that

12    party has been given all the notice that Rule 15(c) requires.").  Stiles's claim could be timely,

13    then, if it accrued no more than two years before September 25, 2014.

14    A claim normally accrues when the plaintiff discovers or "has reason to discover" it.  *Fox*

15    *v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005).  Plaintiffs have "reason to discover" a

16    claim when they have reason "at least to suspect a factual basis" for its "elements."  *Id.* (quoting

17    *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999)).  "Elements," in this context, means

18    "wrongdoing, causation, and harm," not the specific legal elements of a claim.  *Id.*  What did the

19    plaintiffs know?  When did they know it?  Should they have suspected that someone had done

20    something to cause them harm?  *See Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111 (1988).

21    These rules do not permit prospective plaintiffs to sit on their rights.  For example,

22    litigants may not excuse their late claims by arguing they did know who exactly was to blame for

23    their injury.  *See Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 932 (1994).  Plaintiffs must

24    also "conduct a reasonable investigation after becoming aware of an injury."  *Fox*, 35 Cal. 4th at

25    808.  California law assumes plaintiffs know "the information that would have been revealed by

26    such an investigation."  *Id.*

27    Together, these rules and dates set up a straightforward question:  could a reasonable jury

28    decide on this record that Stiles did not know or suspect—and cannot reasonably be charged with

knowing or suspecting—until September 25, 2012 that someone had interfered with her relationship with Walmart?  The answer is yes.  Walmart told Stiles it had decided to end their business relationship in May 2012, but it blamed poor sales, not a new razor, *see* Pls.' Resp. American Stmt. Facts Nos. 139, 147, ECF No. 521.  A jury could reasonably conclude that Stiles did not yet suspect Walmart had plans to replace her razor with its own.  A few months later, in August 2012, Walmart had decided to sell American's alleged copycat razor in its stores in 2013, but no evidence suggests Stiles knew about or could have known about that decision in 2012.  *See* Email (Aug. 10, 2012), Ex. 25, ECF No. 473-1; Davis Dep. at 229–32, ECF No. 473-1.  Finally, no evidence before the court on summary judgment shows the alleged copycat razors appeared on Walmart's shelves ahead of their planned 2013 release.  According to Walmart, American's razors hit the shelves in Spring 2013.  *See* Walmart Reply at 5 (citing Merryman Decl. Ex. 26 at 4).  Thus, no evidence suggests Stiles could have seen American's razors in Walmart in 2012.  A jury could therefore conclude that in 2012, Stiles had no reason to suspect that American or any other company had stepped between her and Walmart.  If a jury reached that conclusion, then her complaint, which was filed in 2014, was timely.  For this reason, American is not entitled to summary judgment in its favor as to its affirmative defense based on the applicable statute of limitations.

American also argues that Stiles can prove neither that it was the instigator of her quarrel with Walmart nor that American's actions were wrongful.  The first problem in addressing that argument is the ambiguity of the allegations of Stiles's complaint.  Although she describes her interference claim as one for intentional interference with a prospective relationship, her opposition to the pending motion describes the relationship as concurrent with the interference.  *See, e.g.*, Opp'n American at 17 (referring to her "existing contractual relationship with Walmart").  The difference is meaningful, most importantly because the two claims impose different pleading and evidentiary requirements on those who assert them.  *See Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392 (1995); *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*, 52 Cal. App. 4th 867, 879–80 (1997).

/////

1    To the extent Stiles intends to pursue a claim based on an existing relationship, she must

2    prove both that she had a "valid contract" with Walmart and that this contract was breached or

3    disrupted.  *See P. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

4    Walmart had several "Supplier Agreements" with Stiles over the years.  *See* Merryman Decl.

5    ¶¶ 98–102 & Exs. 100–104, ECF No. 550-13.  One of these agreements was in place in 2012

6    when Walmart told her it would no longer stock her razors in its stores.  *See* Letter from Carmen

7    Bauza to Sharidan Stiles (May 30, 2012), Evid. App'x Ex. 33, ECF No. 555.  That agreement was

8    effective from September 2011 to September 2012.  Merryman Decl. Ex. 104 at 1, 6, ECF

9    No. 550-13.  No evidence on summary judgment shows that Walmart agreed to buy razors from

10   plaintiff after September 2012.  Its "Termination of Business Relationship" letter in fact shows

11   that it intended to honor its purchasing commitments under that agreement.  *See* Letter from

12   Carmen Bauza to Sharidan Stiles (May 30, 2012), Evid. App'x Ex. 33, ECF No. 555 ("To ensure

13   a smooth transition for both parties, Walmart will continue to purchase, under the terms of our

14   Supplier Agreement, products from Stiles Razor through December 1, 2012.").  Nor does Stiles

15   allege or argue Walmart breached the contract.  Therefore, to the extent plaintiff's economic

16   interference claim is based on an existing contract, American's motion for summary judgment as

17   to that claim will be granted.

18   For a claim based on a prospective relationship, Stiles must prove, among other things,

19   that American "not only knowingly interfered with [her] expectancy, but engaged in conduct that

20   was wrongful by some legal measure other than the fact of interference itself."  *Della Penna*, 11

21   Cal. 4th at 393.  A few avenues of proof are unavailable to her in that regard.  She cannot rely on

22   claims of antitrust violations or patent infringement to show American's actions were wrongful.

23   As explained in sections **Error! Reference source not found.**, **Error! Reference source not**

24   **found.**, and **Error! Reference source not found.** of this order above, she cannot prevail on her

25   antitrust and patent claims.  Nor can she rely on claims that American violated the standards and

26   rules of two trade organizations by agreeing to manufacture the alleged knock-off razors.  *See*

27   Fourth Am. Compl. ¶¶ 132–39.  Although violations of industry rules can show an action was

28   wrongful, that is only so if those rules permit the imposition of sanctions for their violation or

1   allow for enforcement. *See Stevenson Real Est. Servs., Inc. v. CB Richard Ellis Real Est. Servs.,*

2   *Inc.*, 138 Cal. App. 4th 1215, 1223–24 (2006). Stiles concedes the ethical rules she has cited do

3   not include any sanctions or enforcement mechanisms. *See* Pls.' Resp. American Stmt. Facts

4   Nos. 148–49. What remains, then, is Stiles's argument that American's actions were wrongful

5   because she was unfairly driven from Walmart's stores by a competitor. *See* Opp'n American at

6   17. This claim mirrors her anticompetition claims, which are not viable. They are also within the

7   scope of California's "'competition privilege,' which protects one from liability for inducing a

8   third person not to enter into a prospective contractual relation with a business competitor.

9   *Navellier v. Sletten*, 262 F. 3d 923, 937–38 (9th Cir. 2001).

10        Thus, to the extent plaintiff's economic interference claim is based on a prospective

11   relationship, American's motion for summary judgment as to that claim will also be granted.

12                            **CONCLUSION**

13        For the reasons set forth above,

14       1.      Defendant Walmart's motion for partial summary judgment (ECF No. 457) and

15              defendant American's motion for partial summary judgment (ECF No. 473) are

16              granted, in part, as follows:

17              a.     Summary judgment is granted in favor of defendants on plaintiff's first and

18                     second claims for antitrust violations;

19              b.     Summary judgment is granted in favor of defendants on plaintiff's third

20                     claim for design patent infringement with regard to the Micro Razor;

21              c.     Summary judgment is granted in favor of defendants on plaintiff's fourth

22                     claim for utility patent infringement with regard to the Precision Shaper;

23              d.     Summary judgment is granted in favor of defendants on plaintiff's claim

24                     for damages on her fourth claim for utility patent infringement with regard

25                     to the Micro Razor;

26              e.     Summary judgment is granted in favor of defendant Walmart on plaintiff's

27                     sixth claim for false advertising; and

28              f.     Summary judgment is granted in favor of defendant American on

1  plaintiff's seventh claim for economic interference;

2  2.  Pursuant to plaintiff's withdrawal of certain claims:

3  a.  Plaintiff's fifth claim for trade dress infringement against both defendants

4  is dismissed;

5  b.  Plaintiff's third claim for design patent infringement against both

6  defendants with regard to the Precision Shaper is dismissed; and

7  c.  Plaintiff's sixth claim for false association against defendant Walmart is

8  dismissed;

9  3.  Defendants' joint motion for reconsideration (ECF No. 193) is denied as having

10  been rendered moot by this order;

11  4.  Defendant Walmart's unopposed motion to supplement the record (ECF No. 518)

12  is granted;

13  5.  Within seven (7) days from the date of entry of this order, defendant American is

14  directed to review its duplicate filings (ECF Nos. 554 and 555) and correct the

15  mistaken duplication by filing a notice of errata and filing whichever document

16  was mistakenly omitted (*see* footnote 5 above);

17  6.  The court now sets this case for a Final Pretrial Conference on **April 4, 2023 at**

18  **1:30 p.m.** before District Judge Dale A. Drozd by Zoom;

19  a.  The parties shall refer to Judge Drozd's Standing Order (Doc. No. 585) for

20  Zoom appearance information;

21  b.  As provided in the Standing Order, the parties shall meet and confer and

22  file a joint pretrial statement **at least seven (7) days** before the date set for

23  the final pretrial conference; and

24  7.  The court also sets this case for a jury trial on **June 5, 2023 at 9:00 a.m.** before

25  District Judge Dale A. Drozd in Courtroom 4.

26  IT IS SO ORDERED.

27  Dated:  __November 7, 2022__

28  _____
UNITED STATES DISTRICT JUDGE